## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* [PARTY X] | ) ) ) | |
| Plaintiff/Relator, | ) ) | |
| -v- | ) ) | **SEALED COMPLAINT** |
| [PARTY Y] | ) ) | |
| Defendants. | ) | |

## FILED UNDER SEAL

## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

|  |  |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* JOHN DOE | ) ) ) |
| and | ) ) |
| THE STATE OF CALIFORNIA, THE STATE OF COLORADO, THE STATE OF CONNECTICUT, THE STATE OF DELAWARE, THE DISTRICT OF COLUMBIA, THE STATE OF FLORIDA, THE STATE OF GEORGIA, THE STATE OF HAWAII, THE STATE OF ILLINOIS, THE STATE OF INDIANA, THE STATE OF IOWA, THE STATE OF LOUISIANA MEDICAL ASSISTANCE PROGRAMS, THE STATE OF MARYLAND, THE COMMONWEALTH OF MASSACHUSETTS, THE STATE OF MICHIGAN, THE STATE OF MINNESOTA, THE STATE OF MONTANA, THE STATE OF NEVADA, THE STATE OF NEW HAMPSHIRE, THE STATE OF NEW JERSEY, THE STATE OF NEW MEXICO, THE STATE OF NEW YORK, THE STATE OF NORTH CAROLINA, THE STATE OF OKLAHOMA, THE STATE OF RHODE ISLAND, THE STATE OF TENNESSEE, THE STATE OF TEXAS, THE COMMONWEALTH OF VIRGINIA, THE STATE OF WASHINGTON, AND THE STATE OF WISCONSIN, *ex rel.* JOHN DOE | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Relator/Qui Tam Plaintiff, | ) ) |
| -v- | ) ) ) |
| TANGO MERGER SUB 2 LLC as successor by merger to FOREST LABORATORIES, LLC f/k/a FOREST LABORATORIES, INC. | ) ) ) ) |

Case No. _____

(Judge _____)

COMPLAINT AND JURY DEMAND

TO BE FILED UNDER SEAL

DO NOT SERVE

**and**                                            )

)

**FOREST PHARMACEUTICALS, INC.**    )

)

**Defendants**                               )

# TABLE OF CONTENTS

Page

EXECUTIVE SUMMARY ..................................................................................... i

    Forest Paid Two Rebates For One Drug .......................................................... i

    The Rebate Statute Requires Reporting Both Rebates .................................. ii

    Forest Knew It Was Required To Report Both Rebates ................................ iii

    The Damages Exceed $680 Million ............................................................. iv

INTRODUCTION ................................................................................................... 1

NATURE OF ACTION ........................................................................................... 5

JURISDICTION AND VENUE .............................................................................. 5-6

THE PARTIES ........................................................................................................ 6

LEGAL FRAMEWORK ........................................................................................ 7

    The Medicaid Program .................................................................................. 7

    Drug Reimbursement Under Medicaid ......................................................... 9

    Medicaid Reimbursement Formulas ............................................................ 9

    The Medicaid Drug Rebate Program ........................................................... 10

FACTUAL ALLEGATIONS ................................................................................. 13

    Forest's Program of Providing Rebates to Commercial Private Insurance Companies .... 15

    Forest's Program of Providing Rebates to Pharmacy Providers/Group Purchasing
    Organizations (GPOs) ................................................................................... 16

    Forest Intentionally Failed to Report Both Rebates in Calculating Best Price ......... 17

    Forest Not Only Knew It Was Violating Best Price Reporting, but It Knowingly Chose
    Not to Apply Its "DNA" Audit Process to This Situation ............................ 20

    Damages ......................................................................................................... 21

        Fiscal Year 2005 ...................................................................................... 21

        Fiscal Year 2006 ...................................................................................... 24

Fiscal Year 2007 ............................................................................................ 26

Fiscal Year 2008 ............................................................................................ 28

Fiscal Year 2009 ............................................................................................ 30

Fiscal Year 2010 ............................................................................................ 32

Fiscal Year 2011 ............................................................................................ 36

Fiscal Year 2012 ............................................................................................ 40

Fiscal Year 2013 ............................................................................................ 45

Fiscal Year 2014 ............................................................................................ 51

COUNTS I-IV (Violations of Federal False Claims Act) ........................... 58-60

COUNTS V-CXXVIII (Violations of State False Claims Acts) ................... 60-154

PRAYER FOR RELIEF .................................................................................. 155

REQUEST FOR TRIAL BY JURY ................................................................ 155

## EXECUTIVE SUMMARY

Forest Laboratories and its predecessor Forest Pharmaceuticals (collectively "Forest") is a leading manufacturer of pharmaceutical drugs in the United States. Forest has failed to properly report and pay to the States and federal government more than $680 million, as required by the Medicaid Drug Rebate Statute. Under this statute, a drug manufacturer must enter into a Rebate Agreement with the Secretary of HHS and report on a quarterly basis its Best Price for each drug.

The Relator, a former manager for Forest, has specific and personal knowledge of the fraud scheme whereby Forest paid two sets of rebates for the same drug that was supplied to a single end user, but only reported one of the two rebates. The willful failure to properly report both rebates is a violation of the federal and State False Claims Act (FCA). In support of the allegations, the Relator is providing the governments with three key pieces of information. First, the Relator is providing the factual bases establishing that Forest paid multiple rebates for the same drug. Second, the Relator is providing the legal bases establishing that there was a duty for Forest to report these multiple rebates. Third, the Relator is providing evidence that Forest had the necessary scienter to be held liable under the FCA.

### Forest Paid Two Rebates For One Drug

With respect to the factual bases, the Relator has evidence that Forest paid rebates to two separate customers on the same dispensed drug units provided to the same patient. A list of the drugs and details of the rebates are stated in full detail later in this Complaint. In a nutshell, here is how it worked: A patient in a transitional, rehabilitation, group home, short term stay or long term care facility ("Pharmacy Provider Facility") might need a certain type of drug sold by Forest. To incentivize both the Pharmacy Provider and insurance company to prescribe or pay for a drug made by Forest, it paid a rebate to both the Pharmacy Provider and insurance company

i

for such drug used by a single patient.  For instance, Forest would pay a Pharmacy Provider a 20% rebate for Drug X, and also pay a 20% rebate to a private insurance company, such as Humana, for the same drug prescribed to a single patient.  Thus, Forest paid a 40% rebate for the drug, yet only reported to the government one of the two rebates.  The Relator has spreadsheets and data to support the factual allegations that multiple rebates have been paid and has calculated that the underpaid rebates exceed $680 million.

### The Rebate Statute Requires Reporting Both Rebates

With respect to whether Forest had a legal duty to report both sets of rebates, the Medicaid Rebate Statute provides that Best Price "is defined as the lowest price available from the manufacturer during the rebate period to any wholesaler, retailer, provider, health maintenance organization, nonprofit entity, or governmental entity within the United States, and is inclusive of all cash discounts, free goods that are contingent on any purchase requirement, volume discounts, and rebates."  42 U.S.C. § 1396r-8(c)(1)(C)(i), (ii).  The statute and regulations clearly provide that the Best Price is the net price of all rebates or other arrangements that adjust the price and consists of the lowest price available to a single patient.  Specifically, the Best Price Regulations set forth in 42 C.F.R. § 447.505(a) (2007) provide, in relevant part, that "Best price means, with respect to a single source drug or innovator multiple source drug of a manufacturer (including any drug sold under an NDA approved under section 505(c) of the FFDCA), the *lowest price available from the manufacturer* during the rebate period to any entity in the United States . . . ." *Id.* (emphasis added).  The same regulation provides that "[b]est price shall be calculated to include *all sales and associated rebates*, discounts and other price concessions provided by the manufacturer to any entity unless the sale, discount, or other price concession is specifically excluded by statute or regulation or is provided to an entity specifically

excluded by statute or regulation from the rebate calculation." *Id.* (emphasis added).   The regulations further clarify Best Price by stating that:

> Best price shall be net of cash discounts, free goods that are contingent on any purchase requirement, volume discounts, customary prompt pay discounts, chargebacks, returns, incentives, promotional fees, administrative fees, service fees (except bona fide service fees), distribution fees, and *any other discounts or price reductions and rebates*, other than rebates under section 1927 of the Act, *which reduce the price available from the manufacturer. . . . The manufacturer must adjust the best price for a rebate period if cumulative discounts, rebates, or other arrangements subsequently adjust the prices available from the manufacturer.*

42 C.F.R. § 447.505(e) (2007) (emphasis added).

In addition, the notice and comments issued in 2007 during the amendment of the Best Price Regulations pursuant to the Deficit Reduction Act further demonstrate that the determination of Best Price is focused on the manufacturer and the price received on a single drug unit. *See* 72 F.R. 39142-01, at *39149 (2007). "Because best price represents the *lowest price available from the manufacturer* to any entity with respect to a single source drug or innovator multiple source drug of a manufacturer, including an authorized generic, *any price concession associated with that sale should be netted out of the price received by the manufacturer in calculating best price . . . .*") *See id.* (emphasis added).   Therefore, the multiple rebates paid to two entities for a single drug dispensed to a single patient are included in the Best Price calculation.

### Forest Knew It Was Required To Report Both Rebates

With respect to Forest's knowledge that it was required to take into account multiple rebates paid to two entities, Forest has internally recognized that such multiple rebates would set a Best Price. In fact, Forest hired an outside company to address this issue. In 2008, top level managers at Forest held meetings and prepared reports focusing on the fact that two rebates were occasionally claimed or paid on the same drug being dispensed to a single patient. For example,

a patient might have both primary and secondary private medical insurance.  If both the primary insurer and the secondary insurer each paid a portion of that patient's drug expense, specifically his or her pharmaceutical drug treatment, then each could potentially seek a rebate on the same drug disbursements, thereby creating a double rebate on the same dispersed drug.  Aware of their potential Best Price violation based upon double rebate claims from its customers, Forest implemented a data audit process for all rebate claims submitted to Forest by customers in the Commercial market, specifically private insurance companies.  Forest contracted with Data Niche & Associates ("DNA") to develop this data scrubbing process in which it identified both sets of rebates paid to two entities for a drug dispensed to a single patient.  In short, the program would identify instances where two rebates were available to two entities.  The solution was for Forest to identify claims for two rebates for a single dispensed drug and then only pay a rebate to one of the two entities, and thereby not set a new Best Price because only one rebate would be paid.  In other words, Forest did not automatically pay the rebates to both companies, but required them to submit the rebate data that enabled Forest to identify specific patients and instances where two rebates were being claimed by two entities for the same drug for the same patient.  The solution was that Forest would pay the first entity that claimed a rebate and not pay a rebate to the second entity.  Forest included in its contracts with these entities a clause providing that Forest would only pay one company when there are two entities claiming a rebate for the same drug to a single patient.  Thus, Forest recognized that paying two rebates to two entities would be part of the Best Price calculation.

### The Damages Exceed $680 Million

However, Forest elected not to include the same contract clause or DNA data scrubbing protocols with respect to certain favored customers.  Rather, Forest chose to allow two entities to claim rebates for the same drug supplied to a single patient.  Specifically, in the area of

Pharmacy Provider Facilities, Forest opted to pay a rebate to the Pharmacy Provider and to the private insurance company, such as Humana. Unlike other sectors, Forest did not pay only one rebate, but paid both rebates to the two entities. However, Forest did not report to the government that it paid two rebates, but based its Best Price calculations on only one of the two rebates. We have calculated the true Best Price based upon both rebates and the resulting difference exceeds $680 million.

While rebates paid pertaining to Medicaid and Medicare Part D patients within a Pharmacy Provider Facility are exempt from Best Price calculations, the Relator is not alleging that there was a Best Price violation relating to Medicaid and Medicare Part D recipients. Simply because the majority of patients in a Pharmacy Provider Facility are Medicaid and Medicare Part D recipients does not mean that all rebates paid to a Pharmacy Provider are exempt from Best Price. It is widely known that at least 15% of patients at a Pharmacy Provider Facility are private insurance patients and not exempt from Best Price.

For instance, if Forest gave a 40% discount to a Pharmacy Provider for every pill dispensed to every patient, it is true that any such discount would be exempt for the Medicaid and Medicare Part D recipients, but the rebates for the non-Medicaid/Medicare Part D patients would still count in the Best Price calculations. Because the Pharmacy Providers were favored customers with large volumes and were instrumental in making choices as far as what pills its pharmacies would carry, Forest did not require it to back out from the rebates the non-Medicaid/Medicare Part D recipients. Similarly, because Humana was a favored customer, it did not make Humana back out from rebates sales to patients at Pharmacy Provider Facilities. Thus, the Rebate Statute required Forest to give Medicaid these same favored true net Best Prices for commercial patients at Pharmacy Provider Facilities.

## INTRODUCTION

This is an action by *qui tam* Relator John Doe ("Relator"), through the undersigned counsel, made on behalf of himself and the United States of America ("United States") and the State of California, the State of Colorado, the State of Connecticut, the State of Delaware, the District of Columbia, the State of Florida, the State of Georgia, the State of Florida, the State of Georgia, the State of Hawaii, the State of Illinois, the State of Indiana, the State of Iowa, the State of Louisiana Medical Assistance Programs, the State of Maryland, the Commonwealth of Massachusetts, the State of Michigan, the State of Minnesota, the State of Montana, the State of Nevada, the State of New Hampshire, the State of New Jersey, the State of New Mexico, the State of New York, the State of North Carolina, the State of Oklahoma, the State of Rhode Island, the State of Tennessee, the State of Texas, the Commonwealth of Virginia, the State of Washington, and the State of Wisconsin (collectively, the "States") to recover damages and penalties arising from the fraudulent conduct of Defendant Tango Merger Sub 2 LLC as successor by merger to Forest Laboratories, LLC f/k/a Forest Laboratories, Inc. and Defendant Forest Pharmaceuticals, Inc. (collectively, "Defendants" or "Forest") for using, making, presenting or causing to present false statements and claims to the government in violation of the False Claims Act, 31 U.S.C. § 3729 *et. seq.* and applicable state law.

Forest was a leading manufacturer of pharmaceutical drugs in the United States for the past decade. After being acquired by Actavis in 2014, the combined company is now one of the world's fastest growing specialty pharmaceutical companies with expected annual revenues of more than $15 billion. In its FY2014, Forest had net sales in excess of $3.5 billion.[1]

To incentivize the purchase of its drugs, Forest pays commercial private insurers, Pharmacy Providers and Group Purchasing Organizations ("GPOs") rebates and other discounts

---

[1] Forest's fiscal year ends on March 31 of the same calendar year, *e.g.* FY2014 ended on March 31, 2014.

on disbursements of Forest drugs. Forest knows such rebates and other discounts given on the same single drug unit must be counted towards that drug unit's Best Price ("Best Price") when reporting Best Price to the federal government. Forest's executives, compliance department, and sale personnel monitor and track rebates and other discounts in all commercial sales activity; in fact, Forest contracted with Data Niche & Associates ("DNA") in 2008 to develop a data scrubbing process to specifically identify double rebates or rebates paid to two customers for the same pill to a patient on the Commercial side of Forest's business.   Forest used the DNA process to address double rebate situations and avoid Best Price reporting violations.

Forest also provides rebates and other discounts to Pharmacy Providers and GPOs who operate in long term care, rehabilitation, group home, short term stay and transitional facilities around the country – a huge growth area for business in recent years. It is not disputed that drugs sold to Medicaid or Medicare Part D recipients are exempt from Best Price reporting. Forest, however, has actual knowledge that the Pharmacy Providers and GPOs are dispensing pharmaceutical drugs to patients at Pharmacy Provider Facilities who are not Medicaid or Medicare Part D recipients and patients that are covered by commercial private insurance companies. Consequently, a private insurance company will submit a rebate claim to Forest on the same drug disbursement to the same patient for which a Pharmacy Provider or GPO has also submitted a rebate claim. This creates a double rebate for the same drug disbursement to a single non-exempt patient, which must be included in the Best Price calculation.

Forest, however, does not account for the double rebates and other discounts given to the Pharmacy Providers and GPOs at Pharmacy Provider Facilities for the treatment of commercial, non-Medicare/Medicaid patients in its Best Price analysis. Forest executives and compliance department do not accurately report Best Price to the Secretary with respect to the rebates and other discounts given to Pharmacy Providers and GPOs at Pharmacy Provider Facilities, even

though Forest knows that there are two rebates – one to the Pharmacy Provider or GPO and one to the commercial private insurer. In fact, Forest deliberately chooses not to institute the DNA process on the Pharmacy Provider/GPO side to: (a) avoid express recognition of the double rebate and Best Price problem; (b) avoid harming its relationships with major Pharmacy Provider/GPO drug purchasers and Pharmacy Provider Facilities; and (c) preserve shareholder profits. There is nothing wrong with paying two rebates, provided that both rebates are included in the Best Price calculation. In order to protect its market share and market growth with Pharmacy Provider Facilities, Forest has chosen to pay double rebates and also chose not to account for those double rebates when it reports Best Price – even though the double rebates, when properly accounted for in a majority of Best Price or DNA analyses, would result in a Best Price violation.

This conduct has been ongoing and consistent since at least 2005 and involved multiple pharmaceutical drugs. By relator's calculations, with knowledge of the double discounts and Best Price reported for multiple pharmaceutical drugs over the 2005-14 timeframe, Forest has cheated the Medicaid Drug Rebate Program of over $680 Million:

| DRUG | FISCAL YEAR | BEST PRICE VIOLATION AND CALCULATED OVERPAYMENT |
|---|---|---|
| Celexa | | $15.54 Million |
| Lexapro | 2005 | $48 Million |
| Namenda | | $3.29 Million |
| Celexa | | $0.19 Million |
| Lexapro | 2006 | $72 Million |
| Namenda | | $5.03 Million |
| Lexapro | 2007 | $84 Million |
| Namenda | | $6.53 Million |
| Lexapro | | $82.44 Million |
| Namenda | 2008 | $9.87 Million |
| Bystolic | | $0.17 Million |
| Lexapro | | $82.80 Million |
| Namenda | 2009 | $12.24 Million |
| Bystolic | | $1.86 Million |

| Drug | Year | Amount |
|---|---|---|
| Lexapro | 2010 | $81.72 Million |
| Namenda | | $12.10 Million |
| Bystolic | | $4.81 Million |
| Savella | | $0.65 Million |
| Daliresp | | $0.05 Million |
| Lexapro | 2011 | $54.74 Million |
| Namenda | | $2.47 Million |
| Bystolic | | $3.96 Million |
| Savella | | $0.43 Million |
| Viibryd | | $0.17 Million |
| Lexapro | 2012 | $62.58 Million |
| Namenda | | $5.46 Million |
| Bystolic | | $3.64 Million |
| Savella | | $0.48 Million |
| Viibryd | | $0.21 Million |
| Tudorza | | $0.17 Million |
| Linzess | | $0.62 Million |
| Namenda | 2013 | $2.85 Million |
| Bystolic | | $4.78 Million |
| Savella | | $0.50 Million |
| Viibryd | | $0.62 Million |
| Fetzima | | $0.13 Million |
| Tudorza | | $0.16 Million |
| Daliresp | | $0.10 Million |
| Linzess | | $0.25 Million |
| Namenda | 2014 | $7.35 Million |
| Namenda XR | | $0.93 Million |
| Bystolic | | $5.55 Million |
| Savella | | $0.47 Million |
| Viibryd | | $1.99 Million |
| Fetzima | | $0.12 Million |
| Tudorza | | $0.78 Million |
| Linzess | | $1.84 Million |
| **TOTAL** | | **$686.64 Million** |

The Medicaid Drug Rebate Program was designed to ensure that Medicaid would receive the benefit of the same discounts and prices on drugs that other large public and private drug purchasers enjoy. The false reporting of Best Price has resulted in Forest paying lower Medicaid rebates than it would have paid had it reported accurate Best Price. As a result of the unlawful lower rebate payments, Medicaid has paid substantially more for drugs than it should have.

Under the terms of the False Claims Act, this Complaint is to be filed in camera and under seal and is to remain under seal for a period of at least sixty days and shall not be served on the Defendants until the Court so orders. The Government may elect to intervene and proceed with the action within the sixty day time frame, or within any extensions of that initial sixty day period granted by the Court for good cause shown, after it receives both the Complaint and the Material Evidence submitted to it.

For his cause of action, the Relator alleges as follows:

## NATURE OF ACTION

1.      This is an action to recover treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-3733.

2.      Under the False Claims Act, a private person may bring an action in federal district court for herself and for the United States, and may share in any recovery. 31 U.S.C.§ 3730(b). That private person is known as a "Relator" and the action that the Relator brings is called a *qui tam* action.

## JURISDICTION

3.      This Court has subject matter jurisdiction to adjudicate this action under 28 U.S.C. §§ 1331 and 1345 and under 31 U.S.C. § 3732(a).

4.      The Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) because at least one of the Defendants transacts and has transacted business in this District.

## VENUE

5.      Venue is proper in this District under 31 U.S.C. § 3732 and 28 U.S.C. § 1391(b) and (c) because at least one of the Defendants resides and/or transacts business in this District.

## PARTIES

6.      The Relator brings this action on behalf of the United States, including its agency, the Department of Health and Human Services ("HHS") and its component, the Centers for Medicare & Medicaid Services ("CMS," formerly the Health Care Financing Administration ("HCFA")), and all other government healthcare programs.

7.      The Relator also brings this action on behalf of the State of California, the State of Colorado, the State of Connecticut, the State of Delaware, the District of Columbia, the State of Florida, the State of Georgia, the State of Florida, the State of Georgia, the State of Hawaii, the State of Illinois, the State of Indiana, the State of Iowa, the State of Louisiana Medical Assistance Programs, the State of Maryland, the Commonwealth of Massachusetts, the State of Michigan, the State of Minnesota, the State of Montana, the State of Nevada, the State of New Hampshire, the State of New Jersey, the State of New Mexico, the State of New York, the State of North Carolina, the State of Oklahoma, the State of Rhode Island, the State of Tennessee, the State of Texas, the Commonwealth of Virginia, the State of Washington, and the State of Wisconsin. They are collectively referred to as the "States" and include all counterpart agencies to the federal agencies referenced above.

8.      The Relator also brings this action on behalf of himself, as permitted under the False Claims Act. Relator John Doe is a citizen of the United States and a resident of the United States. Relator has direct and independent knowledge, within the meaning of 31 U.S.C. § 3730(e)(4)(B), of the information on which the allegations set forth in this Complaint are based. Relator is the original source of these allegations as defined in 31 U.S.C. § 3730(e)(4)(B). Relator has knowledge of the false claims and records that Defendants have knowingly or with deliberate ignorance or with reckless disregard, falsely and fraudulently submitted to the federal government as alleged herein.

9.    Defendant Tango Merger Sub 2 LLC as successor by merger to Forest Laboratories, LLC f/k/a Forest Laboratories, Inc. ("Tango") is a limited liability company organized under the laws of Delaware with its principal place of business located at 909 Third Avenue, New York, New York 10022.  As a successor by merger, Tango is responsible for all claims against Forest.  Tango is an indirect wholly-owned subsidiary of Actavis plc, a publicly traded pharmaceutical company (NYSE:ACT) incorporated under the laws of Ireland and headquartered in Dublin, Ireland, with its domestic principal place of business located at 400 Interpace Parkway, Parsippany, NJ 07054.

10.    Defendant Forest Pharmaceuticals, Inc. ("Forest Pharma") is a corporation organized under the laws of Delaware with its principal place of business located at 13600 Shoreline Drive, St. Louis, MO 63045, and is a wholly-owned subsidiary of Tango.  Forest Pharma is responsible for the manufacture, sale, and distribution of Forest-branded prescription drug product in the United States.  Collectively, Defendants Tango and Forest Pharma are referred to herein as "Forest" or "Defendants."

11.    At all times material to this Complaint, Forest has participated in the Medicaid Drug Rebate Program.

## LEGAL FRAMEWORK

### The Medicaid Program

12.    Medicaid is a joint federal-state program that pays for health care services, including prescription drug coverage, for low-income individuals, including pregnant women, children, and parents and other caretaker relatives, as well as elderly and disabled individuals. As a result of the Affordable Care Act ("ACA"), each state has the option to expand eligibility for Medicaid beginning in calendar year 2014 to all nonelderly adults with income below 138 percent of the federal poverty guidelines.

13.     State Medicaid programs must comply with the minimum requirements set forth in the federal Medicaid statute to qualify for federal funding. 42 U.S.C. § 1396a. The federal government's share of each state's Medicaid spending, known as the Federal Medical Assistance Percentage ("FMAP"), is based upon the state's per capita income compared to the national average. 42 U.S.C. § 1396d(b). Such share must be at least 50 percent, but no more than 83 percent, and historically has averaged about 57 percent. As part of the ACA's coverage expansion beginning in calendar year 2014, the federal government will pay all of the costs of covering newly eligible enrollees. From 2017 to 2020, the federal share for newly eligible enrollee coverage will decline gradually to 90 percent and remain at that percentage thereafter.

14.     The Medicaid programs of all states reimburse for prescription drugs. Most states contract with private companies for the evaluation and processing of claims submitted by providers for reimbursement under the Medicaid program. Generally speaking, a provider will submit claims for reimbursement electronically to the private company, which will then process the claims, and either pay the claims on behalf of the state or provide the necessary information to the state to enable the state to pay the claims. On a quarterly basis, each state will submit a claim to the HHS for payment of the federal share of the state's Medicaid spending, including prescription drug reimbursements.

15.     By participating as a pharmaceutical drug manufacturer in the Medicaid program, manufacturers and suppliers, such as Forest, are charged with actual notice and knowledge of the federal and state statutes, regulations, and rules applicable to the Medicaid program, and have consented to compliance with all such statutes, regulations, and rules, including those governing reimbursement.

**Drug Reimbursement Under Medicaid**

16.      Pursuant to the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301, *et seq.*,
pharmaceutical drug companies are required to submit to the Food and Drug Administration
("FDA") a listing of every drug product in commercial distribution.  21 U.S.C. § 355.  The FDA
assigns each drug product a unique 11-digit, 3-segment number, known as the National Drug
Code ("NDC").  The drugs at issue in this case, including all forms, whether tablet, liquid or
other forms, include Celexa, Lexapro, Namenda, Namenda XR, Bystolic, Savella, Viibryd,
Fetzima, Tudorza, Daliresp, Saphris, Linzess, Campral, Armour Thyroid, Levothroid, Thyrolar,
Tiazac and Combunox (collectively, the "Forest Drugs").

17.      Drug manufacturers, such as Forest, do not typically submit claims for
reimbursement to Medicaid.  Instead, Forest markets its drug products to its customers, who
then purchase the products either directly or through wholesalers, based on a price the
customers negotiated with Forest.  Additionally, customers also purchase drug products through
Group Purchasing Organizations ("GPOs"), which negotiate prices on behalf of Forest's
customers.

18.      Forest's customers then submit claims for payment for Forest's drug products to
Medicaid after dispensing or administering Forest's drugs.

19.      Generally, claims submitted to Medicaid by Forest's customers are processed and
tracked using the NDC for each drug.

**Medicaid Reimbursement Formulas**

20.      Drug reimbursements under each state's Medicaid program are intended to reflect
the lower of (a) the estimated acquisition cost ("EAC") of covered drugs, plus a reasonable
dispensing fee, or (b) a provider's usual and customary charges to the public.  Federal
regulations define EAC in relevant part as "the agency's best estimate of the price generally and

currently paid by providers for a drug[.]"   42 C.F.R. § 447.301.   In determining the EAC for a

covered drug, state Medicaid programs are required to develop reimbursement formulas that

must be approved by the Secretary of HHS.   42 C.F.R. §§ 447.331-333 (2005).

21.   Although specific reimbursement formulas vary from state to state, state Medicaid

programs have generally reimbursed for each drug based upon the lower of (a) EAC as

determined by the state, (b) the maximum allowable cost ("MAC") set by the state Medicaid

agency, or (c) the providers' usual and customary charge.

22.   Each state's methodology in determining EAC includes one or more of the

following:

a.   A percentage reduction from the Average Wholesale Price ("AWP");

b.   A percentage increase to the Wholesale Acquisition Cost ("WAC");
and/or

c.   The Actual Acquisition Cost ("AAC").

23.   State Medicaid programs generally rely upon the AWP and WAC provided by

pharmaceutical drug manufacturers and published in drug price publications.

24.   Pursuant to section 6001 of the Deficit Reduction Act of 2005, Pub. L. 109-171,

effective January 1, 2007, CMS provides each state with Average Manufacturer Price ("AMP")

data received from pharmaceutical drug manufacturers, including Forest, to give each state

additional drug price information.

**The Medicaid Drug Rebate Program**

25.   In 1990, Congress reviewed the prices that Medicaid was paying for prescription

drugs and determined that Medicaid routinely was paying more than other large drug purchasers

for prescription drugs, particularly for "single source drugs."  *See* H.R. Rep. No. 101-881, at 96

(1990), *reprinted in* 1990 U.S.C.C.A.N. 2017, 2108.  Congress further found that, in order to

contain skyrocketing drug costs, state Medicaid programs were denying beneficiaries' access to needed medications. *See* 136 Cong. Rec. S12954-01, *S12955 (Sept. 12, 1990). Congress concluded that "Medicaid, the means-tested entitlement program that purchases basic health care for the poor, should have the benefit of the same discounts on single source drugs that other large public and private purchasers enjoy." 1990 U.S.C.C.A.N. at 2108. Congress therefore decided to "establish a rebate mechanism in order to give Medicaid the benefit of the best price for which a manufacturer sells a prescription drug to any public or private purchaser ." *Id.*

26.   Under the Medicaid Drug Rebate Statute (42 U.S.C. § 1396r-8), each drug manufacturer must enter into a Rebate Agreement with the Secretary of HHS in order for its covered outpatient drugs to be eligible for federal payment under Medicaid. 42 U.S.C. § 1396r-8(a)(1). Under the Rebate Statute and Rebate Agreement, a manufacturer of a brand name drug, such as those at issue in this case, has two primary obligations. First, the manufacturer must report on a quarterly basis to the Secretary the drug's AMP and Best Price. 42 U.S.C. § 1396r-8(b)(3)(A). AMP is defined as the average price paid to the manufacturer for the drug in the United States by (a) wholesalers for drugs distributed to retail community pharmacists; and (b) retail community pharmacies that purchase drugs directly from the manufacturer. 42 U.S.C. § 1396r-8(k)(1)(A). Best Price, with respect to a single source drug or innovator multiple source drug of a manufacturer, is defined as the *lowest* price available from the manufacturer during the rebate period to any wholesaler, retailer, provider, health maintenance organization, nonprofit entity, or governmental entity within the United States, and is inclusive of all cash discounts, free goods that are contingent on any purchase requirement, volume discounts, and rebates. 42 U.S.C. § 1396r-8(c)(1)(C)(i), (ii).

27.   The Best Price Regulations set forth in 42 C.F.R. § 447.505(a) (2007) similarly provide, in relevant part, that "Best price means, with respect to a single source drug or innovator

11

multiple source drug of a manufacturer (including any drug sold under an NDA approved under section 505(c) of the FFDCA), the *lowest price available from the manufacturer* during the rebate period to any entity in the United States . . . ." *Id.* (emphasis added).  The same regulation provides that "[b]est price shall be calculated to include *all sales and associated rebates*, discounts and other price concessions provided by the manufacturer to any entity unless the sale, discount, or other price concession is specifically excluded by statute or regulation or is provided to an entity specifically excluded by statute or regulation from the rebate calculation." *Id.* (emphasis added).  The regulations further clarify best price by stating that:

> Best price shall be net of cash discounts, free goods that are contingent on any purchase requirement, volume discounts, customary prompt pay discounts, chargebacks, returns, incentives, promotional fees, administrative fees, service fees (except bona fide service fees), distribution fees, and *any other discounts or price reductions and rebates*, other than rebates under section 1927 of the Act, *which reduce the price available from the manufacturer. . . . The manufacturer must adjust the best price for a rebate period if cumulative discounts, rebates, or other arrangements subsequently adjust the prices available from the manufacturer.*

> 42 C.F.R. § 447.505(e) (2007) (emphasis added).

    28.    Moreover, Best Price is determined on a unit basis, *i.e.* pill.  42 C.F.R. § 447.505(e)(2) (2007).  Therefore, a manufacturer's Best Price for a single drug is net of all rebates and other discounts given by the manufacturer to any entity on the same pill, for example, of that single drug.  The notice and comments issued in 2007 during the amendment of the Best Price Regulations pursuant to the Deficit Reduction Act further demonstrate that the determination of Best Price is focused on the manufacturer and the price received on a single drug unit.  *See* 72 F.R. 39142-01, at *39149 (2007).  "Because best price represents the *lowest price available from the manufacturer* to any entity with respect to a single source drug or innovator multiple source drug of a manufacturer, including an authorized generic, *any price*

*concession associated with that sale should be netted out of the price received by the manufacturer in calculating best price . . . .") See id.* (emphasis added).

29.     Second, the manufacturer must pay each state a quarterly rebate equal to the total number of drug units, *e.g.*, pills or vials, purchased by the state Medicaid program times the greater of (1) the statutory minimum rebate percentage, or (2) the difference between the AMP and the Best Price.   42 U.S.C. § 1396r-8(c)(1)(A).   For the rebate period beginning after December 31, 1995 and before January 1, 2010, the minimum rebate percentage is 15.1%.  For the rebate period beginning after December 31, 2009, the minimum rebate percentage is 23.1%, except that in the case of a single source drug or an innovator multiple source drug that (a) the clotting factor for which a separate furnishing payment is made and which is included on a list of such factors specified and updated regularly by the Secretary; or (b) is approved by the FDA exclusively for pediatric indications, the minimum rebate percentage is 17.1%.   42 U.S.C. § 1396r-8(c)(1)(B)(i), (iii).

30.     Based upon the manufacturers' reported AMP and Best Price, the Secretary, through CMS, computes the quarterly Unit Rebate Amount ("URA"), which each state Medicaid program then uses to invoice the manufacturer for the rebate based upon each state's utilization of the drug.

31.     Any rebate amount paid by a manufacturer to a state reduces the amount spent by the state and accordingly reduces the amount of Medicaid spending that the federal government provides to the state.   42 U.S.C. § 1396r-8(b)(1)(B).

### FACTUAL ALLEGATIONS

32.     Currently, and upon information and belief since at least FY2005, Forest has knowingly, with deliberate ignorance, or with reckless disregard engaged in a systemic false and fraudulent scheme to defraud Medicaid out of significant amounts of money based on Forest's

13

willful failure to report accurate Best Price to state Medicaid programs, resulting in lower Medicaid drug rebates being paid by Forest to each state, and thereby causing a higher amount of Medicaid spending by each state, which in turn causes the federal government to provide more Medicaid spending to each state.

33.    Relator, John Doe ("Relator"), was employed by Forest in the 1990's until he was terminated by Forest in 2014. Relator served in managerial roles and had responsibilities over billions in revenues streams, overseeing many sales representatives, and overseeing Pharmacy Provider and GPO account managers. Relator was directly involved in the launch, marketing and sale of Forest pharmaceutical drugs, including the negotiation of discounts, rebates and other incentives provided to drug purchasers. Relator has direct, personal knowledge of the drug rebates and other discounts given to Forest customers that impact the reported Best Price for each drug.

34.    During the course of his employment, Relator discovered that Forest was knowingly, with deliberate ignorance, or with reckless disregard failing to account for the double-rebates being provided by Forest to two separate customers on the same dispensed drug units to the same patient in Forest's Pharmacy Provider/GPO market, resulting in the false and fraudulent reporting of Best Price to the Secretary for Forest's pharmaceutical drug products in such markets. The drugs at issue in this case include Celexa, Lexapro, Namenda, Namenda XR, Bystolic, Savella, Viibryd, Fetzima, Tudorza, Daliresp, Saphris, Linzess, Campral, Armour Thyroid, Levothroid, Thyrolar, Tiazac and Combunox (collectively, the "Forest Drugs"). Namenda is presently Forest's top selling drug with net sales of over $1.5 billion in FY2014, and net sales for Forest's next generation drugs, which include Bystolic, Viibryd, Linzess, Namenda XR, Daliresp, Tudorza, Teflaro, and Fetzima, increased by over $512 million in 2014.

**Forest's Program of Providing Rebates to Commercial Private Insurance Companies**

35.     In its Commercial market, Forest negotiates with private insurance companies to have its drug products placed on the private insurance company's drug formulary.   A drug formulary is a list of prescription drugs, both generic and brand name, that are preferred by a private insurance company.   Typically, a drug formulary has three tiers: (1) Tier 1 has the lowest co-payment and usually includes generic drugs; (2) Tier 2 has a higher co-payment and usually includes preferred brand name drugs; and (3) Tier 3 has the highest co-payment and usually includes non-preferred brand name medications.

36.     In exchange for placing Forest's drugs not only on its formulary, but also at a preferred tier, private insurance companies are paid a negotiated rebate by Forest on each drug based upon the number of dispensed drug units for which the private insurance company pays. By way of example, Forest sold Drug X for $1.00/10mg pill for which Private Insurer A receives a 20% rebate on the total purchase amount, because Drug X is a Tier 2 drug on Private Insurer A's formulary.   If Private Insurer A paid for 100 10mg pills of Drug X to its insureds, it would receive a rebate from Forest for $20.00 ($0.20 * 100 = $20.00).   This rebate of $0.20/10mg pill on $1.00 Drug X would have to be accounted for in determining Drug X's Best Price.   Prior to 2010, the Best Price reported to the Secretary would be $0.80/10mg pill ($1.00 – $0.20 = $0.80), as such price is better than the statutory price of $0.849/10mg pill (15.1% statutory rebate).   From 2010 and on, the Best Price would be the better statutory price of $0.769/10mg pill (23.1% statutory rebate).   Forest uses the Best Price given on the Commercial side of its business to set the overall Best Price for its drugs.

**Forest's Program of Providing Rebates to Pharmacy Providers/Group Purchasing Organizations (GPOs)**

37.     Similarly, Forest negotiates with Pharmacy Providers and GPOs for the sale of its drugs to be disbursed by long term care, rehabilitation/transitional, short term stay and group home facilities, as well as through home delivery. For example, in FY2008, combined sales to Pharmacy Provider Facilities for Lexapro, Namenda and Bystolic alone totaled over $526 million, which was about 14.5% of the $3.6 billion in total sales for those drugs. In 2008, Forest paid Pharmacy Providers over $35 million in rebates – about 10% of the over $342 million in rebates paid by Forest that year.

38.     Generally, Pharmacy Providers and GPOs purchase Forest drugs indirectly through a third party wholesaler, such as McKesson Corporation, pursuant to the terms of a purchasing agreement directly between Forest and the Pharmacy Provider/GPO. Pharmacy Providers that enter into purchasing agreements with Forest directly include larger entities such as PharMerica. Smaller Pharmacy Providers join GPOs, such as Managed Healthcare Associates, Inc., MedAssets, Novation, and GeriMed, which purchase drugs from Forest for their members. Forest sells drugs indirectly through a third party wholesaler, such as McKesson Corporation, because such wholesaler has the warehousing capacity to store the drug supply that the Pharmacy Providers/GPOs might require in the future under the purchasing agreement. The third party wholesaler sells the drugs to the Pharmacy Provider/GPO, who then supplies the drugs to the appropriate Pharmacy Provider Facility, which in the GPO context occurs through each respective member. The third party wholesaler sells the drugs to the Pharmacy Provider/GPO at a discount, which it then charges back to Forest. Pharmacy Providers and GPOs are also paid a negotiated rebate by Forest on each drug, which, prior to 2009, Forest often paid based merely upon the number of drug units purchased from the third party

wholesaler by the Pharmacy Provider/GPO. However, currently, such rebate is based upon the number of dispensed drug units to patients made inside each respective Pharmacy Provider Facility.

39.     In this Pharmacy Provider/GPO context, for example, Forest sold Drug X for $1.00/10mg pill for which Pharmacy Provider Y receives a 20% rebate on the total purchase amount. Forest sells 100 pills of Drug X to Wholesaler Z, who then sells 100 pills of Drug X to Pharmacy Provider Y at the discounted price of $0.96/10mg pill, which discount Wholesaler Z charges back to Forest in the total amount of $4.00 ($0.04 * 100 = $4.00). The Pharmacy Provider Facility supplied Drug X by Pharmacy Provider Y then dispenses 100 10mg pills of Drug X to its patients, which entitles Pharmacy Provider Y to a rebate of $20.00 from Forest ($0.20 * 100 = $20.00). Both the discount of $.04/10mg pill and rebate of $0.20/10mg pill on $1.00 Drug X would have to be accounted for in determining Drug X's Best Price. Two discounts on the same drug would result in the total discount of 24%.

### Forest Intentionally Failed to Report Both Rebates in Calculating Best Price

40.     Relator has direct, personal knowledge of the drug rebates and other discounts given to Forest customers that impact the reported Best Price for each drug.

41.     Forest makes projections on what chargeback discount and rebate a Pharmacy Provider/GPO would receive for Forest drug products based upon the estimated number of quarterly dispensed drug units to be made within a Pharmacy Provider Facility. Such chargeback discounts and rebates must be accounted for in determining each drug product's Best Price.

42.     However, Forest deliberately ignored the clear fact that, while patients treated inside Pharmacy Provider Facilities are in large part covered by Medicaid or Medicare Part D, a

measurable percentage of patients inside Pharmacy Provider Facilities are covered by commercial private insurance companies.

43.     As set forth above, third party private payers, specifically private insurance companies, have also negotiated discounts and rebates they receive from Forest based upon their payments on dispensed units of Forest's drug products, including inside Pharmacy Provider Facilities. Although rebates and other discounts on drugs disbursed to Medicaid or Medicare Part D patients would be exempt from Forest's calculation of Best Price, Forest must account for all rebates or other discounts provided to the commercial private insurance companies that pay on drugs disbursed in Pharmacy Provider Facilities to avoid a Best Price violation. Forest does not. Instead of implementing the DNA process in the Pharmacy Provider/GPO market, or otherwise refusing to pay Pharmacy Providers and GPOs for double rebates on the same dispensed drug to the same patient, Forest deliberately chose to pay such double rebates.

44.     However, Forest does not account for such double rebates and other discounts in determining a drug's Best Price if the drug is dispensed at a Pharmacy Provider Facility. Consequently, Forest only reports to the Secretary the Best Price based upon the one rebate or other discounts given to the commercial private insurance company. By knowingly, with deliberate ignorance, or with reckless disregard failing to account for the double rebates given on drugs dispersed in Pharmacy Provider/GPO facilities, Forest has falsely and fraudulently reported to the Secretary higher Best Price for its drug products dispensed in such facilities. By reporting a higher Best Price, Forest pays less in Medicaid drug rebates to state Medicaid programs, which results in the federal government paying more in Medicaid spending to the states than it would had Forest accurately reported Best Price and states are similarly damaged because they are not receiving their proper rebates.

18

45.   By way of example, returning to the Pharmacy Provider/GPO rebate example set forth above, Forest sold Drug X for $1.00/10mg pill for which Pharmacy Provider Y receives a 20% rebate on the total purchase amount.  Forest sells 100 pills of Drug X to Wholesaler Z, who then sells 100 pills of Drug X to Pharmacy Provider Y at the discounted price of $0.96/10mg pill, which discount Wholesaler Z charges back to Forest in the total amount of $4.00 ($0.04 * 100 = $4.00).  The Pharmacy Provider Facility supplied Drug X by Pharmacy Provider Y then dispenses a 10mg pill of Drug X to a single patient, which entitles Pharmacy Provider Y to a rebate of $0.20 from Forest on that one pill disbursement.  Both the discount of $.04/10mg pill and rebate of $0.20/10mg pill on $1.00 Drug X would have to be accounted for in determining Drug X's Best Price.  Two discounts on the same drug would result in the total discount of 24%.  Where the patients are covered by Medicaid or Medicare Part D, there are no other possible discounts or rebates Forest must account for in determining Best Price.

46.   However, the patient to whom the pill of Drug X is dispensed is, for example, covered by Private Insurer A who, again, receives a 20% rebate on the total purchase amount of $1.00/10mg pill, because Drug X is a Tier 2 drug on Private Insurer A's formulary.  Because Private Insurer A paid this pill of Drug X dispersed to its insured, it would receive a rebate from Forest for $0.20 on that pill.  Taking this rebate into account along with the discounts and rebates received by Pharmacy Provider Y on the same pill dispersed to the same patient, the Best Price for Drug X is actually $0.56/10mg pill ($1.00 – $0.04 – $0.20 – $0.20 = $0.56), rather than the reported Best Price of $.80/10mg pill (prior to 2010), or $0.769/10mg pill (starting in 2010), as established by the rebates given on the Commercial side of Forest's business.

**Forest Not Only Knew It Was Violating Best Price Reporting, but It Knowingly Chose Not to Apply its "DNA" Audit Process to This Situation**

47.     In 2008, top level managers at Forest held meetings and prepared reports focusing on the fact that two rebates were occasionally claimed or paid on the same drug being dispensed to a single patient.  For example, a patient might have both primary and secondary private medical insurance.  If both the primary insurer and the secondary insurer each paid a portion of that patient's medical care, specifically his or her pharmaceutical drug treatment, then each could potentially seek a rebate on the same drug disbursements, thereby creating a double rebate on the same dispersed drug.  Aware of their potential Best Price violation based upon double rebate claims from its customers, Forest implemented a data audit process for all rebate claims submitted to Forest by customers in the Commercial market, specifically private insurance companies.  Forest contracted with Data Niche & Associates ("DNA") to develop this data scrubbing process.  The rebate claim data is submitted by Forest customers in a NCPDP file, which contains, among other things, (a) the drug product name with corresponding NDC; (b) the prescribing doctor; (c) the prescription identification number; (d) the drug dosage; (e) the pharmacy identification number; and (f) the date of service.  The DNA process is used by Forest to identify outliers in a customer's rebate submissions, including double rebate claims for the same dispensed drug units to the same patient.  Forest provides notice to its customers of the disputed rebate claims and such claims do not get paid by Forest, because double rebates or discounts on the same pill would have to be added together and may exceed the Best Price reported to the Secretary.

48.     For example, if Private Insurer Y submitted a rebate claim to Forest on dispensed units of Drug X at a 12% rebate on the purchase price of $1.00/10mg pill, and the DNA data scrubbing process identified two claimed dispensed drug units in the same data set with the same

NDC, prescription identification number, dosage, pharmacy identification number, and/or date of service, then the DNA process would flag one of the dispensed drug units as a double rebate claim to the same patient and would be unpaid by Forest.   Similarly, if the DNA process identified a double rebate claim between the present data set and a prior data set, then the DNA process would flag the latter dispensed drug unit as a double rebate claim between two different patients and would also be unpaid by Forest.   Forest employs the DNA data scrubbing process in order to avoid a Best Price violation.   Unless the two rebates above were identified, the same dispensed units of Drug X would receive a double 12% rebate, resulting in a Best Price of $0.76/10 mg pill ($1.00 − $0.12 − $0.12 = $0.76) and a Best Price violation (assuming Best Price was reported as less than 24%).   Forest, by taking into account only one of the two 12% rebates, would only report the statutory price of $.849/10mg pill (15.1% statutory rebate) or $0.769/10mg pill (23.1% statutory rebate) as Best Price, depending on the applicable year.

49.     Nevertheless, despite not allowing double rebates to occur on the Commercial side due to Best Price concerns, Forest deliberately chose not to institute the DNA process on the Pharmacy Provider/GPO side to avoid negatively impacting its relationships with major Pharmacy Provider/GPO drug purchasers and preserve shareholder profits.   Instead, in the Pharmacy Provider/GPO market, Forest has chosen to pay such double rebates, but Forest does not account for those double rebates when it reports Best Price to the Secretary of Health and Human Services, resulting in Best Price violations quarter after quarter.

**Damages**

Fiscal Year 2005

50.     Forest's willful failure account for these double rebates has resulted in significant overpayments by Medicaid each quarter since at least Forest's FY2005.   Upon information and belief, in FY2005, Forest's net sales for Celexa were about $653 Million, at least 20% of which

21

were Medicaid sales – $130.6 Million.  Upon information and belief, Forest's highest reported Best Price rebate percentage for Celexa in FY2005 was the statutory rebate percentage of 15.1%, based upon the maximum rebate of 15% given by Forest on the Commercial side of its business. Accordingly, Medicaid received a reimbursement from Forest of about $19.72 Million (0.151 * $130.6 Million).  However, upon information and belief, Celexa was dispersed to patients in Pharmacy Provider Facilities with private insurance, with Pharmacy Providers/GPOs receiving a maximum discount/rebate of 12% and commercial insurance companies, again, receiving up to a 15% rebate on the same dispersed drug.  However, Forest knowingly, with deliberate ignorance, or with reckless disregard ignored such double rebates, while also purposefully or with reckless disregard failing to implement the DNA process in the Pharmacy Provider/GPO market to identify such double rebates, despite knowing, or it should have known, upon information and belief, that at least 15% of Pharmacy Provider patients receiving Celexa had private insurance. Therefore, taking into account such double rebates, Medicaid should have received an additional 11.9% rebate (15% Commercial rebate + 12% Pharmacy Provider/GPO rebate – 15.1% reported Best Price rebate = 11.9% under-rebate), resulting in Forest owing Medicaid an additional reimbursement of about **$15.54 Million** (0.119 * $130.6 Million) for **Celexa** in **FY2005**.

51.     Upon information and belief, in FY2005, Forest's net sales for Lexapro were about $1.6 Billion, at least 20% of which were Medicaid sales – $320 Million.  Upon information and belief, Forest's highest reported Best Price rebate percentage for Lexapro in FY2005 was 18%, based upon the maximum rebate of 18% given by Forest on the Commercial side of its business.  Accordingly, Medicaid received a reimbursement from Forest of about $57.6 Million (0.18 * $320 Million).  However, upon information and belief, Lexapro was dispersed to patients in Pharmacy Provider Facilities with private insurance, with Pharmacy Providers/GPOs receiving a maximum discount/rebate of 15% and commercial insurance

22

companies, again, receiving up to a 18% rebate on the same dispersed drug.  However, Forest knowingly, with deliberate ignorance, or with reckless disregard ignored such double rebates, while also purposefully or with reckless disregard failing to implement the DNA process in the Pharmacy Provider/GPO market to identify such double rebates, despite knowing, or it should have known, upon information and belief, that at least 15% of Pharmacy Provider patients receiving Lexapro had private insurance.  Therefore, taking into account such double rebates, Medicaid should have received an additional 15% rebate (18% Commercial rebate + 15% Pharmacy Provider/GPO rebate – 18% reported Best Price rebate = 15% under-rebate), resulting in Forest owing Medicaid an additional reimbursement of about **$48 Million** (0.15 * $320 Million) for **Lexapro** in **FY2005**.

52.    Upon information and belief, in FY2005, Forest's net sales for Namenda were about $332 Million, at least 10% of which were Medicaid sales – $33.2 Million.  Upon information and belief, Forest's highest reported Best Price rebate percentage for Namenda in FY2005 was the statutory rebate percentage of 15.1%, based upon the maximum rebate of 10% given by Forest on the Commercial side of its business.  Accordingly, Medicaid received a reimbursement from Forest of about $5.01 Million (0.151 * $33.2 Million).  However, upon information and belief, Namenda was dispersed to patients in Pharmacy Provider Facilities with private insurance, with Pharmacy Providers/GPOs receiving a maximum discount/rebate of 15% and commercial insurance companies, again, receiving up to a 10% rebate on the same dispersed drug.  However, Forest knowingly, with deliberate ignorance, or with reckless disregard ignored such double rebates, while also purposefully or with reckless disregard failing to implement the DNA process in the Pharmacy Provider/GPO market to identify such double rebates, despite knowing, or it should have known, upon information and belief, that at least 7% of Pharmacy Provider patients receiving Namenda had private insurance.  Therefore, taking into account such

double rebates, Medicaid should have received an additional 9.9% rebate (10% Commercial rebate + 15% Pharmacy Provider/GPO rebate − 15.1% reported Best Price rebate = 9.9% under-rebate), resulting in Forest owing Medicaid an additional reimbursement of about **$3.29 Million** (0.099 * $33.2 Million) for **Namenda** in **FY2005**.

Fiscal Year 2006

53.     Upon information and belief, in FY2006, Forest's net sales for Celexa were about $19 Million, at least 20% of which were Medicaid sales − $3.8 Million.  Upon information and belief, Forest's highest reported Best Price rebate percentage for Celexa in FY2006 was the statutory rebate percentage of 15.1%, based upon the maximum rebate of 10% given by Forest on the Commercial side of its business.  Accordingly, Medicaid received a reimbursement from Forest of about $0.57 Million (0.151 * $3.8 Million).  However, upon information and belief, Celexa was dispersed to patients in Pharmacy Provider Facilities with private insurance, with Pharmacy Providers/GPOs receiving a maximum discount/rebate of 10% and commercial insurance companies, again, receiving up to a 10% rebate on the same dispersed drug.  However, Forest knowingly, with deliberate ignorance, or with reckless disregard ignored such double rebates, while also purposefully or with reckless disregard failing to implement the DNA process in the Pharmacy Provider/GPO market to identify such double rebates, despite knowing, or it should have known, upon information and belief, that at least 15% of Pharmacy Provider patients receiving Celexa had private insurance.  Therefore, taking into account such double rebates, Medicaid should have received an additional 4.9% rebate (10% Commercial rebate + 10% Pharmacy Provider/GPO rebate − 15.1% reported Best Price rebate = 4.9% under-rebate), resulting in Forest owing Medicaid an additional reimbursement of about **$0.19 Million** (.049 * $3.8 Million) for **Celexa** in **FY2006**.

24

54.     Upon information and belief, in FY2006, Forest's net sales for Lexapro were about $1.8 Billion, at least 20% of which were Medicaid sales – $360 Million.   Upon information and belief, Forest's highest reported Best Price rebate percentage for Lexapro in FY2006 was 20%, based upon the maximum rebate of 20% given by Forest on the Commercial side of its business.  Accordingly, Medicaid received a reimbursement from Forest of about $72 Million (0.20 * $360 Million).  However, upon information and belief, Lexapro was dispersed to patients in Pharmacy Provider Facilities with private insurance, with Pharmacy Providers/GPOs receiving a maximum discount/rebate of 20% and commercial insurance companies, again, receiving up to a 20% rebate on the same dispersed drug.  However, Forest knowingly, with deliberate ignorance, or with reckless disregard ignored such double rebates, while also purposefully or with reckless disregard failing to implement the DNA process in the Pharmacy Provider/GPO market to identify such double rebates, despite knowing, or it should have known, upon information and belief, that at least 15% of Pharmacy Provider patients receiving Lexapro had private insurance.  Therefore, taking into account such double rebates, Medicaid should have received an additional 20% rebate (20% Commercial rebate + 20% Pharmacy Provider/GPO rebate – 20% reported Best Price rebate = 20% under-rebate), resulting in Forest owing Medicaid an additional reimbursement of about **$72 Million** (0.20 * $360 Million) for **Lexapro in FY2006**.

55.     Upon information and belief, in FY2006, Forest's net sales for Namenda were about $508 Million, at least 10% of which were Medicaid sales – $50.8 Million.   Upon information and belief, Forest's highest reported Best Price rebate percentage for Namenda in FY2006 was the statutory rebate percentage of 15.1%, based upon the maximum rebate of 10% given by Forest on the Commercial side of its business.  Accordingly, Medicaid received a reimbursement from Forest of about $7.67 Million (0.151 * $50.8 Million).  However, upon

25

information and belief, Namenda was dispersed to patients in Pharmacy Provider Facilities with private insurance, with Pharmacy Providers/GPOs receiving a maximum discount/rebate of 15% and commercial insurance companies, again, receiving up to a 10% rebate on the same dispersed drug. However, Forest knowingly, with deliberate ignorance, or with reckless disregard ignored such double rebates, while also purposefully or with reckless disregard failing to implement the DNA process in the Pharmacy Provider/GPO market to identify such double rebates, despite knowing, or it should have known, upon information and belief, that at least 7% of Pharmacy Provider patients receiving Namenda had private insurance. Therefore, taking into account such double rebates, Medicaid should have received an additional 9.9% rebate (10% Commercial rebate + 15% Pharmacy Provider/GPO rebate – 15.1% reported Best Price rebate = 9.9% under-rebate), resulting in Forest owing Medicaid an additional reimbursement of about **$5.03 Million** (0.099 * $50.8 Million) for **Namenda** in **FY2006**.

### Fiscal Year 2007

56.     Upon information and belief, in FY2007, Forest's net sales for Lexapro were about $2.1 Billion, at least 20% of which were Medicaid sales – $420 Million. Upon information and belief, Forest's highest reported Best Price rebate percentage for Lexapro in FY2007 was 20%, based upon the maximum rebate of 20% given by Forest on the Commercial side of its business. Accordingly, Medicaid received a reimbursement from Forest of about $84 Million (0.20 * $420 Million). However, upon information and belief, Lexapro was dispersed to patients in Pharmacy Provider Facilities with private insurance, with Pharmacy Providers/GPOs receiving a maximum discount/rebate of 20% and commercial insurance companies, again, receiving up to a 20% rebate on the same dispersed drug. However, Forest knowingly, with deliberate ignorance, or with reckless disregard ignored such double rebates, while also purposefully or with reckless disregard failing to implement the DNA process in the Pharmacy

Provider/GPO market to identify such double rebates, despite knowing, or it should have known, upon information and belief, that at least 15% of Pharmacy Provider patients receiving Lexapro had private insurance. Therefore, taking into account such double rebates, Medicaid should have received an additional 20% rebate (20% Commercial rebate + 20% Pharmacy Provider/GPO rebate – 20% reported Best Price rebate = 20% under-rebate), resulting in Forest owing Medicaid an additional reimbursement of about **$84 Million** (0.20 * $420 Million) for **Lexapro** in **FY2007**.

57.   Upon information and belief, in FY2007, Forest's net sales for Namenda were about $660 Million, at least 10% of which were Medicaid sales – $66 Million. Upon information and belief, Forest's highest reported Best Price rebate percentage for Namenda in FY2007 was the statutory rebate percentage of 15.1%, based upon the maximum rebate of 10% given by Forest on the Commercial side of its business. Accordingly, Medicaid received a reimbursement from Forest of about $9.97 Million (0.151 * $66 Million). However, upon information and belief, Namenda was dispersed to patients in Pharmacy Provider Facilities with private insurance, with Pharmacy Providers/GPOs receiving a maximum discount/rebate of 15% and commercial insurance companies, again, receiving up to a 10% rebate on the same dispersed drug. However, Forest knowingly, with deliberate ignorance, or with reckless disregard ignored such double rebates, while also purposefully or with reckless disregard failing to implement the DNA process in the Pharmacy Provider/GPO market to identify such double rebates, despite knowing, or it should have known, upon information and belief, that at least 7% of Pharmacy Provider patients receiving Namenda had private insurance. Therefore, taking into account such double rebates, Medicaid should have received an additional 9.9% rebate (10% Commercial rebate + 15% Pharmacy Provider/GPO rebate – 15.1% reported Best Price rebate = 9.9% under-

rebate), resulting in Forest owing Medicaid an additional reimbursement of about **$6.53 Million** (0.099 * $66 Million) for **Namenda** in **FY2007**.

Fiscal Year 2008

58.     Upon information and belief, in FY2008, Forest's net sales for Lexapro were about $2.29 Billion, at least 20% of which were Medicaid sales – $458 Million.   Upon information and belief, Forest's highest reported Best Price rebate percentage for Lexapro in FY2008 was 20%, based upon the maximum rebate of 20% given by Forest on the Commercial side of its business.   Accordingly, Medicaid received a reimbursement from Forest of about $91.6 Million (0.20 * $458 Million).   However, upon information and belief, Lexapro was dispersed to patients in Pharmacy Provider Facilities with private insurance, with Pharmacy Providers/GPOs receiving a maximum discount/rebate of 18% and commercial insurance companies, again, receiving up to a 20% rebate on the same dispersed drug.   However, Forest knowingly, with deliberate ignorance, or with reckless disregard ignored such double rebates, while also purposefully or with reckless disregard failing to implement the DNA process in the Pharmacy Provider/GPO market to identify such double rebates, despite knowing, or it should have known, upon information and belief, that at least 15% of Pharmacy Provider patients receiving Lexapro had private insurance.   Therefore, taking into account such double rebates, Medicaid should have received an additional 18% rebate (20% Commercial rebate + 18% Pharmacy Provider/GPO rebate – 20% reported Best Price rebate = 18% under-rebate), resulting in Forest owing Medicaid an additional reimbursement of about **$82.44 Million** (0.18 * $458 Million) for **Lexapro** in **FY2008**.

59.     Upon information and belief, in FY2008, Forest's net sales for Namenda were about $829 Million, at least 10% of which were Medicaid sales – $82.9 Million.   Upon information and belief, Forest's highest reported Best Price rebate percentage for Namenda in

FY2008 was the statutory rebate percentage of 15.1%, based upon the maximum rebate of 12% given by Forest on the Commercial side of its business. Accordingly, Medicaid received a reimbursement from Forest of about $12.52 Million (0.151 * $82.9 Million). However, upon information and belief, Namenda was dispersed to patients in Pharmacy Provider Facilities with private insurance, with Pharmacy Providers/GPOs receiving a maximum discount/rebate of 15% and commercial insurance companies, again, receiving up to a 12% rebate on the same dispersed drug. However, Forest knowingly, with deliberate ignorance, or with reckless disregard ignored such double rebates, while also purposefully or with reckless disregard failing to implement the DNA process in the Pharmacy Provider/GPO market to identify such double rebates, despite knowing, or it should have known, upon information and belief, that at least 7% of Pharmacy Provider patients receiving Namenda had private insurance. Therefore, taking into account such double rebates, Medicaid should have received an additional 11.9% rebate (12% Commercial rebate + 15% Pharmacy Provider/GPO rebate – 15.1% reported Best Price rebate = 11.9% under-rebate), resulting in Forest owing Medicaid an additional reimbursement of about **$9.87 Million** (0.119 * $82.9 Million) for **Namenda** in **FY2008**.

60.    Upon information and belief, in FY2008, Forest's net sales for Bystolic were about $11 Million, at least 15% of which were Medicaid sales – $1.65 Million. Upon information and belief, Forest's highest reported Best Price rebate percentage for Bystolic in FY2008 was 25%, based upon the maximum rebate of 25% given by Forest on the Commercial side of its business. Accordingly, Medicaid received a reimbursement from Forest of about $0.41 Million (0.25 * $1.65 Million). However, upon information and belief, Bystolic was dispersed to patients in Pharmacy Provider Facilities with private insurance, with Pharmacy Providers/GPOs receiving a maximum discount/rebate of 10% and commercial insurance companies, again, receiving up to a 25% rebate on the same dispersed drug. However, Forest

knowingly, with deliberate ignorance, or with reckless disregard ignored such double rebates, while also purposefully or with reckless disregard failing to implement the DNA process in the Pharmacy Provider/GPO market to identify such double rebates, despite knowing, or it should have known, upon information and belief, that at least 15% of Pharmacy Provider patients receiving Bystolic had private insurance. Therefore, taking into account such double rebates, Medicaid should have received an additional 10% rebate (25% Commercial rebate + 10% Pharmacy Provider/GPO rebate – 25% reported Best Price rebate = 10% under-rebate), resulting in Forest owing Medicaid an additional reimbursement of about **$0.17 Million** (0.10 * $1.65 Million) for **Bystolic** in **FY2008**.

> Fiscal Year 2009

61.    Upon information and belief, in FY2009, Forest's net sales for Lexapro were about $2.3 Billion, at least 20% of which were Medicaid sales – $460 Million. Upon information and belief, Forest's highest reported Best Price rebate percentage for Lexapro in FY2009 was 20%, based upon the maximum rebate of 20% given by Forest on the Commercial side of its business. Accordingly, Medicaid received a reimbursement from Forest of about $92 Million (0.20 * $460 Million). However, upon information and belief, Lexapro was dispersed to patients in Pharmacy Provider Facilities with private insurance, with Pharmacy Providers/GPOs receiving a maximum discount/rebate of 18% and commercial insurance companies, again, receiving up to a 20% rebate on the same dispersed drug. However, Forest knowingly, with deliberate ignorance, or with reckless disregard ignored such double rebates, while also purposefully or with reckless disregard failing to implement the DNA process in the Pharmacy Provider/GPO market to identify such double rebates, despite knowing, or it should have known, upon information and belief, that at least 15% of Pharmacy Provider patients receiving Lexapro had private insurance. Therefore, taking into account such double rebates, Medicaid should have

received an additional 18% rebate (20% Commercial rebate + 18% Pharmacy Provider/GPO rebate − 20% reported Best Price rebate = 18% under-rebate), resulting in Forest owing Medicaid an additional reimbursement of about **$82.8 Million** (0.18 * $460 Million) for **Lexapro** in **FY2009**.

62.     Upon information and belief, in FY2009, Forest's net sales for Namenda were about $949 Million, at least 10% of which were Medicaid sales − $94.9 Million.   Upon information and belief, Forest's highest reported Best Price rebate percentage for Namenda in FY2009 was the statutory rebate percentage of 15.1%, based upon the maximum rebate of 12% given by Forest on the Commercial side of its business.   Accordingly, Medicaid received a reimbursement from Forest of about $14.33 Million (0.151 * $94.9 Million).   However, upon information and belief, Namenda was dispersed to patients in Pharmacy Provider Facilities with private insurance, with Pharmacy Providers/GPOs receiving a maximum discount/rebate of 16% and commercial insurance companies, again, receiving up to a 12% rebate on the same dispersed drug.   However, Forest knowingly, with deliberate ignorance, or with reckless disregard ignored such double rebates, while also purposefully or with reckless disregard failing to implement the DNA process in the Pharmacy Provider/GPO market to identify such double rebates, despite knowing, or it should have known, upon information and belief, that at least 7% of Pharmacy Provider patients receiving Namenda had private insurance.   Therefore, taking into account such double rebates, Medicaid should have received an additional 12.9% rebate (12% Commercial rebate + 16% Pharmacy Provider/GPO rebate − 15.1% reported Best Price rebate = 12.9% under-rebate), resulting in Forest owing Medicaid an additional reimbursement of about **$12.24 Million** (0.129 * $94.9 Million) for **Namenda** in **FY2009**.

63.     Upon information and belief, in FY2009, Forest's net sales for Bystolic were about $69 Million, at least 15% of which were Medicaid sales − $10.35 Million.   Upon

31

information and belief, Forest's highest reported Best Price rebate percentage for Bystolic in FY2009 was 33%, based upon the maximum rebate of 33% given by Forest on the Commercial side of its business. Accordingly, Medicaid received a reimbursement from Forest of about $3.42 Million (0.33 * $10.35 Million). However, upon information and belief, Bystolic was dispersed to patients in Pharmacy Provider Facilities with private insurance, with Pharmacy Providers/GPOs receiving a maximum discount/rebate of 18% and commercial insurance companies, again, receiving up to a 33% rebate on the same dispersed drug. However, Forest knowingly, with deliberate ignorance, or with reckless disregard ignored such double rebates, while also purposefully or with reckless disregard failing to implement the DNA process in the Pharmacy Provider/GPO market to identify such double rebates, despite knowing, or it should have known, upon information and belief, that at least 15% of Pharmacy Provider patients receiving Bystolic had private insurance. Therefore, taking into account such double rebates, Medicaid should have received an additional 18% rebate (33% Commercial rebate + 18% Pharmacy Provider/GPO rebate – 33% reported Best Price rebate = 18% under-rebate), resulting in Forest owing Medicaid an additional reimbursement of about **$1.86 Million** (0.18 * $10.35 Million) for **Bystolic** in **FY2009**.

Fiscal Year 2010

64.     Upon information and belief, in FY2010, Forest's net sales for Lexapro were about $2.27 Billion, at least 20% of which were Medicaid sales – $454 Million. Upon information and belief, Forest's highest reported Best Price rebate percentage for Lexapro in FY2010 was 20%, based upon the maximum rebate of 20% given by Forest on the Commercial side of its business. Accordingly, Medicaid received a reimbursement from Forest of about $90.8 Million (0.20 * $454 Million). However, upon information and belief, Lexapro was dispersed to patients in Pharmacy Provider Facilities with private insurance, with Pharmacy

Providers/GPOs receiving a maximum discount/rebate of 18% and commercial insurance companies, again, receiving up to a 20% rebate on the same dispersed drug. However, Forest knowingly, with deliberate ignorance, or with reckless disregard ignored such double rebates, while also purposefully or with reckless disregard failing to implement the DNA process in the Pharmacy Provider/GPO market to identify such double rebates, despite knowing, or it should have known, upon information and belief, that at least 15% of Pharmacy Provider patients receiving Lexapro had private insurance. Therefore, taking into account such double rebates, Medicaid should have received an additional 18% rebate (20% Commercial rebate + 18% Pharmacy Provider/GPO rebate – 20% reported Best Price rebate = 18% under-rebate), resulting in Forest owing Medicaid an additional reimbursement of about **$81.72 Million** (0.18 * $454 Million) for **Lexapro** in **FY2010**.

65.     Upon information and belief, in FY2010, Forest's net sales for Namenda were about $1.11 Billion, at least 10% of which were Medicaid sales – $111 Million.   Upon information and belief, Forest's highest reported Best Price rebate percentage for Namenda in FY2010 was the weighted statutory rebate percentage of 17.1%[2], based upon the maximum rebate of 12% given by Forest on the Commercial side of its business. Accordingly, Medicaid received a reimbursement from Forest of about $18.98 Million (0.171 * $111 Million). However, upon information and belief, Namenda was dispersed to patients in Pharmacy Provider Facilities with private insurance, with Pharmacy Providers/GPOs receiving a maximum discount/rebate of 16% and commercial insurance companies, again, receiving up to a 12% rebate on the same dispersed drug. However, Forest knowingly, with deliberate ignorance, or with reckless disregard ignored such double rebates, while also purposefully or with reckless

---

[2] In 2010, the statutory rebate percentage increased from 15.1% to 23.1%. Therefore, the statutory rebate percentage for the Fourth Quarter of FY2010 was 23.1%, resulting in a weighted statutory rebate percentage of 17.1% for the entire fiscal year [(15.1% + 15.1% + 15.1% + 23.1%) / 4 = 17.1%].

disregard failing to implement the DNA process in the Pharmacy Provider/GPO market to identify such double rebates, despite knowing, or it should have known, upon information and belief, that at least 7% of Pharmacy Provider patients receiving Namenda had private insurance. Therefore, taking into account such double rebates, Medicaid should have received an additional 10.9% rebate (12% Commercial rebate + 16% Pharmacy Provider/GPO rebate – 17.1% reported Best Price rebate = 10.9% under-rebate), resulting in Forest owing Medicaid an additional reimbursement of about **$12.1 Million** (0.109 * $111 Million) for **Namenda** in **FY2010**.

66.    Upon information and belief, in FY2010, Forest's net sales for Bystolic were about $178 Million, at least 15% of which were Medicaid sales – $26.7 Million.   Upon information and belief, Forest's highest reported Best Price rebate percentage for Bystolic in FY2010 was 33%, based upon the maximum rebate of 33% given by Forest on the Commercial side of its business.   Accordingly, Medicaid received a reimbursement from Forest of about $8.81 Million (0.33 * $26.7 Million).   However, upon information and belief, Bystolic was dispersed to patients in Pharmacy Provider Facilities with private insurance, with Pharmacy Providers/GPOs receiving a maximum discount/rebate of 18% and commercial insurance companies, again, receiving up to a 33% rebate on the same dispersed drug.   However, Forest knowingly, with deliberate ignorance, or with reckless disregard ignored such double rebates, while also purposefully or with reckless disregard failing to implement the DNA process in the Pharmacy Provider/GPO market to identify such double rebates, despite knowing, or it should have known, upon information and belief, that at least 15% of Pharmacy Provider patients receiving Bystolic had private insurance.   Therefore, taking into account such double rebates, Medicaid should have received an additional 18% rebate (33% Commercial rebate + 18% Pharmacy Provider/GPO rebate – 33% reported Best Price rebate = 18% under-rebate), resulting

34

in Forest owing Medicaid an additional reimbursement of about **$4.81 Million** (0.18 * $26.7 Million) for **Bystolic** in **FY2010**.

67.     Upon information and belief, in FY2010, Forest's net sales for Savella were about $52 Million, at least 25% of which were Medicaid sales – $13 Million.  Upon information and belief, Forest's highest reported Best Price rebate percentage for Savella in FY2010 was 20%, based upon the maximum rebate of 20% given by Forest on the Commercial side of its business. Accordingly, Medicaid received a reimbursement from Forest of about $2.6 Million (0.20 * $13 Million).  However, upon information and belief, Savella was dispersed to patients in Pharmacy Provider Facilities with private insurance, with Pharmacy Providers/GPOs receiving a maximum discount/rebate of 5% and commercial insurance companies, again, receiving up to a 20% rebate on the same dispersed drug.  However, Forest knowingly, with deliberate ignorance, or with reckless disregard ignored such double rebates, while also purposefully or with reckless disregard failing to implement the DNA process in the Pharmacy Provider/GPO market to identify such double rebates, despite knowing, or it should have known, upon information and belief, that at least 15% of Pharmacy Provider patients receiving Savella had private insurance. Therefore, taking into account such double rebates, Medicaid should have received an additional 5% rebate (20% Commercial rebate + 5% Pharmacy Provider/GPO rebate – 20% reported Best Price rebate = 5% under-rebate), resulting in Forest owing Medicaid an additional reimbursement of about **$0.65 Million** (0.05 * $13 Million) for **Savella** in **FY2010**.

68.     Upon information and belief, in FY2010, Forest's net sales for Daliresp were about $25 Million, at least 7% of which were Medicaid sales – $1.75 Million.  Upon information and belief, Forest's highest reported Best Price rebate percentage for Daliresp in FY2010 was the weighted statutory rebate percentage of 17.1%, based upon the maximum rebate of 15% given by Forest on the Commercial side of its business.  Accordingly, Medicaid received a reimbursement

from Forest of about $0.3 Million (0.171 * $1.75 Million).  However, upon information and belief, Daliresp was dispersed to patients in Pharmacy Provider Facilities with private insurance, with Pharmacy Providers/GPOs receiving a maximum discount/rebate of 5% and commercial insurance companies, again, receiving up to a 15% rebate on the same dispersed drug.  However, Forest knowingly, with deliberate ignorance, or with reckless disregard ignored such double rebates, while also purposefully or with reckless disregard failing to implement the DNA process in the Pharmacy Provider/GPO market to identify such double rebates, despite knowing, or it should have known, upon information and belief, that at least 7% of Pharmacy Provider patients receiving Daliresp had private insurance.  Therefore, taking into account such double rebates, Medicaid should have received an additional 2.9% rebate (15% Commercial rebate + 5% Pharmacy Provider/GPO rebate – 17.1% reported Best Price rebate = 2.9% under-rebate), resulting in Forest owing Medicaid an additional reimbursement of about **$0.05 Million** (0.029 * $1.75 Million) for **Daliresp** in **FY2010**.

Fiscal Year 2011

69.     Upon information and belief, in FY2011, Forest's net sales for Lexapro were about $2.3 Billion, at least 20% of which were Medicaid sales – $460 Million.  Upon information and belief, Forest's highest reported Best Price rebate percentage for Lexapro in FY2011 was the statutory rebate percentage of 23.1%, based upon the maximum rebate of 20% given by Forest on the Commercial side of its business.  Accordingly, Medicaid received a reimbursement from Forest of about $106.26 Million (0.231 * $460 Million).  However, upon information and belief, Lexapro was dispersed to patients in Pharmacy Provider Facilities with private insurance, with Pharmacy Providers/GPOs receiving a maximum discount/rebate of 15% and commercial insurance companies, again, receiving up to a 20% rebate on the same dispersed drug.  However, Forest knowingly, with deliberate ignorance, or with reckless disregard ignored

36

such double rebates, while also purposefully or with reckless disregard failing to implement the DNA process in the Pharmacy Provider/GPO market to identify such double rebates, despite knowing, or it should have known, upon information and belief, that at least 15% of Pharmacy Provider patients receiving Lexapro had private insurance.  Therefore, taking into account such double rebates, Medicaid should have received an additional 11.9% rebate (20% Commercial rebate + 15% Pharmacy Provider/GPO rebate − 23.1% reported Best Price rebate = 11.9% under-rebate), resulting in Forest owing Medicaid an additional reimbursement of about **$54.74 Million** (0.119 * $460 Million) for **Lexapro** in **FY2011**.

70.     Upon information and belief, in FY2011, Forest's net sales for Namenda were about $1.3 Billion, at least 10% of which were Medicaid sales − $130 Million.  Upon information and belief, Forest's highest reported Best Price rebate percentage for Namenda in FY2011 was the statutory rebate percentage of 23.1%, based upon the maximum rebate of 11% given by Forest on the Commercial side of its business.  Accordingly, Medicaid received a reimbursement from Forest of about $30.03 Million (0.231 * $130 Million).  However, upon information and belief, Namenda was dispersed to patients in Pharmacy Provider Facilities with private insurance, with Pharmacy Providers/GPOs receiving a maximum discount/rebate of 14% and commercial insurance companies, again, receiving up to a 11% rebate on the same dispersed drug.  However, Forest knowingly, with deliberate ignorance, or with reckless disregard ignored such double rebates, while also purposefully or with reckless disregard failing to implement the DNA process in the Pharmacy Provider/GPO market to identify such double rebates, despite knowing, or it should have known, upon information and belief, that at least 7% of Pharmacy Provider patients receiving Namenda had private insurance.  Therefore, taking into account such double rebates, Medicaid should have received an additional 1.9% rebate (11% Commercial rebate + 14% Pharmacy Provider/GPO rebate − 23.1% reported Best Price rebate = 1.9% under-

rebate), resulting in Forest owing Medicaid an additional reimbursement of about **$2.47 Million** (0.019 * $130 Million) for **Namenda** in **FY2011**.

71.     Upon information and belief, in FY2011, Forest's net sales for Bystolic were about $264 Million, at least 15% of which were Medicaid sales – $39.6 Million. Upon information and belief, Forest's highest reported Best Price rebate percentage for Bystolic in FY2011 was 33%, based upon the maximum rebate of 33% given by Forest on the Commercial side of its business. Accordingly, Medicaid received a reimbursement from Forest of about $13.07 Million (0.33 * $39.6 Million). However, upon information and belief, Bystolic was dispersed to patients in Pharmacy Provider Facilities with private insurance, with Pharmacy Providers/GPOs receiving a maximum discount/rebate of 10% and commercial insurance companies, again, receiving up to a 33% rebate on the same dispersed drug. However, Forest knowingly, with deliberate ignorance, or with reckless disregard ignored such double rebates, while also purposefully or with reckless disregard failing to implement the DNA process in the Pharmacy Provider/GPO market to identify such double rebates, despite knowing, or it should have known, upon information and belief, that at least 15% of Pharmacy Provider patients receiving Bystolic had private insurance. Therefore, taking into account such double rebates, Medicaid should have received an additional 10% rebate (33% Commercial rebate + 10% Pharmacy Provider/GPO rebate – 33% reported Best Price rebate = 10% under-rebate), resulting in Forest owing Medicaid an additional reimbursement of about **$3.96 Million** (0.10 * $39.6 Million) for **Bystolic** in **FY2011**.

72.     Upon information and belief, in FY2011, Forest's net sales for Savella were about $90 Million, at least 25% of which were Medicaid sales – $22.5 Million. Upon information and belief, Forest's highest reported Best Price rebate percentage for Savella in FY2011 was the statutory rebate percentage of 23.1%, based upon the maximum rebate of 20% given by Forest

38

on the Commercial side of its business. Accordingly, Medicaid received a reimbursement from Forest of about $5.2 Million (0.231 * $22.5 Million). However, upon information and belief, Savella was dispersed to patients in Pharmacy Provider Facilities with private insurance, with Pharmacy Providers/GPOs receiving a maximum discount/rebate of 5% and commercial insurance companies, again, receiving up to a 20% rebate on the same dispersed drug. However, Forest knowingly, with deliberate ignorance, or with reckless disregard ignored such double rebates, while also purposefully or with reckless disregard failing to implement the DNA process in the Pharmacy Provider/GPO market to identify such double rebates, despite knowing, or it should have known, upon information and belief, that at least 15% of Pharmacy Provider patients receiving Savella had private insurance. Therefore, taking into account such double rebates, Medicaid should have received an additional 1.9% rebate (20% Commercial rebate + 5% Pharmacy Provider/GPO rebate – 23.1% reported Best Price rebate = 1.9% under-rebate), resulting in Forest owing Medicaid an additional reimbursement of about **$0.43 Million** (0.019 * $22.5 Million) for **Savella** in **FY2011**.

73.    Upon information and belief, in FY2011, Forest's net sales for Viibryd were about $45 Million, at least 20% of which were Medicaid sales – $9 Million. Upon information and belief, Forest's highest reported Best Price rebate percentage for Viibryd in FY2011 was the statutory rebate percentage of 23.1%, based upon the maximum rebate of 20% given by Forest on the Commercial side of its business. Accordingly, Medicaid received a reimbursement from Forest of about $2.01 Million (0.231 * $9 Million). However, upon information and belief, Viibryd was dispersed to patients in Pharmacy Provider Facilities with private insurance, with Pharmacy Providers/GPOs receiving a maximum discount/rebate of 5% and commercial insurance companies, again, receiving up to a 20% rebate on the same dispersed drug. However, Forest knowingly, with deliberate ignorance, or with reckless disregard ignored such double

39

rebates, while also purposefully or with reckless disregard failing to implement the DNA process in the Pharmacy Provider/GPO market to identify such double rebates, despite knowing, or it should have known, upon information and belief, that at least 15% of Pharmacy Provider patients receiving Viibryd had private insurance. Therefore, taking into account such double rebates, Medicaid should have received an additional 1.9% rebate (20% Commercial rebate + 5% Pharmacy Provider/GPO rebate − 23.1% reported Best Price rebate = 1.9% under-rebate), resulting in Forest owing Medicaid an additional reimbursement of about **$0.17 Million** (0.019 * $9 Million) for **Viibryd** in **FY2011**.

<u>Fiscal Year 2012</u>

74.    Upon information and belief, in FY2012, Forest's net sales for Lexapro were about $2.1 Billion, at least 20% of which were Medicaid sales − $420 Million. Upon information and belief, Forest's highest reported Best Price rebate percentage for Lexapro in FY2012 was the statutory rebate percentage of 23.1%, based upon the maximum rebate of 23% given by Forest on the Commercial side of its business. Accordingly, Medicaid received a reimbursement from Forest of about $97.02 Million (0.231 * $420 Million). However, upon information and belief, Lexapro was dispersed to patients in Pharmacy Provider Facilities with private insurance, with Pharmacy Providers/GPOs receiving a maximum discount/rebate of 15% and commercial insurance companies, again, receiving up to a 23% rebate on the same dispersed drug. However, Forest knowingly, with deliberate ignorance, or with reckless disregard ignored such double rebates, while also purposefully or with reckless disregard failing to implement the DNA process in the Pharmacy Provider/GPO market to identify such double rebates, despite knowing, or it should have known, upon information and belief, that at least 15% of Pharmacy Provider patients receiving Lexapro had private insurance. Therefore, taking into account such double rebates, Medicaid should have received an additional 14.9% rebate (23% Commercial

40

rebate + 15% Pharmacy Provider/GPO rebate – 23.1% reported Best Price rebate = 14.9% under-rebate), resulting in Forest owing Medicaid an additional reimbursement of about **$62.58 Million** (0.149 * $420 Million) for **Lexapro** in **FY2012**.

75.     Upon information and belief, in FY2012, Forest's net sales for Namenda were about $1.4 Billion, at least 10% of which were Medicaid sales – $140 Million.   Upon information and belief, Forest's highest reported Best Price rebate percentage for Namenda in FY2012 was the statutory rebate percentage of 23.1%, based upon the maximum rebate of 13% given by Forest on the Commercial side of its business.   Accordingly, Medicaid received a reimbursement from Forest of about $32.34 Million (0.231 * $140 Million).   However, upon information and belief, Namenda was dispersed to patients in Pharmacy Provider Facilities with private insurance, with Pharmacy Providers/GPOs receiving a maximum discount/rebate of 14% and commercial insurance companies, again, receiving up to a 13% rebate on the same dispersed drug.   However, Forest knowingly, with deliberate ignorance, or with reckless disregard ignored such double rebates, while also purposefully or with reckless disregard failing to implement the DNA process in the Pharmacy Provider/GPO market to identify such double rebates, despite knowing, or it should have known, upon information and belief, that at least 7% of Pharmacy Provider patients receiving Namenda had private insurance.   Therefore, taking into account such double rebates, Medicaid should have received an additional 3.9% rebate (13% Commercial rebate + 14% Pharmacy Provider/GPO rebate – 23.1% reported Best Price rebate = 3.9% under-rebate), resulting in Forest owing Medicaid an additional reimbursement of about **$5.46 Million** (0.039 * $140 Million) for **Namenda** in **FY2012**.

76.     Upon information and belief, in FY2012, Forest's net sales for Bystolic were about $347 Million, at least 15% of which were Medicaid sales – $52.05 Million.   Upon information and belief, Forest's highest reported Best Price rebate percentage for Bystolic in

41

FY2012 was 33%, based upon the maximum rebate of 33% given by Forest on the Commercial side of its business. Accordingly, Medicaid received a reimbursement from Forest of about $17.18 Million (0.33 * $52.05 Million). However, upon information and belief, Bystolic was dispersed to patients in Pharmacy Provider Facilities with private insurance, with Pharmacy Providers/GPOs receiving a maximum discount/rebate of 7% and commercial insurance companies, again, receiving up to a 33% rebate on the same dispersed drug. However, Forest knowingly, with deliberate ignorance, or with reckless disregard ignored such double rebates, while also purposefully or with reckless disregard failing to implement the DNA process in the Pharmacy Provider/GPO market to identify such double rebates, despite knowing, or it should have known, upon information and belief, that at least 15% of Pharmacy Provider patients receiving Bystolic had private insurance. Therefore, taking into account such double rebates, Medicaid should have received an additional 7% rebate (33% Commercial rebate + 7% Pharmacy Provider/GPO rebate – 33% reported Best Price rebate = 7% under-rebate), resulting in Forest owing Medicaid an additional reimbursement of about **$3.64 Million** (0.07 * $52.05 Million) for **Bystolic** in **FY2012**.

77.     Upon information and belief, in FY2012, Forest's net sales for Savella were about $102 Million, at least 25% of which were Medicaid sales – $25.5 Million. Upon information and belief, Forest's highest reported Best Price rebate percentage for Savella in FY2012 was the statutory rebate percentage of 23.1%, based upon the maximum rebate of 20% given by Forest on the Commercial side of its business. Accordingly, Medicaid received a reimbursement from Forest of about $5.89 Million (0.231 * $25.5 Million). However, upon information and belief, Savella was dispersed to patients in Pharmacy Provider Facilities with private insurance, with Pharmacy Providers/GPOs receiving a maximum discount/rebate of 5% and commercial insurance companies, again, receiving up to a 20% rebate on the same dispersed drug. However,

Forest knowingly, with deliberate ignorance, or with reckless disregard ignored such double rebates, while also purposefully or with reckless disregard failing to implement the DNA process in the Pharmacy Provider/GPO market to identify such double rebates, despite knowing, or it should have known, upon information and belief, that at least 15% of Pharmacy Provider patients receiving Savella had private insurance. Therefore, taking into account such double rebates, Medicaid should have received an additional 1.9% rebate (20% Commercial rebate + 5% Pharmacy Provider/GPO rebate − 23.1% reported Best Price rebate = 1.9% under-rebate), resulting in Forest owing Medicaid an additional reimbursement of about **$0.48 Million** (0.019 * $25.5 Million) for **Savella** in **FY2012**.

78.     Upon information and belief, in FY2012, Forest's net sales for Viibryd were about $56 Million, at least 20% of which were Medicaid sales – $11.2 Million. Upon information and belief, Forest's highest reported Best Price rebate percentage for Viibryd in FY2012 was the statutory rebate percentage of 23.1%, based upon the maximum rebate of 20% given by Forest on the Commercial side of its business. Accordingly, Medicaid received a reimbursement from Forest of about $2.59 Million (0.231 * $11.2 Million). However, upon information and belief, Viibryd was dispersed to patients in Pharmacy Provider Facilities with private insurance, with Pharmacy Providers/GPOs receiving a maximum discount/rebate of 5% and commercial insurance companies, again, receiving up to a 20% rebate on the same dispersed drug. However, Forest knowingly, with deliberate ignorance, or with reckless disregard ignored such double rebates, while also purposefully or with reckless disregard failing to implement the DNA process in the Pharmacy Provider/GPO market to identify such double rebates, despite knowing, or it should have known, upon information and belief, that at least 15% of Pharmacy Provider patients receiving Viibryd had private insurance. Therefore, taking into account such double rebates, Medicaid should have received an additional 1.9% rebate (20% Commercial

rebate + 5% Pharmacy Provider/GPO rebate – 23.1% reported Best Price rebate = 1.9% under-rebate), resulting in Forest owing Medicaid an additional reimbursement of about **$0.21 Million** (0.019 * $11.2 Million) for **Viibryd** in **FY2012**.

79.     Upon information and belief, in FY2012, Forest's net sales for Tudorza were about $35 Million, at least 10% of which were Medicaid sales – $3.5 Million. Upon information and belief, Forest's highest reported Best Price rebate percentage for Tudorza in FY2012 was the statutory rebate percentage of 23.1%, based upon the maximum rebate of 18% given by Forest on the Commercial side of its business. Accordingly, Medicaid received a reimbursement from Forest of about $0.81 Million (0.231 * $3.5 Million). However, upon information and belief, Tudorza was dispersed to patients in Pharmacy Provider Facilities with private insurance, with Pharmacy Providers/GPOs receiving a maximum discount/rebate of 10% and commercial insurance companies, again, receiving up to a 18% rebate on the same dispersed drug. However, Forest knowingly, with deliberate ignorance, or with reckless disregard ignored such double rebates, while also purposefully or with reckless disregard failing to implement the DNA process in the Pharmacy Provider/GPO market to identify such double rebates, despite knowing, or it should have known, upon information and belief, that at least 7% of Pharmacy Provider patients receiving Tudorza had private insurance. Therefore, taking into account such double rebates, Medicaid should have received an additional 4.9% rebate (18% Commercial rebate + 10% Pharmacy Provider/GPO rebate – 23.1% reported Best Price rebate = 4.9% under-rebate), resulting in Forest owing Medicaid an additional reimbursement of about **$0.17 Million** (0.049 * $3.5 Million) for **Tudorza** in **FY2012**.

80.     Upon information and belief, in FY2012, Forest's net sales for Linzess were about $60 Million, at least 15% of which were Medicaid sales – $9 Million. Upon information and belief, Forest's highest reported Best Price rebate percentage for Linzess in FY2012 was the

44

statutory rebate percentage of 23.1%, based upon the maximum rebate of 23% given by Forest on the Commercial side of its business. Accordingly, Medicaid received a reimbursement from Forest of about $2.08 Million (0.231 * $9 Million). However, upon information and belief, Linzess was dispersed to patients in Pharmacy Provider Facilities with private insurance, with Pharmacy Providers/GPOs receiving a maximum discount/rebate of 7% and commercial insurance companies, again, receiving up to a 23% rebate on the same dispersed drug. However, Forest knowingly, with deliberate ignorance, or with reckless disregard ignored such double rebates, while also purposefully or with reckless disregard failing to implement the DNA process in the Pharmacy Provider/GPO market to identify such double rebates, despite knowing, or it should have known, upon information and belief, that at least 10% of Pharmacy Provider patients receiving Linzess had private insurance. Therefore, taking into account such double rebates, Medicaid should have received an additional 6.9% rebate (23% Commercial rebate + 7% Pharmacy Provider/GPO rebate − 23.1% reported Best Price rebate = 6.9% under-rebate), resulting in Forest owing Medicaid an additional reimbursement of about **$0.62 Million** (0.069 * $9 Million) for **Linzess** in **FY2012**.

<u>Fiscal Year 2013</u>

81.     Upon information and belief, in FY2013, Forest's net sales for Namenda were about $1.5 Billion, at least 10% of which were Medicaid sales − $150 Million. Upon information and belief, Forest's highest reported Best Price rebate percentage for Namenda in FY2013 was the statutory rebate percentage of 23.1%, based upon the maximum rebate of 13% given by Forest on the Commercial side of its business. Accordingly, Medicaid received a reimbursement from Forest of about $34.65 Million (0.231 * $150 Million). However, upon information and belief, Namenda was dispersed to patients in Pharmacy Provider Facilities with private insurance, with Pharmacy Providers/GPOs receiving a maximum discount/rebate of 13%

45

and commercial insurance companies, again, receiving up to a 13% rebate on the same dispersed drug. However, Forest knowingly, with deliberate ignorance, or with reckless disregard ignored such double rebates, while also purposefully or with reckless disregard failing to implement the DNA process in the Pharmacy Provider/GPO market to identify such double rebates, despite knowing, or it should have known, upon information and belief, that at least 7% of Pharmacy Provider patients receiving Namenda had private insurance. Therefore, taking into account such double rebates, Medicaid should have received an additional 2.9% rebate (13% Commercial rebate + 13% Pharmacy Provider/GPO rebate – 23.1% reported Best Price rebate = 2.9% under-rebate), resulting in Forest owing Medicaid an additional reimbursement of about **$2.85 Million** (0.019 * $150 Million) for **Namenda** in **FY2013**.

82.    Upon information and belief, in FY2013, Forest's net sales for Bystolic were about $455 Million, at least 15% of which were Medicaid sales – $68.25 Million. Upon information and belief, Forest's highest reported Best Price rebate percentage for Bystolic in FY2013 was 33%, based upon the maximum rebate of 33% given by Forest on the Commercial side of its business. Accordingly, Medicaid received a reimbursement from Forest of about $22.52 Million (0.33 * $68.25 Million). However, upon information and belief, Bystolic was dispersed to patients in Pharmacy Provider Facilities with private insurance, with Pharmacy Providers/GPOs receiving a maximum discount/rebate of 7% and commercial insurance companies, again, receiving up to a 33% rebate on the same dispersed drug. However, Forest knowingly, with deliberate ignorance, or with reckless disregard ignored such double rebates, while also purposefully or with reckless disregard failing to implement the DNA process in the Pharmacy Provider/GPO market to identify such double rebates, despite knowing, or it should have known, upon information and belief, that at least 15% of Pharmacy Provider patients receiving Bystolic had private insurance. Therefore, taking into account such double rebates,

Medicaid should have received an additional 7% rebate (33% Commercial rebate + 7% Pharmacy Provider/GPO rebate – 33% reported Best Price rebate = 7% under-rebate), resulting in Forest owing Medicaid an additional reimbursement of about **$4.78 Million** (0.07 * $68.25 Million) for **Bystolic** in **FY2013**.

83.     Upon information and belief, in FY2013, Forest's net sales for Savella were about $105 Million, at least 25% of which were Medicaid sales – $26.25 Million.  Upon information and belief, Forest's highest reported Best Price rebate percentage for Savella in FY2013 was the statutory rebate percentage of 23.1%, based upon the maximum rebate of 20% given by Forest on the Commercial side of its business.  Accordingly, Medicaid received a reimbursement from Forest of about $6.06 Million (0.231 * $26.25 Million).  However, upon information and belief, Savella was dispersed to patients in Pharmacy Provider Facilities with private insurance, with Pharmacy Providers/GPOs receiving a maximum discount/rebate of 5% and commercial insurance companies, again, receiving up to a 20% rebate on the same dispersed drug.  However, Forest knowingly, with deliberate ignorance, or with reckless disregard ignored such double rebates, while also purposefully or with reckless disregard failing to implement the DNA process in the Pharmacy Provider/GPO market to identify such double rebates, despite knowing, or it should have known, upon information and belief, that at least 15% of Pharmacy Provider patients receiving Savella had private insurance.  Therefore, taking into account such double rebates, Medicaid should have received an additional 1.9% rebate (20% Commercial rebate + 5% Pharmacy Provider/GPO rebate – 23.1% reported Best Price rebate = 1.9% under-rebate), resulting in Forest owing Medicaid an additional reimbursement of about **$0.5 Million** (0.019 * $26.25 Million) for **Savella** in **FY2013**.

84.     Upon information and belief, in FY2013, Forest's net sales for Viibryd were about $163 Million, at least 20% of which were Medicaid sales – $32.6 Million.  Upon

47

information and belief, Forest's highest reported Best Price rebate percentage for Viibryd in FY2013 was the statutory rebate percentage of 23.1%, based upon the maximum rebate of 20% given by Forest on the Commercial side of its business. Accordingly, Medicaid received a reimbursement from Forest of about $7.53 Million (0.231 * $32.6 Million). However, upon information and belief, Viibryd was dispersed to patients in Pharmacy Provider Facilities with private insurance, with Pharmacy Providers/GPOs receiving a maximum discount/rebate of 5% and commercial insurance companies, again, receiving up to a 20% rebate on the same dispersed drug. However, Forest knowingly, with deliberate ignorance, or with reckless disregard ignored such double rebates, while also purposefully or with reckless disregard failing to implement the DNA process in the Pharmacy Provider/GPO market to identify such double rebates, despite knowing, or it should have known, upon information and belief, that at least 15% of Pharmacy Provider patients receiving Viibryd had private insurance. Therefore, taking into account such double rebates, Medicaid should have received an additional 1.9% rebate (20% Commercial rebate + 5% Pharmacy Provider/GPO rebate – 23.1% reported Best Price rebate = 1.9% under-rebate), resulting in Forest owing Medicaid an additional reimbursement of about **$0.62 Million** (0.019 * $32.6 Million) for **Viibryd** in **FY2013**.

85.     Upon information and belief, in FY2013, Forest's net sales for Fetzima were about $13 Million, at least 20% of which were Medicaid sales – $2.6 Million. Upon information and belief, Forest's highest reported Best Price rebate percentage for Fetzima in FY2013 was 25%, based upon the maximum rebate of 25% given by Forest on the Commercial side of its business. Accordingly, Medicaid received a reimbursement from Forest of about $0.65 Million (0.25 * $2.6 Million). However, upon information and belief, Fetzima was dispersed to patients in Pharmacy Provider Facilities with private insurance, with Pharmacy Providers/GPOs receiving a maximum discount/rebate of 5% and commercial insurance companies, again,

receiving up to a 25% rebate on the same dispersed drug. However, Forest knowingly, with deliberate ignorance, or with reckless disregard ignored such double rebates, while also purposefully or with reckless disregard failing to implement the DNA process in the Pharmacy Provider/GPO market to identify such double rebates, despite knowing, or it should have known, upon information and belief, that at least 15% of Pharmacy Provider patients receiving Fetzima had private insurance. Therefore, taking into account such double rebates, Medicaid should have received an additional 5% rebate (25% Commercial rebate + 5% Pharmacy Provider/GPO rebate − 25% reported Best Price rebate = 5% under-rebate), resulting in Forest owing Medicaid an additional reimbursement of about **$0.13 Million** (0.05 * $2.6 Million) for **Fetzima** in **FY2013**.

86.     Upon information and belief, in FY2013, Forest's net sales for Tudorza were about $23 Million, at least 10% of which were Medicaid sales − $2.3 Million. Upon information and belief, Forest's highest reported Best Price rebate percentage for Tudorza in FY2013 was the statutory rebate percentage of 23.1%, based upon the maximum rebate of 20% given by Forest on the Commercial side of its business. Accordingly, Medicaid received a reimbursement from Forest of about $0.53 Million (0.231 * $2.3 Million). However, upon information and belief, Tudorza was dispersed to patients in Pharmacy Provider Facilities with private insurance, with Pharmacy Providers/GPOs receiving a maximum discount/rebate of 10% and commercial insurance companies, again, receiving up to a 20% rebate on the same dispersed drug. However, Forest knowingly, with deliberate ignorance, or with reckless disregard ignored such double rebates, while also purposefully or with reckless disregard failing to implement the DNA process in the Pharmacy Provider/GPO market to identify such double rebates, despite knowing, or it should have known, upon information and belief, that at least 7% of Pharmacy Provider patients receiving Tudorza had private insurance. Therefore, taking into account such double rebates, Medicaid should have received an additional 6.9% rebate (20% Commercial rebate + 10%

49

Pharmacy Provider/GPO rebate – 23.1% reported Best Price rebate = 6.9% under-rebate), resulting in Forest owing Medicaid an additional reimbursement of about **$0.16 Million** (0.069 * $2.3 Million) for **Tudorza** in **FY2013**.

87.    Upon information and belief, in FY2013, Forest's net sales for Daliresp were about $78 Million, at least 7% of which were Medicaid sales – $5.46 Million.  Upon information and belief, Forest's highest reported Best Price rebate percentage for Daliresp in FY2013 was the statutory rebate percentage of 23.1%, based upon the maximum rebate of 18% given by Forest on the Commercial side of its business.  Accordingly, Medicaid received a reimbursement from Forest of about $1.26 Million (0.231 * $5.46 Million).  However, upon information and belief, Daliresp was dispersed to patients in Pharmacy Provider Facilities with private insurance, with Pharmacy Providers/GPOs receiving a maximum discount/rebate of 7% and commercial insurance companies, again, receiving up to a 18% rebate on the same dispersed drug.  However, Forest knowingly, with deliberate ignorance, or with reckless disregard ignored such double rebates, while also purposefully or with reckless disregard failing to implement the DNA process in the Pharmacy Provider/GPO market to identify such double rebates, despite knowing, or it should have known, upon information and belief, that at least 7% of Pharmacy Provider patients receiving Daliresp had private insurance.  Therefore, taking into account such double rebates, Medicaid should have received an additional 1.9% rebate (18% Commercial rebate + 7% Pharmacy Provider/GPO rebate – 23.1% reported Best Price rebate = 1.9% under-rebate), resulting in Forest owing Medicaid an additional reimbursement of about **$0.10 Million** (0.019 * $5.46 Million) for **Daliresp** in **FY2013**.

88.    Upon information and belief, in FY2013, Forest's net sales for Linzess were about $24 Million, at least 15% of which were Medicaid sales – $3.6 Million.  Upon information and belief, Forest's highest reported Best Price rebate percentage for Linzess in FY2013 was 25%,

based upon the maximum rebate of 25% given by Forest on the Commercial side of its business. Accordingly, Medicaid received a reimbursement from Forest of about $0.9 Million (0.25 * $3.6 Million). However, upon information and belief, Linzess was dispersed to patients in Pharmacy Provider Facilities with private insurance, with Pharmacy Providers/GPOs receiving a maximum discount/rebate of 7% and commercial insurance companies, again, receiving up to a 25% rebate on the same dispersed drug. However, Forest knowingly, with deliberate ignorance, or with reckless disregard ignored such double rebates, while also purposefully or with reckless disregard failing to implement the DNA process in the Pharmacy Provider/GPO market to identify such double rebates, despite knowing, or it should have known, upon information and belief, that at least 10% of Pharmacy Provider patients receiving Linzess had private insurance. Therefore, taking into account such double rebates, Medicaid should have received an additional 7% rebate (25% Commercial rebate + 7% Pharmacy Provider/GPO rebate – 25% reported Best Price rebate = 7% under-rebate), resulting in Forest owing Medicaid an additional reimbursement of about **$0.25 Million** (0.07 * $3.6 Million) for **Linzess** in **FY2013**.

Fiscal Year 2014

89.    Upon information and belief, in FY2014, Forest's net sales for Namenda were about $1.5 Billion, at least 10% of which were Medicaid sales – $150 Million. Upon information and belief, Forest's highest reported Best Price rebate percentage for Namenda in FY2014 was the statutory rebate percentage of 23.1%, based upon the maximum rebate of 15% given by Forest on the Commercial side of its business. Accordingly, Medicaid received a reimbursement from Forest of about $34.65 Million (0.231 * $150 Million). However, upon information and belief, Namenda was dispersed to patients in Pharmacy Provider Facilities with private insurance, with Pharmacy Providers/GPOs receiving a maximum discount/rebate of 13% and commercial insurance companies, again, receiving up to a 15% rebate on the same dispersed

drug. However, Forest knowingly, with deliberate ignorance, or with reckless disregard ignored such double rebates, while also purposefully or with reckless disregard failing to implement the DNA process in the Pharmacy Provider/GPO market to identify such double rebates, despite knowing, or it should have known, upon information and belief, that at least 7% of Pharmacy Provider patients receiving Namenda had private insurance. Therefore, taking into account such double rebates, Medicaid should have received an additional 4.9% rebate (15% Commercial rebate + 13% Pharmacy Provider/GPO rebate – 23.1% reported Best Price rebate = 4.9% under-rebate), resulting in Forest owing Medicaid an additional reimbursement of about **$7.35 Million** (0.049 * $150 Million) for **Namenda** in **FY2014**.

90.    Upon information and belief, in FY2014, Forest's net sales for Namenda XR were about $135 Million, at least 10% of which were Medicaid sales -- $13.5 Million.  Upon information and belief, Forest's highest reported Best Price rebate percentage for Namenda XR in FY2014 was the statutory rebate percentage of 23.1%, based upon the maximum rebate of 15% given by Forest on the Commercial side of its business.  Accordingly, Medicaid received a reimbursement from Forest of about $3.12 Million (0.231 * $13.5 Million).  However, upon information and belief, Namenda XR was dispersed to patients in Pharmacy Provider Facilities with private insurance, with Pharmacy Providers/GPOs receiving a maximum discount/rebate of 15% and commercial insurance companies, again, receiving up to a 15% rebate on the same dispersed drug.  However, Forest knowingly, with deliberate ignorance, or with reckless disregard ignored such double rebates, while also purposefully or with reckless disregard failing to implement the DNA process in the Pharmacy Provider/GPO market to identify such double rebates, despite knowing, or it should have known, upon information and belief, that at least 7% of Pharmacy Provider patients receiving Namenda XR had private insurance.  Therefore, taking into account such double rebates, Medicaid should have received an additional 6.9% rebate (15%

Commercial rebate + 15% Pharmacy Provider/GPO rebate – 23.1% reported Best Price rebate = 6.9% under-rebate), resulting in Forest owing Medicaid an additional reimbursement of about **$0.93 Million** (0.069 * $13.5 Million) for **Namenda XR** in **FY2014**.

91.     Upon information and belief, in FY2014, Forest's net sales for Bystolic were about $529 Million, at least 15% of which were Medicaid sales – $79.35 Million.   Upon information and belief, Forest's highest reported Best Price rebate percentage for Bystolic in FY2014 was 33%, based upon the maximum rebate of 33% given by Forest on the Commercial side of its business.   Accordingly, Medicaid received a reimbursement from Forest of about $26.19 Million (0.33 * $79.35 Million).   However, upon information and belief, Bystolic was dispersed to patients in Pharmacy Provider Facilities with private insurance, with Pharmacy Providers/GPOs receiving a maximum discount/rebate of 7% and commercial insurance companies, again, receiving up to a 33% rebate on the same dispersed drug.   However, Forest knowingly, with deliberate ignorance, or with reckless disregard ignored such double rebates, while also purposefully or with reckless disregard failing to implement the DNA process in the Pharmacy Provider/GPO market to identify such double rebates, despite knowing, or it should have known, upon information and belief, that at least 15% of Pharmacy Provider patients receiving Bystolic had private insurance.   Therefore, taking into account such double rebates, Medicaid should have received an additional 7% rebate (33% Commercial rebate + 7% Pharmacy Provider/GPO rebate – 33% reported Best Price rebate = 7% under-rebate), resulting in Forest owing Medicaid an additional reimbursement of about **$5.55 Million** (0.07 * $79.35 Million) for **Bystolic** in **FY2014**.

92.     Upon information and belief, in FY2014, Forest's net sales for Savella were about $98.7 Million, at least 25% of which were Medicaid sales – $24.68 Million.   Upon information and belief, Forest's highest reported Best Price rebate percentage for Savella in FY2014 was the

statutory rebate percentage of 23.1%, based upon the maximum rebate of 20% given by Forest on the Commercial side of its business. Accordingly, Medicaid received a reimbursement from Forest of about $5.7 Million (0.231 * $24.68 Million). However, upon information and belief, Savella was dispersed to patients in Pharmacy Provider Facilities with private insurance, with Pharmacy Providers/GPOs receiving a maximum discount/rebate of 5% and commercial insurance companies, again, receiving up to a 20% rebate on the same dispersed drug. However, Forest knowingly, with deliberate ignorance, or with reckless disregard ignored such double rebates, while also purposefully or with reckless disregard failing to implement the DNA process in the Pharmacy Provider/GPO market to identify such double rebates, despite knowing, or it should have known, upon information and belief, that at least 15% of Pharmacy Provider patients receiving Savella had private insurance. Therefore, taking into account such double rebates, Medicaid should have received an additional 1.9% rebate (20% Commercial rebate + 5% Pharmacy Provider/GPO rebate − 23.1% reported Best Price rebate = 1.9% under-rebate), resulting in Forest owing Medicaid an additional reimbursement of about **$0.47 Million** (0.019 * $24.68 Million) for **Savella** in **FY2014**.

93.    Upon information and belief, in FY2014, Forest's net sales for Viibryd were about $199 Million, at least 20% of which were Medicaid sales − $39.8 Million. Upon information and belief, Forest's highest reported Best Price rebate percentage for Viibryd in FY2014 was 25%, based upon the maximum rebate of 25% given by Forest on the Commercial side of its business. Accordingly, Medicaid received a reimbursement from Forest of about $9.95 Million (0.25 * $39.8 Million). However, upon information and belief, Viibryd was dispersed to patients in Pharmacy Provider Facilities with private insurance, with Pharmacy Providers/GPOs receiving a maximum discount/rebate of 5% and commercial insurance companies, again, receiving up to a 25% rebate on the same dispersed drug. However, Forest

54

knowingly, with deliberate ignorance, or with reckless disregard ignored such double rebates, while also purposefully or with reckless disregard failing to implement the DNA process in the Pharmacy Provider/GPO market to identify such double rebates, despite knowing, or it should have known, upon information and belief, that at least 15% of Pharmacy Provider patients receiving Viibryd had private insurance. Therefore, taking into account such double rebates, Medicaid should have received an additional 5% rebate (25% Commercial rebate + 5% Pharmacy Provider/GPO rebate – 25% reported Best Price rebate = 5% under-rebate), resulting in Forest owing Medicaid an additional reimbursement of about **$1.99 Million** (0.05 * $39.8 Million) for **Viibryd** in **FY2014**.

94.     Upon information and belief, in FY2014, Forest's net sales for Fetzima were about $11.7 Million, at least 20% of which were Medicaid sales – $2.34 Million. Upon information and belief, Forest's highest reported Best Price rebate percentage for Fetzima in FY2014 was 30%, based upon the maximum rebate of 30% given by Forest on the Commercial side of its business. Accordingly, Medicaid received a reimbursement from Forest of about $0.7 Million (0.30 * $2.34 Million). However, upon information and belief, Fetzima was dispersed to patients in Pharmacy Provider Facilities with private insurance, with Pharmacy Providers/GPOs receiving a maximum discount/rebate of 5% and commercial insurance companies, again, receiving up to a 30% rebate on the same dispersed drug. However, Forest knowingly, with deliberate ignorance, or with reckless disregard ignored such double rebates, while also purposefully or with reckless disregard failing to implement the DNA process in the Pharmacy Provider/GPO market to identify such double rebates, despite knowing, or it should have known, upon information and belief, that at least 15% of Pharmacy Provider patients receiving Fetzima had private insurance. Therefore, taking into account such double rebates, Medicaid should have received an additional 5% rebate (30% Commercial rebate + 5% Pharmacy Provider/GPO rebate

– 30% reported Best Price rebate = 5% under-rebate), resulting in Forest owing Medicaid an additional reimbursement of about **$0.12 Million** (0.05 * $2.34 Million) for **Fetzima** in **FY2014**.

95.     Upon information and belief, in FY2014, Forest's net sales for Tudorza were about $78.4 Million, at least 10% of which were Medicaid sales – $7.84 Million.   Upon information and belief, Forest's highest reported Best Price rebate percentage for Tudorza in FY2014 was the statutory rebate percentage of 23.1%, based upon the maximum rebate of 23% given by Forest on the Commercial side of its business.   Accordingly, Medicaid received a reimbursement from Forest of about $1.81 Million (0.231 * $7.84 Million).   However, upon information and belief, Tudorza was dispersed to patients in Pharmacy Provider Facilities with private insurance, with Pharmacy Providers/GPOs receiving a maximum discount/rebate of 10% and commercial insurance companies, again, receiving up to a 23% rebate on the same dispersed drug.   However, Forest knowingly, with deliberate ignorance, or with reckless disregard ignored such double rebates, while also purposefully or with reckless disregard failing to implement the DNA process in the Pharmacy Provider/GPO market to identify such double rebates, despite knowing, or it should have known, upon information and belief, that at least 7% of Pharmacy Provider patients receiving Tudorza had private insurance.   Therefore, taking into account such double rebates, Medicaid should have received an additional 9.9% rebate (23% Commercial rebate + 10% Pharmacy Provider/GPO rebate – 23.1% reported Best Price rebate = 9.9% under-rebate), resulting in Forest owing Medicaid an additional reimbursement of about **$0.78 Million** (0.099 * $7.84 Million) for **Tudorza** in **FY2014**.

96.     Upon information and belief, in FY2014, Forest's net sales for Linzess were about $175 Million, at least 15% of which were Medicaid sales – $26.25 Million.   Upon information and belief, Forest's highest reported Best Price rebate percentage for Linzess in FY2014 was 25%, based upon the maximum rebate of 25% given by Forest on the Commercial side of its

business. Accordingly, Medicaid received a reimbursement from Forest of about $6.56 Million (0.25 * $26.25 Million). However, upon information and belief, Linzess was dispersed to patients in Pharmacy Provider Facilities with private insurance, with Pharmacy Providers/GPOs receiving a maximum discount/rebate of 7% and commercial insurance companies, again, receiving up to a 25% rebate on the same dispersed drug. However, Forest knowingly, with deliberate ignorance, or with reckless disregard ignored such double rebates, while also purposefully or with reckless disregard failing to implement the DNA process in the Pharmacy Provider/GPO market to identify such double rebates, despite knowing, or it should have known, upon information and belief, that at least 10% of Pharmacy Provider patients receiving Linzess had private insurance. Therefore, taking into account such double rebates, Medicaid should have received an additional 7% rebate (25% Commercial rebate + 7% Pharmacy Provider/GPO rebate − 25% reported Best Price rebate = 7% under-rebate), resulting in Forest owing Medicaid an additional reimbursement of about **$1.84 Million** (0.07 * $26.25 Million) for **Linzess** in **FY2014**.

97.     All told, upon information and belief, for **FY2005 to FY2014**, Forest owes Medicaid an additional reimbursement of about **$686.64 Million** as set forth above for those drugs alone. However, upon information and belief, Forest has been knowingly, with deliberate ignorance, or with reckless disregard committing Best Price violations in relation to any one of the Forest Drugs since at least FY2005.

98.     Such double rebates on the same dispersed drug units are similar to the double rebates Forest has attempted to avoid in the Commercial market with the DNA process. Yet, despite its clear awareness of Best Price issues involving double rebates, coupled with its knowledge of third party private payers in the Pharmacy Provider/GPO market, Forest has knowingly, with deliberate ignorance, or with reckless disregard failed to accurately report the

Best Price to the Secretary for its drug products dispersed in Pharmacy Provider Facilities, inclusive of all discounts and rebates given to both the Pharmacy Providers/GPOs *and* the private insurance companies that cover a measurable percentage of Pharmacy Provider patients in such facilities.

99.     Therefore, Forest's false and fraudulent conduct has resulted in state Medicaid programs not receiving the *lowest* price available from Forest during the relevant rebate periods on such drugs, inclusive of all discounts and rebates.   Forest's violation of the Best Price reported to the Secretary has caused the federal government to pay over $680 Million more in Medicaid spending to various state Medicaid programs than it should have under the Medicaid Drug Rebate Program.

**COUNT I**
**VIOLATION OF THE FALSE CLAIMS ACT**
**31 U.S.C. § 3729(a)(1) (1990)/31 U.S.C. § 3729(a)(1)(A) (2009)**

100.    Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

101.    As set forth above, Defendants knowingly, with deliberate ignorance, or with reckless disregard presented, or caused to be presented, false or fraudulent claims for payment to officials of the United States Government in violation of 31 U.S.C. § 3729(a)(1) (1990) and 31 U.S.C. § 3729(a)(1)(A) (2009).

102.    By virtue of the false or fraudulent claims made by the Defendants, the United States suffered actual damages and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty for each violation.

## COUNT II
## VIOLATION OF THE FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(2) (1990)/31 U.S.C. § 3729(a)(1)(B) (2009)

103.    Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

104.    As set forth above, Defendants knowingly, with deliberate ignorance, or with reckless disregard made, used, or caused to be made or used false records or statements material to a false or fraudulent claim in violation of 31 U.S.C. § 3729(a)(2) (1990) and 31 U.S.C. § 3729(a)(1)(B) (2009).

105.    By virtue of the false records or statements made by the Defendants, the United States suffered actual damages and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty for each violation.

## COUNT III
## VIOLATION OF THE FALSE CLAIMS ACT
### 31 U.S.C. §3729(a)(3) (1990) / 31 U.S.C. §3729(a)(1)(C) (2009)

106.    Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

107.    As set forth above, Defendants knowingly conspired to commit a violation of the False Claims Act in violation of 31 U.S.C. § 3729(a)(3) (1990) and 31 U.S.C. § 3729(a)(1)(C) (2009 amendments).

108.    By virtue of the false records or statements made by the Defendants, the United States suffered actual damages and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty for each violation.

## COUNT IV
## VIOLATION OF THE FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(7) (1990)/31 U.S.C. § 3729(a)(1)(G) (2009)

109.   Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

110.   As set forth above, Defendants knowingly, with deliberate ignorance, or with reckless disregard made, used, or caused to be made or used false records or statements material to an obligation to pay or transmit money or property to the Government, or knowingly, with deliberate ignorance, or with reckless disregard concealed or knowingly, with deliberate ignorance, or with reckless disregard and improperly avoided or decreased an obligation to pay or transmit money or property to the Government in violation of 31 U.S.C. § 3729(a)(7) (1990) and 31 U.S.C. § 3729(a)(1)(G) (2009).

111.   By virtue of the false records or statements made by the Defendants, the United States suffered actual damages and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty for each violation.

## COUNT V
## VIOLATION OF THE CALIFORNIA FALSE CLAIMS ACT
### Cal. Gov't Code § 12651(A)(1))

112.   Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

113.   This is a claim for penalties and treble damages under the California False Claims Act.

114.   By virtue of the acts described above, Defendants, for the purpose of defrauding the California State Government, knowingly, with deliberate ignorance, or with reckless disregard presented and/or caused to be presented false claims for payment or approval under

Medicaid and other California State funded programs to officers or employees of the state within the meaning of Cal. Gov't Code § 12651(a)(1).

115.    As a result, California State monies were lost through payments made in respect of the claims and other costs were sustained by the California State Government.

116.    Therefore, the California State Government has been damaged in an amount to be proven at trial.

117.    Additionally, the California State Government is entitled to the maximum penalty for each and every false claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

## COUNT VI
## VIOLATION OF THE CALIFORNIA FALSE CLAIMS ACT
### Cal. Gov't Code § 12651(A)(2)

118.    Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

119.    This is a claim for penalties and treble damages under the California False Claims Act.

120.    By virtue of the acts described above, Defendants, for the purpose of defrauding the California State Government, knowingly, with deliberate ignorance, or with reckless disregard made, used, and/or caused to be made or used, false records or statements to get false claims paid or approved under Medicaid and other California State funded programs within the meaning of Cal. Gov't Code § 12651(a)(2).

121.    As a result, California State monies were lost through payments made in respect of the claims and other costs were sustained by the California State Government.

## COUNT VII
## VIOLATION OF THE CALIFORNIA FALSE CLAIMS ACT
### Cal. Gov't Code § 12651(A)(3)

122.   Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

123.   This is a claim for penalties and treble damages under the California False Claims Act.

124.   By virtue of the acts described above, Defendants have knowingly conspired together to defraud the California State Government under Cal. Gov't Code § 12651(a)(3).

125.   As a result, California State monies were lost through payments made in respect of the claims and other costs were sustained by the California State Government.

## COUNT VIII
## VIOLATION OF THE CALIFORNIA FALSE CLAIMS ACT
### Cal. Gov't Code § 12651(A)(7)

126.   Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

127.   This is a claim for penalties and treble damages under the California False Claims Act.

128.   As set forth above, Defendants knowingly, with deliberate ignorance, or with reckless disregard made, used, or caused to be made or used false records or statements material to an obligation to pay or transmit money or property to the California State Government, or knowingly, with deliberate ignorance, or with reckless disregard concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the California State Government in violation of Cal. Gov't Code § 12651(a)(7).

129.   As a result, California State monies were lost through payments made in respect of the claims and other costs were sustained by the California State Government.

130.    Therefore, the California State Government has been damaged in an amount to be proven at trial.

131.    Additionally, the California State Government is entitled to the maximum penalty for each and every false claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

## COUNT IX
## VIOLATION OF THE COLORADO FALSE CLAIMS ACT
### C.R.S.A. § 25.5-4-305 and 306

132.    Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

133.    This is a claim for penalties and treble damages under the Colorado False Claims Act.

134.    By virtue of the acts described above, Defendants, for the purpose of defrauding the Colorado State Government, knowingly, with deliberate ignorance, or with reckless disregard presented and/or caused to be presented false claims for payment or approval under Medicaid and other Colorado State funded programs to officers or employees or agents of the state within the meaning of C.R.S.A. § 25.5-4-305(1)(a).

135.    As a result, Colorado State monies were lost through payments made in respect of the claims and other costs were sustained by the Colorado State Government.

136.    Therefore, the Colorado State Government has been damaged in an amount to be proven at trial.

137.    Additionally, the Colorado State Government is entitled to the maximum penalty for each and every false claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

## COUNT X
## VIOLATION OF THE COLORADO FALSE CLAIMS ACT
### C.R.S.A. § 25.5-4-305 and 306

138.   Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

139.   This is a claim for penalties and treble damages under the Colorado False Claims Act.

140.   By virtue of the acts described above, Defendants, for the purpose of defrauding the Colorado State Government, knowingly, with deliberate ignorance, or with reckless disregard made, used, and/or caused to be made or used, false records or statements to get false claims paid or approved under Medicaid and other Colorado State funded programs within the meaning of C.R.S.A. § 25.5-4-305(1)(b).

141.   As a result, Colorado State monies were lost through payments made in respect of the claims and other costs were sustained by the Colorado State Government.

142.   Therefore, the Colorado State Government has been damaged in an amount to be proven at trial.

143.   Additionally, the Colorado State Government is entitled to the maximum penalty for each and every false claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

## COUNT XI
## VIOLATION OF THE COLORADO FALSE CLAIMS ACT
### C.R.S.A. § 25.5-4-305 and 306

144.   Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

145.   This is a claim for penalties and treble damages under the Colorado False Claims Act.

146.   By virtue of the acts described above, Defendants have knowingly conspired together to defraud the Colorado State Government under C.R.S.A. § 25.5-4-305(1)(g).

147.   As a result, Colorado State monies were lost through payments made in respect of the claims and other costs were sustained by the Colorado State Government.

148.   Therefore, the Colorado State Government has been damaged in an amount to be proven at trial.

149.   Additionally, the Colorado State Government is entitled to the maximum penalty for each and every false claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

## COUNT XII
## VIOLATION OF THE COLORADO FALSE CLAIMS ACT
### C.R.S.A. § 25.5-4-305 and 306

150.   Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

151.   This is a claim for penalties and treble damages under the Colorado False Claims Act.

152.   As set forth above, Defendants knowingly, with deliberate ignorance, or with reckless disregard made, used, or caused to be made or used false records or statements material to an obligation to pay or transmit money or property to the Colorado State Government, or knowingly, with deliberate ignorance, or with reckless disregard concealed or knowingly, with deliberate ignorance, or with reckless disregard and improperly avoided or decreased an obligation to pay or transmit money or property to the Colorado State Government in violation of C.R.S.A. § 25.5-4-305(1)(f).

153.   As a result, Colorado State monies were lost through payments made in respect of the claims and other costs were sustained by the Colorado State Government.

154.     Therefore, the Colorado State Government has been damaged in an amount to be proven at trial.

155.     Additionally, the Colorado State Government is entitled to the maximum penalty for each and every false claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

**COUNT XIII**
**VIOLATION OF THE CONNECTICUT FALSE CLAIMS ACT**
**CONN. GEN. STAT. §§ 17b-301b and 17b-301d**

156.     Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

157.     This is a claim for penalties and treble damages under the Connecticut False Claims Act.

158.     By virtue of the acts described above, Defendants, for the purpose of defrauding the Connecticut State Government, knowingly, with deliberate ignorance, or with reckless disregard presented and/or caused to be presented false claims for payment or approval under medical assistance program and other Connecticut State funded programs administered by the Department of Social Services within the meaning of Conn. Gen. Stat. §17b-301b(a)(1).

159.     As a result, Connecticut State monies were lost through payments made in respect of the claims and other costs were sustained by the Connecticut State Government.

160.     Therefore, the Connecticut State Government has been damaged in an amount to be proven at trial.

161.     Additionally, the Connecticut State Government is entitled to the maximum penalty for each and every false claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

## COUNT XIV
## VIOLATION OF THE CONNECTICUT FALSE CLAIMS ACT
### Conn. Gen. Stat. §§ 17b-301b and 17b-301d

162.    Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

163.    This is a claim for penalties and treble damages under the Connecticut False Claims Act.

164.    By virtue of the acts described above, Defendants, for the purpose of defrauding the Connecticut State Government, knowingly, with deliberate ignorance, or with reckless disregard made, used, and/or caused to be made or used, false records or statements to get false claims paid or approved under a medical assistance program administered by Connecticut Department of Social Services within the meaning of Conn. Gen. Stat. §17b-301b(a)(2).

165.    As a result, Connecticut State monies were lost through payments made in respect of the claims and other costs were sustained by the Connecticut State Government.

166.    Therefore, the Connecticut State Government has been damaged in an amount to be proven at trial.

167.    Additionally, the Connecticut State Government is entitled to the maximum penalty for each and every false claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

## COUNT XV
## VIOLATION OF THE CONNECTICUT FALSE CLAIMS ACT
### Conn. Gen. Stat. §§ 17b-301b and 17b-301d

168.    Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

169.    This is a claim for penalties and treble damages under the Connecticut False Claims Act.

170.     By virtue of the acts described above, Defendants have knowingly conspired together to defraud the Connecticut State Government under Conn. Gen. Stat. §17b-301b(a)(3).

171.     As a result, Connecticut State monies were lost through payments made in respect of the claims and other costs were sustained by the Connecticut State Government.

172.     Therefore, the Connecticut State Government has been damaged in an amount to be proven at trial.

173.     Additionally, the Connecticut State Government is entitled to the maximum penalty for each and every false claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

**COUNT XVI**
**VIOLATION OF THE CONNECTICUT FALSE CLAIMS ACT**
**Conn. Gen. Stat. §§ 17b-301b and 17b-301d**

174.     Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

175.     This is a claim for penalties and treble damages under the Connecticut False Claims Act.

176.     As set forth above, Defendants knowingly, with deliberate ignorance, or with reckless disregard made, used, or caused to be made or used false records or statements material to an obligation to pay or transmit money or property to the Connecticut State Government, or knowingly, with deliberate ignorance, or with reckless disregard concealed or knowingly, with deliberate ignorance, or with reckless disregard and improperly avoided or decreased an obligation to pay or transmit money or property to the Connecticut State Government in violation of Conn. Gen. Stat. §17b-301b(a)(7-8).

177.     As a result, Connecticut State monies were lost through payments made in respect of the claims and other costs were sustained by the Connecticut State Government.

68

178.   Therefore, the Connecticut State Government has been damaged in an amount to be proven at trial.

179.   Additionally, the Connecticut State Government is entitled to the maximum penalty for each and every false claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

## COUNT XVII
## VIOLATION OF DELAWARE FALSE CLAIMS AND REPORTING ACT
### 6 Del. C. § 1201(a)(1)

180.   Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

181.   This is a claim for penalties and treble damages under the Delaware False Claims and Reporting Act.

182.   By virtue of the acts described above, Defendants, for the purpose of defrauding the Delaware State Government, knowingly, with deliberate ignorance, or with reckless disregard presented and/or caused to be presented, directly or indirectly, false or fraudulent claims for payment or approval under Medicaid and other Delaware State funded programs to officers or employees of the state within the meaning of 6 Del. C. § 1201(a)(1).

183.   As a result, Delaware State monies were lost through payments made in respect of the claims and other costs were sustained by the Delaware State Government.

184.   Therefore, the Delaware State Government has been damaged in an amount to be proven at trial.

185.   Additionally, the Delaware State Government is entitled to the maximum penalty for each and every false and fraudulent claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

## COUNT XVIII
## VIOLATION OF DELAWARE FALSE CLAIMS AND REPORTING ACT
## 6 Del. C. § 1201(a)(2)

186. Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

187. This is a claim for penalties and treble damages under the Delaware False Claims and Reporting Act.

188. By virtue of the acts described above, Defendants, for the purpose of defrauding the Delaware State Government, knowingly, with deliberate ignorance, or with reckless disregard made, used, and/or caused to be made or used, directly or indirectly, false records or statements to get false or fraudulent claims paid or approved under Medicaid and other Delaware State funded programs within the meaning of 6 Del. C. § 1201(a)(2).

189. As a result, Delaware State monies were lost through payments made in respect of the claims and other costs were sustained by the Delaware State Government.

190. Therefore, the Delaware State Government has been damaged in an amount to be proven at trial.

191. Additionally, the Delaware State Government is entitled to the maximum penalty for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

## COUNT XIX
## VIOLATION OF DELAWARE FALSE CLAIMS AND REPORTING ACT
## 6 Del. C. § 1201(a)(3)

192. Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

193. This is a claim for penalties and treble damages under the Delaware False Claims and Reporting Act.

194.    By virtue of the acts described above, Defendants have knowingly conspired together to defraud the Delaware State Government under 6 Del. C. § 1201(a)(3).

195.    As a result, Delaware State monies were lost through payments made in respect of the claims and other costs were sustained by the Delaware State Government.

196.    Therefore, the Delaware State Government has been damaged in an amount to be proven at trial.

197.    Additionally, the Delaware State Government is entitled to the maximum penalty for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

## COUNT XX
### VIOLATION OF DELAWARE FALSE CLAIMS AND REPORTING ACT
### 6 Del. C. § 1201(A)(1)

198.    Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

199.    This is a claim for penalties and treble damages under the Delaware False Claims and Reporting Act.

200.    As set forth above, Defendants knowingly, with deliberate ignorance, or with reckless disregard made, used, or caused to be made or used false records or statements material to an obligation to pay or transmit money or property to the Delaware State Government, or knowingly, with deliberate ignorance, or with reckless disregard concealed or knowingly, with deliberate ignorance, or with reckless disregard and improperly avoided or decreased an obligation to pay or transmit money or property to the Delaware State Government in violation of 6 Del. C. § 1201(a)(7).

201.    As a result, Delaware State monies were lost through payments made in respect of the claims and other costs were sustained by the Delaware State Government.

71

202. Therefore, the Delaware State Government has been damaged in an amount to be proven at trial.

203. Additionally, the Delaware State Government is entitled to the maximum penalty for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

## COUNT XXI
## VIOLATION OF THE DISTRICT OF COLUMBIA PROCUREMENT REFORM AMENDMENT ACT
### D.C. Code § 2-308.14(a)(1)

204. Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

205. This is a claim for penalties and treble damages under the District of Columbia Procurement Reform Amendment Act.

206. By virtue of the acts described above, Defendants, for the purpose of defrauding the District of Columbia Government, knowingly, with deliberate ignorance, or with reckless disregard presented and/or caused to be presented, false claims for payment or approval under Medicaid and other District of Columbia funded programs to officers or employees of the District within the meaning of D.C. Code § 2-308.14(a)(1).

207. As a result, District of Columbia monies were lost through payments made in respect of the claims and other costs were sustained by the District of Columbia Government.

208. Therefore, the District of Columbia Government has been damaged in an amount to be proven at trial.

209. Additionally, the District of Columbia Government is entitled to the maximum penalty for each and every false claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

## COUNT XXII
## VIOLATION OF THE DISTRICT OF COLUMBIA PROCUREMENT
## REFORM AMENDMENT ACT
### D.C. Code § 2-308.14(a)(2)

210. Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

211. This is a claim for penalties and treble damages under the District of Columbia Procurement Reform Amendment Act.

212. By virtue of the acts described above, Defendants, for the purpose of defrauding the District of Columbia Government, knowingly, with deliberate ignorance, or with reckless disregard made, used, and/or caused to be made or used, false records or statements to get false claims paid or approved under Medicaid and other District of Columbia funded programs within the meaning of D.C. Code § 2-308.14(a)(2).

213. As a result, District of Columbia monies were lost through payments made in respect of the claims and other costs were sustained by the District of Columbia Government.

214. Therefore, the District of Columbia Government has been damaged in an amount to be proven at trial.

215. Additionally, the District of Columbia Government is entitled to the maximum penalty for each and every false claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

## COUNT XXIII
## VIOLATION OF THE DISTRICT OF COLUMBIA PROCUREMENT
## REFORM AMENDMENT ACT
### D.C. Code § 2-308.14(a)(3)

216. Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

217.   This is a claim for penalties and treble damages under the District of Columbia Procurement Reform Amendment Act.

218.   By virtue of the acts described above, Defendants have knowingly conspired together to defraud the District of Columbia Government under D.C. Code § 2-308.14(a)(3).

219.   As a result, District of Columbia monies were lost through payments made in respect of the claims and other costs were sustained by the District of Columbia Government.

220.   Therefore, the District of Columbia Government has been damaged in an amount to be proven at trial.

221.   Additionally, the District of Columbia Government is entitled to the maximum penalty for each and every false claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

## COUNT XXIV
## VIOLATION OF THE DISTRICT OF COLUMBIA PROCUREMENT REFORM AMENDMENT ACT
### D.C. Code § 2-308.14(a)(7)

222.   Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

223.   This is a claim for penalties and treble damages under the District of Columbia Procurement Reform Amendment Act.

224.   As set forth above, Defendants knowingly, with deliberate ignorance, or with reckless disregard made, used, or caused to be made or used false records or statements material to an obligation to pay or transmit money or property to the District of Columbia Government, or knowingly, with deliberate ignorance, or with reckless disregard concealed or knowingly, with deliberate ignorance, or with reckless disregard and improperly avoided or decreased an

obligation to pay or transmit money or property to the District of Columbia Government in violation of D.C. Code § 2-308.14(a)(7).

225.    As a result, District of Columbia monies were lost through payments made in respect of the claims and other costs were sustained by the District of Columbia Government.

226.    Therefore, the District of Columbia Government has been damaged in an amount to be proven at trial.

227.    Additionally, the District of Columbia Government is entitled to the maximum penalty for each and every false claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

## COUNT XXV
## VIOLATION OF THE FLORIDA FALSE CLAIMS ACT
### Fla. Stat. § 68.082(2)(a)

228.    Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

229.    This is a claim for penalties and treble damages under the Florida False Claims Act.

230.    By virtue of the acts described above, Defendants, for the purpose of defrauding the Florida State Government, knowingly, with deliberate ignorance, or with reckless disregard presented and/or caused to be presented false claims for payment or approval under Medicaid and other Florida State funded programs to officers or employees of the state within the meaning of Fla. Stat. § 68.082(2)(a).

231.    As a result, Florida State monies were lost through payments made in respect of the claims and other costs were sustained by the Florida State Government.

232.    Therefore, the Florida State Government has been damaged in an amount to be proven at trial.

233.   Additionally, the Florida State Government is entitled to the maximum penalty for each and every false claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

## COUNT XXVI
## VIOLATION OF THE FLORIDA FALSE CLAIMS ACT
### Fla. Stat. § 68.082(2)(b)

234.   Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

235.   This is a claim for penalties and treble damages under the Florida False Claims Act.

236.   By virtue of the acts described above, Defendants, for the purpose of defrauding the Florida State Government, knowingly, with deliberate ignorance, or with reckless disregard made, used, and/or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved under Medicaid and other Florida State funded programs within the meaning of Fla. Stat. § 68.082(2)(b).

237.   As a result, Florida State monies were lost through payments made in respect of the claims and other costs were sustained by the Florida State Government.

238.   Therefore, the Florida State Government has been damaged in an amount to be proven at trial.

239.   Additionally, the Florida State Government is entitled to the maximum penalty for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

## COUNT XXVII
## VIOLATION OF THE FLORIDA FALSE CLAIMS ACT
### Fla. Stat. § 68.082(2)(c)

240.    Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

241.    This is a claim for penalties and treble damages under the Florida False Claims Act.

242.    By virtue of the acts described above, Defendants have knowingly conspired together to defraud the Florida State Government under Fla. Stat. § 68.082(2)(c).

243.    As a result, Florida State monies were lost through payments made in respect of the claims and other costs were sustained by the Florida State Government.

244.    Therefore, the Florida State Government has been damaged in an amount to be proven at trial.

245.    Additionally, the Florida State Government is entitled to the maximum penalty for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

## COUNT XXVIII
## VIOLATION OF THE FLORIDA FALSE CLAIMS ACT
### Fla. Stat. § 68.082(2)(g)

246.    Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

247.    This is a claim for penalties and treble damages under the Florida False Claims Act.

248.    As set forth above, Defendants knowingly, with deliberate ignorance, or with reckless disregard made, used, or caused to be made or used false records or statements material to an obligation to pay or transmit money or property to the Florida State Government, or

knowingly, with deliberate ignorance, or with reckless disregard concealed or knowingly, with deliberate ignorance, or with reckless disregard and improperly avoided or decreased an obligation to pay or transmit money or property to the Florida State Government in violation of Fla. Stat. § 68.082(2)(g).

249.    As a result, Florida State monies were lost through payments made in respect of the claims and other costs were sustained by the Florida State Government.

250.    Therefore, the Florida State Government has been damaged in an amount to be proven at trial.

251.    Additionally, the Florida State Government is entitled to the maximum penalty for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

## COUNT XXIX
## VIOLATION OF THE GEORGIA STATE FALSE MEDICAID CLAIMS ACT
### Ga. Code Ann. § 49-4-168.1(a)(1)

252.    Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

253.    This is a claim for penalties and treble damages under the Georgia State False Medicaid Claims Act.

254.    By virtue of the acts described above, Defendants, for the purpose of defrauding the Georgia State Government, knowingly, with deliberate ignorance, or with reckless disregard presented and/or caused to be presented to the Georgia Medicaid program false or fraudulent claims for payment or approval within the meaning of Ga. Code Ann. § 49-4-168.1(a)(1).

255.    As a result, Georgia State monies were lost through payments made in respect of the claims and other costs were sustained by the Georgia State Government.

256.    Therefore, the Georgia State Government has been damaged in an amount to be proven at trial.

257.    Additionally, the Georgia State Government is entitled to the maximum penalty for each and every false or fraudulent claim presented or caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

### COUNT XXX
### VIOLATION OF THE GEORGIA STATE FALSE MEDICAID CLAIMS ACT
### Ga. Code Ann. § 49-4-168.1(a)(2)

258.    Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

258.    This is a claim for penalties and treble damages under the Georgia State False Medicaid Claims Act.

259.    By virtue of the acts described above, Defendants, for the purpose of defrauding the Georgia State Government, knowingly, with deliberate ignorance, or with reckless disregard made, used, and/or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Georgia Medicaid program within the meaning of Ga. Code Ann. § 49-4-168.1(a)(2).

260.    As a result, Georgia State monies were lost through payments made in respect of the claims and other costs were sustained by the Georgia State Government.

261.    Therefore, the Georgia State Government has been damaged in an amount to be proven at trial.

262.    Additionally, the Georgia State Government is entitled to the maximum penalty for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

**COUNT XXXI**
**VIOLATION OF THE GEORGIA STATE FALSE MEDICAID CLAIMS ACT**
**Ga. Code Ann. § 49-4-168.1(a)(3))**

263.   Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

264.   This is a claim for penalties and treble damages under the Georgia State False Medicaid Claims Act.

265.   By virtue of the acts described above, Defendants have knowingly conspired together to defraud the Georgia State Government under Ga. Code Ann. § 49-4-168.1(a)(3).

266.   As a result, Georgia State monies were lost through payments made in respect of the claims and other costs were sustained by the Georgia State Government.

267.   Therefore, the Georgian State Government has been damaged in an amount to be proven at trial.

268.   Additionally, the Georgia State Government is entitled to the maximum penalty for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

**COUNT XXXII**
**VIOLATION OF THE GEORGIA STATE FALSE MEDICAID CLAIMS ACT**
**Ga. Code Ann. § 49-4-168.1(a)(7)**

269.   Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

270.   This is a claim for penalties and treble damages under the Georgia State False Medicaid Claims Act.

271.   As set forth above, Defendants knowingly, with deliberate ignorance, or with reckless disregard made, used, or caused to be made or used false records or statements material to an obligation to pay or transmit money or property to the Georgia State Government, or

knowingly, with deliberate ignorance, or with reckless disregard concealed or knowingly, with deliberate ignorance, or with reckless disregard and improperly avoided or decreased an obligation to pay or transmit money or property to the Georgia State Government in violation of Ga. Code Ann. § 49-4-168.1(a)(7).

272.    As a result, Georgia State monies were lost through payments made in respect of the claims and other costs were sustained by the Georgia State Government.

273.    Therefore, the Georgian State Government has been damaged in an amount to be proven at trial.

274.    Additionally, the Georgia State Government is entitled to the maximum penalty for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

## COUNT XXXIII
## VIOLATION OF THE HAWAII FALSE CLAIMS ACT
### Haw. Rev. Stat. § 661-21(a)(1)

275.    Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

276.    This is a claim for penalties and treble damages under the Hawaii False Claims Act.

277.    By virtue of the acts described above, Defendants, for the purpose of defrauding the Hawaii State Government, knowingly, with deliberate ignorance, or with reckless disregard presented and/or caused to be presented false or fraudulent claims for payment or approval under Medicaid and other Hawaii State funded programs to officers or employees of the state within the meaning of Haw. Rev. Stat. § 661-21)(a)(1).

278.    As a result, Hawaii State monies were lost through payments made in respect of the claims and other costs were sustained by the Hawaii State Government.

279.   Therefore, the Hawaii State Government has been damaged in an amount to be proven at trial.

280.   Additionally, the Hawaii State Government is entitled to the maximum penalty for each and every false or fraudulent claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

### COUNT XXXIV
### VIOLATION OF THE HAWAII FALSE CLAIMS ACT
### Haw. Rev. Stat. § 661-21(a)(2)

281.   Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

282.   This is a claim for penalties and treble damages under the Hawaii False Claims Act.

283.   By virtue of the acts described above, Defendants, for the purpose of defrauding the Hawaii State Government, knowingly, with deliberate ignorance, or with reckless disregard made, used, and/or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved under Medicaid and other Hawaii State funded programs within the meaning of Haw. Rev. Stat. § 661-21)(a)(2).

284.   As a result, Hawaii State monies were lost through payments made in respect of the claims and other costs were sustained by the Hawaii State Government.

285.   Therefore, the Hawaii State Government has been damaged in an amount to be proven at trial.

286.   Additionally, the Hawaii State Government is entitled to the maximum penalty for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

## COUNT XXXV
## VIOLATION OF THE HAWAII FALSE CLAIMS ACT
### Haw. Rev. Stat. § 661-21)(a)(3)

287.    Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

288.    This is a claim for penalties and treble damages under the Hawaii False Claims Act.

289.    By virtue of the acts described above, Defendants have knowingly conspired together to defraud the Hawaii State Government under Haw. Rev. Stat. § 661-21)(a)(3).

290.    As a result, Hawaii State monies were lost through payments made in respect of the claims and other costs were sustained by the Hawaii State Government.

291.    Therefore, the Hawaii State Government has been damaged in an amount to be proven at trial.

292.    Additionally, the Hawaii State Government is entitled to the maximum penalty for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

## COUNT XXXVI
## VIOLATION OF THE HAWAII FALSE CLAIMS ACT
### Haw. Rev. Stat. § 661-21)(a)6)

293.    Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

294.    This is a claim for penalties and treble damages under the Hawaii False Claims Act.

295.    As set forth above, Defendants knowingly, with deliberate ignorance, or with reckless disregard made, used, or caused to be made or used false records or statements material to an obligation to pay or transmit money or property to the Hawaii State Government, or

knowingly, with deliberate ignorance, or with reckless disregard concealed or knowingly, with deliberate ignorance, or with reckless disregard and improperly avoided or decreased an obligation to pay or transmit money or property to the Hawaii State Government in violation of Haw. Rev. Stat. § 661-21)(a)(6).

296. As a result, Hawaii State monies were lost through payments made in respect of the claims and other costs were sustained by the Hawaii State Government.

297. Therefore, the Hawaii State Government has been damaged in an amount to be proven at trial.

298. Additionally, the Hawaii State Government is entitled to the maximum penalty for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

## COUNT XXXVII
## VIOLATION OF THE ILLINOIS WHISTLEBLOWER REWARD
## AND PROTECTION ACT
### 740 Ill. Comp. Stat. 175/3(a)(1)(A)

299. Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

300. This is a claim for penalties and treble damages under the Illinois Whistleblower Reward and Protection Act.

301. By virtue of the acts described above, Defendants, for the purpose of defrauding the Illinois State Government, knowingly, with deliberate ignorance, or with reckless disregard presented and/or caused to be presented false or fraudulent claims for payment or approval under Medicaid and other Illinois State funded programs to  officers or employees of the state within the meaning of 740 Ill. Comp. Stat. 175/3(a)(1)(A).

302.   As a result, Illinois State monies were lost through payments made in respect of the claims and other costs were sustained by the Illinois State Government.

303.   Therefore, the Illinois State Government has been damaged in an amount to be proven at trial.

304.   Additionally, the Illinois State Government is entitled to the maximum penalty for each and every false or fraudulent claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

## COUNT XXXVIII
## VIOLATION OF THE ILLINOIS WHISTLEBLOWER REWARD AND PROTECTION ACT
### 740 Ill. Comp. Stat. 175/3(a)(1)(B)

305.   Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

306.   This is a claim for penalties and treble damages under the Illinois Whistleblower Reward and Protection Act.

307.   By virtue of the acts described above, Defendants, for the purpose of defrauding the Illinois State Government, knowingly, with deliberate ignorance, or with reckless disregard made, used, and/or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved under Medicaid and other Illinois State funded programs within the meaning of 740 Ill. Comp. Stat. 175/3(a)(1)(B).

308.   As a result, Illinois State monies were lost through payments made in respect of the claims and other costs were sustained by the Illinois State Government.

309.   Therefore, the Illinois State Government has been damaged in an amount to be proven at trial.

310.    Additionally, the Illinois State Government is entitled to the maximum penalty for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

## COUNT XXXIX
## VIOLATION OF THE ILLINOIS WHISTLEBLOWER REWARD
## AND PROTECTION ACT
### 740 Ill. Comp. Stat. 175/3(a)(1)(C))

311.    Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

312.    This is a claim for penalties and treble damages under the Illinois False Claims Act.

313.    By virtue of the acts described above, Defendants have knowingly conspired together to defraud the Illinois State Government under 740 Ill. Comp. Stat. 175/3(a)(1)(C).

314.    As a result, Illinois State monies were lost through payments made in respect of the claims and other costs were sustained by the Illinois State Government.

315.    Therefore, the Illinois State Government has been damaged in an amount to be proven at trial.

316.    Additionally, the Illinois State Government is entitled to the maximum penalty for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

## COUNT XL
## VIOLATION OF THE ILLINOIS WHISTLEBLOWER REWARD
## AND PROTECTION ACT
### 740 Ill. Comp. Stat. 175/3(a)(1)(G)

317.    Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

318.   This is a claim for penalties and treble damages under the Illinois False Claims Act.

319.   As set forth above, Defendants knowingly, with deliberate ignorance, or with reckless disregard made, used, or caused to be made or used false records or statements material to an obligation to pay or transmit money or property to the Illinois State Government, or knowingly, with deliberate ignorance, or with reckless disregard concealed or knowingly, with deliberate ignorance, or with reckless disregard and improperly avoided or decreased an obligation to pay or transmit money or property to the Illinois State Government in violation of 740 Ill. Comp. Stat. 175/3(a)(1)(G).

320.   As a result, Illinois State monies were lost through payments made in respect of the claims and other costs were sustained by the Illinois State Government.

317.   Therefore, the Illinois State Government has been damaged in an amount to be proven at trial.

318.   Additionally, the Illinois State Government is entitled to the maximum penalty for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

**COUNT XLI**
**VIOLATION OF THE INDIANA FALSE CLAIMS AND**
**WHISTLEBLOWER PROTECTION ACT**
**Ind. Code § 5-11-5.5-2(b)(1) and (8)**

324.   Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

325.   This is a claim for penalties and treble damages under the Indiana False Claims and Whistleblower Protection Act.

326.   By virtue of the acts described above, Defendants, for the purpose of defrauding the Indiana State Government, knowingly, with deliberate ignorance, or with reckless disregard or intentionally presented and/or caused or induced another to present false claims under Medicaid and other Indiana State funded programs to the state for payment or approval within the meaning of Ind. Code § 5-11-5.5-2(b)(1) and (8).

327.   As a result, Indiana State monies were lost through payments made in respect of the claims and other costs were sustained by the Indiana State Government.

328.   Therefore, the Indiana State Government has been damaged in an amount to be proven at trial.

329.   Additionally, the Indiana State Government is entitled to a civil penalty for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as describe herein.

## COUNT XLII
## VIOLATION OF THE INDIANA FALSE CLAIMS AND
## WHISTLEBLOWER PROTECTION ACT
### Ind. Code § 5-11-5.5-2(b)(2) and (8)

330.   Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

331.   This is a claim for penalties and treble damages under the Indiana False Claims and Whistleblower Protection Act.

332.   By virtue of the acts described above, Defendants, for the purpose of defrauding the Indiana State Government, knowingly, with deliberate ignorance, or with reckless disregard or intentionally made, used, and/or caused or induced another to make or use, false records or statements to obtain payment or approval of a false claim under Medicaid and other Indiana State funded programs within the meaning of Ind. Code § 5-11-5.5-2(b)(2) and (8).

333.   As a result, Indiana State monies were lost through payments made in respect of the claims and other costs were sustained by the Indiana State Government.

334.   Therefore, the Indiana State Government has been damaged in an amount to be proven at trial.

335.   Additionally, the Indiana State Government is entitled to a civil penalty for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as describe herein.

## COUNT XLIII
## VIOLATION OF THE INDIANA FALSE CLAIMS AND
## WHISTLEBLOWER PROTECTION ACT
### Ind. Code § 5-11-5.5-2(b)(7) and (8)

336.   Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

337.   This is a claim for penalties and treble damages under the Indiana False Claims and Whistleblower Protection Act.

338.   By virtue of the acts described above, Defendants have knowingly conspired together to defraud the Indiana State Government under Ind. Code § 5-11-5.5-2(b)(7) and (8).

339.   As a result, Indiana State monies were lost through payments made in respect of the claims and other costs were sustained by the Indiana State Government.

340.   Therefore, the Indiana State Government has been damaged in an amount to be proven at trial.

341.   Additionally, the Indiana State Government is entitled to a civil penalty for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as describe herein.

## COUNT XLIV
## VIOLATION OF THE INDIANA FALSE CLAIMS AND
## WHISTLEBLOWER PROTECTION ACT
### Ind. Code § 5-11-5.5-2(b)(7) and (8)

342.   Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

343.   This is a claim for penalties and treble damages under the Indiana False Claims and Whistleblower Protection Act.

344.   As set forth above, Defendants knowingly, with deliberate ignorance, or with reckless disregard made, used, or caused to be made or used false records or statements material to an obligation to pay or transmit money or property to the Indiana State Government, or knowingly, with deliberate ignorance, or with reckless disregard concealed or knowingly, with deliberate ignorance, or with reckless disregard and improperly avoided or decreased an obligation to pay or transmit money or property to the Indiana State Government in violation of Ind. Code § 5-11-5.5-2(b)(6) and (8).

345.   As a result, Indiana State monies were lost through payments made in respect of the claims and other costs were sustained by the Indiana State Government.

346.   Therefore, the Indiana State Government has been damaged in an amount to be proven at trial.

347.   Additionally, the Indiana State Government is entitled to a civil penalty for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as describe herein.

## COUNT XLV
## VIOLATION OF THE IOWA FALSE CLAIMS LAW
### Iowa Code §685.2(1)(a)

348.   Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

349.   This is a claim for penalties and treble damages under the Iowa False Claims Act.

350.   By virtue of the acts described above, Defendants, for the purpose of defrauding the Iowa State Government, knowingly, with deliberate ignorance, or with reckless disregard or intentionally presented and/or caused or induced another to present false claims under Medicaid and other Iowa State funded programs to the state for payment or approval within the meaning of Iowa Code § 685.2(1)(a).

351.   As a result, Iowa State monies were lost through payments made in respect of the claims and other costs were sustained by the Iowa State Government.

352.   Therefore, the Iowa State Government has been damaged in an amount to be proven at trial.

353.   Additionally, the Iowa State Government is entitled to a civil penalty for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as describe herein.

## COUNT XLVI
## VIOLATION OF THE IOWA FALSE CLAIMS LAW
### Iowa Code §685.2(1)(b)

354.   Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

355.   This is a claim for penalties and treble damages under the Iowa False Claims Act.

356.   By virtue of the acts described above, Defendants, for the purpose of defrauding the Iowa State Government, knowingly, with deliberate ignorance, or with reckless disregard or

intentionally made, used, and/or caused or induced another to make or use, false records or statements to obtain payment or approval of a false claim under Medicaid and other Iowa State funded programs within the meaning of Iowa Code § 685.2(1)(b).

357. As a result, Iowa State monies were lost through payments made in respect of the claims and other costs were sustained by the Iowa State Government.

358. Therefore, the Iowa State Government has been damaged in an amount to be proven at trial.

359. Additionally, the Iowa State Government is entitled to a civil penalty for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as describe herein.

## COUNT XLVII
## VIOLATION OF THE IOWA FALSE CLAIMS LAW
### Iowa Code §685.2(1)(c)

360. Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

361. This is a claim for penalties and treble damages under the Iowa False Claims Act.

362. By virtue of the acts described above, Defendants have knowingly conspired together to defraud the Iowa State Government under Iowa Code § 685.21(1)(c).

363. As a result, Iowa State monies were lost through payments made in respect of the claims and other costs were sustained by the Iowa State Government.

364. Therefore, the Iowa State Government has been damaged in an amount to be proven at trial.

365. Additionally, the Iowa State Government is entitled to a civil penalty for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as describe herein.

**COUNT XLVIII**
**VIOLATION OF THE IOWA FALSE CLAIMS LAW**
**Iowa Code §685.2(1)(g)**

366.   Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

367.   This is a claim for penalties and treble damages under the Iowa False Claims Act.

368.   As set forth above, Defendants knowingly, with deliberate ignorance, or with reckless disregard made, used, or caused to be made or used false records or statements material to an obligation to pay or transmit money or property to the Iowa State Government, or knowingly, with deliberate ignorance, or with reckless disregard concealed or knowingly, with deliberate ignorance, or with reckless disregard and improperly avoided or decreased an obligation to pay or transmit money or property to the Iowa State Government in violation of Iowa Code §685.2(1)(g).

369.   As a result, Iowa State monies were lost through payments made in respect of the claims and other costs were sustained by the Iowa State Government.

370.   Therefore, the Iowa State Government has been damaged in an amount to be proven at trial.

371.   Additionally, the Iowa State Government is entitled to a civil penalty for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as describe herein.

**COUNT XLIX**
**VIOLATION OF THE LOUISIANA MEDICAL ASSISTANCE**
**PROGRAMS INTEGRITY LAW**
**La. Rev. Stat. 46:438.3(A)**

372.   Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

373.   This is a claim for a fine and damages under the Louisiana Medical Assistance Programs Integrity Law.

374.   By virtue of the acts described above, Defendants, for the purpose of defrauding the Louisiana State Government, knowingly, with deliberate ignorance, or with reckless disregard presented and/or caused to be presented false or fraudulent claims for payment or approval under Medicaid and other Louisiana State funded programs within the meaning of La. Rev. Stat. 46:438.3(A).

375.   As a result, Louisiana State monies were lost through payments made in respect of the claims and other costs were sustained by the Louisiana State Government.

376.   Therefore, the Louisiana State Government has been damaged in an amount to be proven at trial.

377.   Additionally, the Louisiana State Government is entitled to the maximum civil fine in the amount of three times the amount of actual damages sustained by the medical assistance programs as a result of the violations described herein. La. Rev. Stat. 46:438.6(B)(2).

**COUNT L**
**VIOLATION OF THE LOUISIANA MEDICAL ASSISTANCE**
**PROGRAMS INTEGRITY LAW**
**La. Rev. Stat. 46:438.3(B)**

378.   Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

379.   This is a claim for a fine and damages under the Louisiana Medical Assistance Programs Integrity Law.

380.   By virtue of the acts described above, Defendants, for the purpose of defrauding the Louisiana State Government, knowingly, with deliberate ignorance, or with reckless

disregard engaged in misrepresentations to obtain, or attempt to obtain, payment from medical assistance program funds within the meaning of La. Rev. Stat. 46:483.3(B).

381.   As a result, Louisiana State monies were lost through payments made in respect of the Defendants' conduct and other costs were sustained by the Louisiana State Government.

382.   Therefore, the Louisiana State Government has been damaged in an amount to be proven at trial.

383.   Additionally, the Louisiana State Government is entitled to the maximum civil fine in the amount of three times the amount of actual damages sustained by the medical assistance programs as a result of the violations described herein. La. Rev. Stat. 46:438.6(B)(2).

## COUNT LI
## VIOLATION OF THE LOUISIANA MEDICAL ASSISTANCE
## PROGRAMS INTEGRITY LAW
## La. Rev. Stat. 46:438.3(D)

384.   Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

385.   This is a claim for a fine and damages under the Louisiana Medical Assistance Programs Integrity Law.

386.   By virtue of the acts described above, Defendants have knowingly conspired together to defraud the Louisiana State Government under La. Rev. Stat. 46:483.3(D).

387.   As a result, Louisiana State monies were lost through payments made in respect of the Defendants' conduct and other costs were sustained by the Louisiana State Government.

388.   Therefore, the Louisiana State Government has been damaged in an amount to be proven at trial.

389.   Additionally, the Louisiana State Government is entitled to the maximum civil fine in the amount of three times the amount of actual damages sustained by the medical assistance programs as a result of the violations described herein. La. Rev. Stat. 46:438.6(B)(2).

## COUNT LII
## VIOLATION OF THE LOUISIANA MEDICAL ASSISTANCE
## PROGRAMS INTEGRITY LAW
## La. Rev. Stat. 46:438.3(C)

390.   Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

391.   This is a claim for a fine and damages under the Louisiana Medical Assistance Programs Integrity Law.

392.   As set forth above, Defendants knowingly, with deliberate ignorance, or with reckless disregard made, used, or caused to be made or used false records or statements material to an obligation to pay or transmit money or property to the Louisiana State Government, or knowingly, with deliberate ignorance, or with reckless disregard concealed or knowingly, with deliberate ignorance, or with reckless disregard and improperly avoided or decreased an obligation to pay or transmit money or property to the Louisiana State Government in violation of La. Rev. Stat. 46:483.3(C).

393.   As a result, Louisiana State monies were lost through payments made in respect of the Defendants' conduct and other costs were sustained by the Louisiana State Government.

394.   Therefore, the Louisiana State Government has been damaged in an amount to be proven at trial.

395.   Additionally, the Louisiana State Government is entitled to the maximum civil fine in the amount of three times the amount of actual damages sustained by the medical assistance programs as a result of the violations described herein. La. Rev. Stat. 46:438.6(B)(2).

### COUNT LIII
### MARYLAND FALSE CLAIMS ACT
### MD Code, Health - General, § 2-602(a)(1)

396.    Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

397.    This is a claim for penalties and treble damages under the Maryland False Claims Act.

398.    By virtue of the acts described above, Defendants, for the purpose of defrauding the Maryland State Government, knowingly, with deliberate ignorance, or with reckless disregard presented and/or caused to be presented false or fraudulent claims for payment or approval under Medicaid and other Maryland funded programs within the meaning of MD Code, Health - General, § 2-602(1).

399.    As a result, Maryland monies were lost through payments made in respect of the claims and other costs were sustained by the Maryland Government.

400.    Therefore, the Maryland State Government has been damaged in an amount to be proven at trial.

401.    Additionally, the Maryland State Government is entitled to the maximum penalty for each and every false or fraudulent claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

### COUNT LIV
### MARYLAND FALSE CLAIMS ACT
### MD Code, Health - General, § 2-602(a)(2)

402.    Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

403.    This is a claim for penalties and treble damages under the Maryland False Claims Act.

404.     By virtue of the acts described above, Defendants, for the purpose of defrauding the Maryland State Government, knowingly, with deliberate ignorance, or with reckless disregard made, used, and/or caused to be made or used, false records or statements to obtain payment or approval of claims by the Maryland State Government within the meaning of MD Code, Health - General, § 2-602(a)(2).

405.     As a result, Maryland State monies were lost through payments made in respect of the claims and other costs were sustained by the Maryland State Government.

406.     Therefore, the Maryland State Government has been damaged in an amount to be proven at trial.

407.     Additionally, the Maryland State Government is entitled to the maximum penalty for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

## COUNT LV
## MARYLAND FALSE CLAIMS ACT
### MD Code, Health - General, § 2-602(3)

408.     Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

409.     This is a claim for penalties and treble damages under the Maryland False Claims Act.

410.     By virtue of the acts described above, Defendants have knowingly conspired together to defraud the Maryland State Government under MD Code, Health - General, § 2-602(3).

411.     As a result, Maryland State monies were lost through payments made in respect of the claims and other costs were sustained by the Maryland State Government.

412.     Therefore, the Maryland State Government has been damaged in an amount to be proven at trial.

413.     Additionally, the Maryland State Government is entitled to the maximum penalty for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

## COUNT LVI
## MARYLAND FALSE CLAIMS ACT
### MD Code, Health - General, § 2-602(8)

414.     Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

415.     This is a claim for penalties and treble damages under the Maryland False Claims Act.

416.     As set forth above, Defendants knowingly, with deliberate ignorance, or with reckless disregard made, used, or caused to be made or used false records or statements material to an obligation to pay or transmit money or property to the Maryland State Government, or knowingly, with deliberate ignorance, or with reckless disregard concealed or knowingly, with deliberate ignorance, or with reckless disregard and improperly avoided or decreased an obligation to pay or transmit money or property to the Maryland State Government in violation of MD Code, Health - General, § 2-602(a)(8).

417.     As a result, Maryland State monies were lost through payments made in respect of the claims and other costs were sustained by the Maryland State Government.

418.     Therefore, the Maryland State Government has been damaged in an amount to be proven at trial.

419.     Additionally, the Maryland State Government is entitled to the maximum penalty for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

## COUNT LVII
## VIOLATION OF THE MASSACHUSETTS FALSE CLAIMS ACT
### Mass. Gen. L. Ch. 12, §§ 5B(1)

420.     Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

421.     This is a claim for penalties and treble damages under the Massachusetts False Claims Act.

422.     By virtue of the acts described above, Defendants, for the purpose of defrauding the Massachusetts Commonwealth Government, knowingly, with deliberate ignorance, or with reckless disregard presented and/or caused to be presented false or fraudulent claims for payment or approval under Medicaid and other Massachusetts Commonwealth funded programs within the meaning of Mass. Gen. L. Ch. 12, §§ 5B(1).

423.     As a result, Massachusetts Commonwealth monies were lost through payments made in respect of the claims and other costs were sustained by the Massachusetts Commonwealth Government.

424.     Therefore, the Massachusetts Commonwealth Government has been damaged in an amount to be proven at trial.

425.     Additionally, the Massachusetts Commonwealth Government is entitled to the maximum penalty for each and every false or fraudulent claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

## COUNT LVIII
### VIOLATION OF THE MASSACHUSETTS FALSE CLAIMS ACT
### Mass. Gen. L. Ch. 12, §§ 5B(2)

426.   Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

427.   This is a claim for penalties and treble damages under the Massachusetts False Claims Act.

428.   By virtue of the acts described above, Defendants, for the purpose of defrauding the Massachusetts Commonwealth Government, knowingly, with deliberate ignorance, or with reckless disregard made, used, and/or caused to be made or used, false records or statements to obtain payment or approval of claims by the Commonwealth within the meaning of Mass. Gen. L. Ch. 12, §§ 5B(2).

429.   As a result, Massachusetts Commonwealth monies were lost through payments made in respect of the claims and other costs were sustained by the Massachusetts Commonwealth Government.

430.   Therefore, the Massachusetts Commonwealth Government has been damaged in an amount to be proven at trial.

431.   Additionally, the Massachusetts Commonwealth Government is entitled to the maximum penalty for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

## COUNT LIX
### VIOLATION OF THE MASSACHUSETTS FALSE CLAIMS ACT
### Mass. Gen. L. Ch. 12, §§ 5B(3)

432.   Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

433.    This is a claim for penalties and treble damages under the Massachusetts False Claims Act.

434.    By virtue of the acts described above, Defendants have knowingly conspired together to defraud the Massachusetts Commonwealth Government under Mass. Gen. L. Ch. 12, §§ 5B(3).

435.    As a result, Massachusetts Commonwealth monies were lost through payments made in respect of the claims and other costs were sustained by the Massachusetts Commonwealth Government.

436.    Therefore, the Massachusetts Commonwealth Government has been damaged in an amount to be proven at trial.

437.    Additionally, the Massachusetts Commonwealth Government is entitled to the maximum penalty for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

### COUNT LX
### VIOLATION OF THE MASSACHUSETTS FALSE CLAIMS ACT
### Mass. Gen. L. Ch. 12, §§ 5B(9)

438.    Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

439.    This is a claim for penalties and treble damages under the Massachusetts False Claims Act.

440.    As set forth above, Defendants knowingly, with deliberate ignorance, or with reckless disregard made, used, or caused to be made or used false records or statements material to an obligation to pay or transmit money or property to the Massachusetts Commonwealth Government, or knowingly, with deliberate ignorance, or with reckless disregard concealed or knowingly, with deliberate ignorance, or with reckless disregard and improperly avoided or

decreased an obligation to pay or transmit money or property to the Massachusetts Commonwealth Government in violation of Mass. Gen. L. Ch. 12, §§ 5B(9).

441.    As a result, Massachusetts Commonwealth monies were lost through payments made in respect of the claims and other costs were sustained by the Massachusetts Commonwealth Government.

442.    Therefore, the Massachusetts Commonwealth Government has been damaged in an amount to be proven at trial.

443.    Additionally, the Massachusetts Commonwealth Government is entitled to the maximum penalty for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

**COUNT LXI**
**VIOLATION OF THE MICHIGAN MEDICAID FALSE CLAIMS ACT**
**Mich. Comp. Laws § 400.607(1)**

444.    Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

445.    This is a claim for damages and a civil penalty under the Michigan Medicaid False Claims Act.

446.    By virtue of the acts described above, Defendants, for the purpose of defrauding the Michigan State Government, made or presented, or caused to be made or presented, to an employee or officer of the State of Michigan a claim under the social welfare act, Act No. 280 of the Public Acts of 1939, as amended, being sections 400.1 to 400.121 of the Michigan Compiled Laws, upon or against the State of Michigan, knowing the claim to be false within the meaning of Mich. Comp. Law §§ 400.607(1).

447.    As a result, Michigan State monies were lost through payments made in respect of the claims and other costs were sustained by the Michigan State Government.

448.    Therefore, the Michigan State Government has been damaged in an amount to be proven at trial.

449.    Additionally, the Michigan State Government is entitled to a civil penalty equal to the full amount of the benefit received by the Defendants plus triple the amount of damages suffered by the state as a result of the conduct by Defendants as described herein.

## COUNT LXII
## VIOLATION OF THE MICHIGAN MEDICAID FALSE CLAIMS ACT
### Mich. Comp. Laws § 400.607(2)

450.    Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

451.    This is a claim for penalties and treble damages under the Michigan False Claims Act.

452.    By virtue of the acts described above, Defendants, for the purpose of defrauding the Michigan State Government, knowingly, with deliberate ignorance, or with reckless disregard made, presented or caused to be presented  claims under the social welfare act, 1939 PA 280, being sections 400.1 to 400.119b of the Michigan Compiled Laws, that they knew falsely represented that the goods or services for which the claims were made were medically necessary in accordance with professionally accepted standards within the meaning of Mich. Comp. Law §§ 400.607(2).

453.    As a result, Michigan State monies were lost through payments made in respect of the claims and other costs were sustained by the Michigan State Government.

454.    Therefore, the Michigan State Government has been damaged in an amount to be proven at trial.

455. Additionally, the Michigan State Government is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

## COUNT LXIII
### VIOLATION OF THE MICHIGAN MEDICAID FALSE CLAIMS ACT
### Mich. Comp. Laws § 400.606(1)

456. Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

457. This is a claim for penalties and treble damages under the Michigan False Claims Act.

458. By virtue of the acts described above, Defendants have knowingly conspired together to defraud the Michigan State Government under Mich. Comp. Law §§ 400.606(1).

459. As a result, Michigan monies were lost through payments made in respect of the claims and other costs were sustained by the Michigan State Government.

460. Therefore, the Michigan State Government has been damaged in an amount to be proven at trial.

461. Additionally, the Michigan State Government is entitled to the maximum penalty for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

## COUNT LXIV
### VIOLATION OF THE MICHIGAN MEDICAID FALSE CLAIMS ACT
### Mich. Comp. Laws § 400.607(3)

462. Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

463. This is a claim for penalties and treble damages under the Michigan False Claims Act.

464.    As set forth above, Defendants knowingly, with deliberate ignorance, or with reckless disregard made, used, or caused to be made or used false records or statements material to an obligation to pay or transmit money or property to the Michigan State Government, or knowingly, with deliberate ignorance, or with reckless disregard concealed or knowingly, with deliberate ignorance, or with reckless disregard and improperly avoided or decreased an obligation to pay or transmit money or property to the Michigan State Government in violation of Mich. Comp. Law §§ 400.607(3).

465.    As a result, Michigan State monies were lost through payments made in respect of the claims and other costs were sustained by the Michigan State Government.

466.    Therefore, the Michigan State Government has been damaged in an amount to be proven at trial.

467.    Additionally, the Michigan State Government is entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

## COUNT LXV
## VIOLATION OF THE MINNESOTA FALSE CLAIMS ACT
### Minn. Stat. § 15C.02(a)(1)

468.    Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

469.    This is a claim for penalties and treble damages under the Minnesota False Claims Act.

470.    By virtue of the acts described above, Defendants, for the purpose of defrauding the Minnesota State Government, knowingly, with deliberate ignorance, or with reckless disregard presented and/or caused to be presented false or fraudulent claims for payment or

approval under Medicaid and other Minnesota State funded programs within the meaning of Minn. Stat. § 15C.02(a)(1)).

471.     As a result, Minnesota State monies were lost through payments made in respect of the claims and other costs were sustained by the Minnesota State Government.

472.     Therefore, the Minnesota State Government has been damaged in an amount to be proven at trial.

473.     Additionally, the Minnesota State Government is entitled to the maximum penalty for each and every false or fraudulent claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

**COUNT LXVI**
**VIOLATION OF THE MINNESOTA FALSE CLAIMS ACT**
**Minn. Stat. § 15C.02(a)(2)**

474.     Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

475.     This is a claim for penalties and treble damages under the Minnesota False Claims Act.

476.     By virtue of the acts described above, Defendants, for the purpose of defrauding the Minnesota State Government, knowingly, with deliberate ignorance, or with reckless disregard made, used, and/or caused to be made or used, false records or statements to obtain payment or approval of claims by the State of Minnesota within the meaning of Minn. Stat. § 15C.02(a)(2).

477.     As a result, Minnesota State monies were lost through payments made in respect of the claims and other costs were sustained by the Minnesota State Government.

478.     Therefore, the Minnesota State Government has been damaged in an amount to be proven at trial.

479.   Additionally, the Minnesota State Government is entitled to the maximum penalty for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

## COUNT LXVII
## VIOLATION OF THE MINNESOTA FALSE CLAIMS ACT
### Minn. Stat. § 15C.02(a)(3)

480.   Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

481.   This is a claim for penalties and treble damages under the Minnesota False Claims Act.

482.   By virtue of the acts described above, Defendants have knowingly conspired together to defraud the Minnesota State Government under Minn. Stat. § 15C.02(a)(3).

483.   As a result, Minnesota State monies were lost through payments made in respect of the claims and other costs were sustained by the Minnesota State Government.

484.   Therefore, the Minnesota State Government has been damaged in an amount to be proven at trial.

485.   Additionally, the Minnesota State Government is entitled to the maximum penalty for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

## COUNT LXVIII
## VIOLATION OF THE MINNESOTA FALSE CLAIMS ACT
### Minn. Stat. § 15C.02(a)(7)

486.   Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

487.   This is a claim for penalties and treble damages under the Minnesota False Claims Act.

488.    As set forth above, Defendants knowingly, with deliberate ignorance, or with reckless disregard made, used, or caused to be made or used false records or statements material to an obligation to pay or transmit money or property to the Minnesota State Government, or knowingly, with deliberate ignorance, or with reckless disregard concealed or knowingly, with deliberate ignorance, or with reckless disregard and improperly avoided or decreased an obligation to pay or transmit money or property to the Minnesota State Government in violation of Minn. Stat. § 15C.02(a)(7).

489.    As a result, Minnesota State monies were lost through payments made in respect of the claims and other costs were sustained by the Minnesota State Government.

490.    Therefore, the Minnesota State Government has been damaged in an amount to be proven at trial.

491.    Additionally, the Minnesota State Government is entitled to the maximum penalty for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

## COUNT LXIX
## VIOLATION OF THE MONTANA FALSE CLAIMS ACT
### MCA 17-8-403(1)(a)

492.    Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

493.    This is a claim for penalties and treble damages under the Montana False Claims Act.

494.    By virtue of the acts described above, Defendants, for the purpose of defrauding the Montana State Government, knowingly, with deliberate ignorance, or with reckless disregard presented and/or caused to be presented false or fraudulent claims for payment or approval under Medicaid and other Montana State funded programs within the meaning of MCA 17-8-403(1)(a).

495.     As a result, Montana State monies were lost through payments made in respect of the claims and other costs were sustained by the Montana State Government.

496.     Therefore, the Montana State Government has been damaged in an amount to be proven at trial.

497.     Additionally, the Montana State Government is entitled to the maximum penalty for each and every false or fraudulent claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

**COUNT LXX**
**VIOLATION OF THE MONTANA FALSE CLAIMS ACT**
**MCA 17-8-403(1)(b)**

498.     Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

499.     This is a claim for penalties and treble damages under the Montana False Claims Act.

500.     By virtue of the acts described above, Defendants, for the purpose of defrauding the Montana State Government, knowingly, with deliberate ignorance, or with reckless disregard made, used, and/or caused to be made or used, false records or statements to obtain payment or approval of claims by the Montana State within the meaning of MCA 17-8-403(1)(b).

501.     As a result, Montana State monies were lost through payments made in respect of the claims and other costs were sustained by the Montana State Government.

502.     Therefore, the Montana State Government has been damaged in an amount to be proven at trial.

503.     Additionally, the Montana State Government is entitled to the maximum penalty for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

## COUNT LXXI
## VIOLATION OF THE MONTANA FALSE CLAIMS ACT
### MCA 17-8-403(1)(c)

504.   Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

505.   This is a claim for penalties and treble damages under the Montana False Claims Act.

506.   By virtue of the acts described above, Defendants have knowingly conspired together to defraud the Montana State Government under MCA 17-8-403(1)(c).

507.   As a result, Montana State monies were lost through payments made in respect of the claims and other costs were sustained by the Montana State Government.

508.   Therefore, the Montana State Government has been damaged in an amount to be proven at trial.

509.   Additionally, the Montana State Government is entitled to the maximum penalty for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

## COUNT LXXII
## VIOLATION OF THE MONTANA FALSE CLAIMS ACT
### MCA 17-8-403(1)(g)

510.   Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

511.   This is a claim for penalties and treble damages under the Montana False Claims Act.

512.   As set forth above, Defendants knowingly, with deliberate ignorance, or with reckless disregard made, used, or caused to be made or used false records or statements material to an obligation to pay or transmit money or property to the Montana State Government, or

knowingly, with deliberate ignorance, or with reckless disregard concealed or knowingly, with deliberate ignorance, or with reckless disregard and improperly avoided or decreased an obligation to pay or transmit money or property to the Montana State Government in violation of MCA 17-8-403(1)(g).

513.   As a result, Montana State monies were lost through payments made in respect of the claims and other costs were sustained by the Montana State Government.

514.   Therefore, the Montana State Government has been damaged in an amount to be proven at trial.

515.   Additionally, the Montana State Government is entitled to the maximum penalty for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

## COUNT LXXIII
## VIOLATION OF THE NEVADA FALSE CLAIMS ACT
### Nev. Rev. Stat. § 357.040(1)(a)

516.   Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

517.   This is a claim for penalties and treble damages under the Nevada False Claims Act, entitled "Submission of False Claims to State or Local Government."

518.   By virtue of the acts described above, Defendants, for the purpose of defrauding the Nevada State Government, knowingly, with deliberate ignorance, or with reckless disregard presented and/or caused to be presented false claims for payment or approval under Medicaid and other Nevada State funded programs within the meaning of Nev. Rev. Stat. § 357.040(1)(a).

519.   As a result, Nevada State monies were lost through payments made in respect of the claims and other costs were sustained by the Nevada State Government.

520.     Therefore, the Nevada State Government has been damaged in an amount to be proven at trial.

521.     Additionally, the Nevada State Government is entitled to the maximum penalty for each and every false claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

### COUNT LXXIV
### VIOLATION OF THE NEVADA FALSE CLAIMS ACT
### Nev. Rev. Stat. § 357.040(1)(b)

522.     Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

523.     This is a claim for penalties and treble damages under the Nevada False Claims Act, entitled "Submission of False Claims to State or Local Government."

524.     By virtue of the acts described above, Defendants, for the purpose of defrauding the Nevada State Government, knowingly, with deliberate ignorance, or with reckless disregard made, used, and/or caused to be made or used, false records or statements to get false claims paid or approved under Medicaid and other Nevada State funded programs within the meaning of Nev. Rev. Stat. § 357.040(1)(b).

525.     As a result, Nevada State monies were lost through payments made in respect of the claims and other costs were sustained by the Nevada State Government.

526.     Therefore, the Nevada State Government has been damaged in an amount to be proven at trial.

527.     Additionally, the Nevada State Government is entitled to the maximum penalty for each and every false claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

## COUNT LXXV
## VIOLATION OF THE NEVADA FALSE CLAIMS ACT
### Nev. Rev. Stat. § 357.040(1)(i)

528.     Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

529.     This is a claim for penalties and treble damages under the Nevada False Claims Act, entitled "Submission of False Claims to State or Local Government."

530.     By virtue of the acts described above, Defendants have knowingly conspired together to defraud the Government under Nev. Rev. Stat. § 357.040(1)(i).

531.     As a result, Nevada State monies were lost through payments made in respect of the claims and other costs were sustained by the Nevada State Government.

532.     Therefore, the Nevada State Government has been damaged in an amount to be proven at trial.

533.     Additionally, the Nevada State Government is entitled to the maximum penalty for each and every false claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

## COUNT LXXVI
## VIOLATION OF THE NEVADA FALSE CLAIMS ACT
### Nev. Rev. Stat. § 357.040(1)(f-g)

534.     Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

535.     This is a claim for penalties and treble damages under the Nevada False Claims Act, entitled "Submission of False Claims to State or Local Government."

536.     As set forth above, Defendants knowingly, with deliberate ignorance, or with reckless disregard made, used, or caused to be made or used false records or statements material to an obligation to pay or transmit money or property to the Nevada State Government, or

114

knowingly, with deliberate ignorance, or with reckless disregard concealed or knowingly, with deliberate ignorance, or with reckless disregard and improperly avoided or decreased an obligation to pay or transmit money or property to the Nevada State Government in violation of Nev. Rev. Stat. § 357.040(1)(f-g).

537.    As a result, Nevada State monies were lost through payments made in respect of the claims and other costs were sustained by the Nevada State Government.

538.    Therefore, the Nevada State Government has been damaged in an amount to be proven at trial.

539.    Additionally, the Nevada State Government is entitled to the maximum penalty for each and every false claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

**COUNT LXXVII**
**VIOLATION OF THE NEW HAMPSHIRE FALSE CLAIMS ACT**
**N.H. Rev. Stat. Ann. § 167:61-b(I)(a)**

540.    Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

541.    This is a claim for penalties and treble damages under the New Hampshire False Claims Act.

542.    By virtue of the acts described above, Defendants, for the purpose of defrauding the New Hampshire State Government, knowingly, with deliberate ignorance, or with reckless disregard presented and/or caused to be presented false claims for payment or approval under Medicaid and other New Hampshire State funded programs to officers or employees of the state within the meaning of N.H. Rev. Stat. Ann. § 167:61-b(I)(a).

543.    As a result, New Hampshire state monies were lost through payments made in respect of the claims and other costs were sustained by the New Hampshire State Government.

544.    Therefore, the New Hampshire State Government has been damaged in an amount to be proven at trial.

545.    Additionally, the New Hampshire State Government is entitled to the maximum penalty for each and every false claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

### COUNT LXXVIII
### VIOLATION OF THE NEW HAMPSHIRE FALSE CLAIMS ACT
### N.H. Rev. Stat. Ann. § 167:61-b(I)(b)

546.    Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

547.    This is a claim for penalties and treble damages under the New Hampshire False Claims Act.

548.    By virtue of the acts described above, Defendants, for the purpose of defrauding the New Hampshire State Government, knowingly, with deliberate ignorance, or with reckless disregard made, used, and/or caused to be made or used, false records or statements to get false claims paid or approved under Medicaid and other New Hampshire State funded programs within the meaning of N.H. Rev. Stat. Ann. § 167:61-b(I)(b).

549.    As a result, New Hampshire State monies were lost through payments made in respect of the claims and other costs were sustained by the New Hampshire State Government.

550.    Therefore, the New Hampshire State Government has been damaged in an amount to be proven at trial.

551.    Additionally, the New Hampshire State Government is entitled to the maximum penalty for each and every false claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

## COUNT LXXIX
## VIOLATION OF THE NEW HAMPSHIRE FALSE CLAIMS ACT
### N.H. Rev. Stat. Ann. § 167:61-b(I)(c)

552.    Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

553.    This is a claim for penalties and treble damages under the New Hampshire False Claims Act.

554.    By virtue of the acts described above, Defendants have knowingly conspired together to defraud the New Hampshire Government under N.H. Rev. Stat. Ann. § 167:61-b(I)(c).

555.    As a result, New Hampshire state monies were lost through payments made in respect of the claims and other costs were sustained by the New Hampshire State Government.

556.    Therefore, the New Hampshire State Government has been damaged in an amount to be proven at trial.

557.    Additionally, the New Hampshire State Government is entitled to the maximum penalty for each and every false claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

## COUNT LXXX
## VIOLATION OF THE NEW HAMPSHIRE FALSE CLAIMS ACT
### N.H. Rev. Stat. Ann. § 167:61-b(I)(e)

558.    Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

559.    This is a claim for penalties and treble damages under the New Hampshire False Claims Act.

560.    As set forth above, Defendants knowingly, with deliberate ignorance, or with reckless disregard made, used, or caused to be made or used false records or statements material

to an obligation to pay or transmit money or property to the New Hampshire State Government, or knowingly, with deliberate ignorance, or with reckless disregard concealed or knowingly, with deliberate ignorance, or with reckless disregard and improperly avoided or decreased an obligation to pay or transmit money or property to the New Hampshire State Government in violation of N.H. Rev. Stat. Ann. § 167:61-b(I)(e).

561.    As a result, New Hampshire State monies were lost through payments made in respect of the claims and other costs were sustained by the New Hampshire State Government.

562.    Therefore, the New Hampshire State Government has been damaged in an amount to be proven at trial.

563.    Additionally, the New Hampshire State Government is entitled to the maximum penalty for each and every false claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

## COUNT LXXXI
## VIOLATION OF THE NEW JERSEY FALSE CLAIMS ACT
### N.J.S.A. 2A:32C-3(a)

564.    Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

565.    This is a claim for penalties and treble damages under the New Jersey False Claims Act.

566.    By virtue of the acts described above, Defendants, for the purpose of defrauding the New Jersey State Government, knowingly, with deliberate ignorance, or with reckless disregard presented and/or caused to be presented false or fraudulent claims for payment or approval under Medicaid and other New Jersey State funded programs within the meaning of N.J.S.A. 2A:32C-3(a).

567.     As a result, New Jersey State monies were lost through payments made in respect of the claims and other costs were sustained by the New Jersey State Government.

568.     Therefore, the New Jersey State Government has been damaged in an amount to be proven at trial.

569.     Additionally, the New Jersey State Government is entitled to the maximum penalty for each and every false or fraudulent claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

## COUNT LXXXII
## VIOLATION OF THE NEW JERSEY FALSE CLAIMS ACT
### N.J.S.A. 2A:32C-3(b)

570.     Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

571.     This is a claim for penalties and treble damages under the New Jersey False Claims Act.

572.     By virtue of the acts described above, Defendants, for the purpose of defrauding the New Jersey State Government, knowingly, with deliberate ignorance, or with reckless disregard made, used, and/or caused to be made or used, false records or statements to obtain payment or approval of claims by the State of New Jersey within the meaning of N.J.S.A. 2A:32C-3(b).

573.     As a result, New Jersey State monies were lost through payments made in respect of the claims and other costs were sustained by the New Jersey State Government.

574.     Therefore, the New Jersey State Government has been damaged in an amount to be proven at trial.

575.    Additionally, the New Jersey State Government is entitled to the maximum penalty for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

## COUNT LXXXIII
### VIOLATION OF THE NEW JERSEY FALSE CLAIMS ACT
### N.J.S.A. 2A:32C-3(c)

576.    Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

577.    This is a claim for penalties and treble damages under the New Jersey False Claims Act.

578.    By virtue of the acts described above, Defendants have knowingly conspired together to defraud the New Jersey State Government under N.J.S.A. 2A:32C-3(c).

579.    As a result, New Jersey State monies were lost through payments made in respect of the claims and other costs were sustained by the New Jersey State Government.

580.    Therefore, the New Jersey State Government has been damaged in an amount to be proven at trial.

581.    Additionally, the New Jersey State Government is entitled to the maximum penalty for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

## COUNT LXXXIV
### VIOLATION OF THE NEW JERSEY FALSE CLAIMS ACT
### N.J.S.A. 2A:32C-3(g)

582.    Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

583.    This is a claim for penalties and treble damages under the New Jersey False Claims Act.

584.    As set forth above, Defendants knowingly, with deliberate ignorance, or with reckless disregard made, used, or caused to be made or used false records or statements material to an obligation to pay or transmit money or property to the New Jersey State Government, or knowingly, with deliberate ignorance, or with reckless disregard concealed or knowingly, with deliberate ignorance, or with reckless disregard and improperly avoided or decreased an obligation to pay or transmit money or property to the New Jersey State Government in violation of N.J.S.A. 2A:32C-3(g).

585.    As a result, New Jersey State monies were lost through payments made in respect of the claims and other costs were sustained by the New Jersey State Government.

586.    Therefore, the New Jersey State Government has been damaged in an amount to be proven at trial.

587.    Additionally, the New Jersey State Government is entitled to the maximum penalty for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

**COUNT LXXXV**
**VIOLATION OF THE NEW MEXICO MEDICAID FALSE CLAIMS ACT**
**N.M. Stat. Ann. § 27-14-4(A)**

588.    Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

589.    This is a claim for penalties and treble damages under the New Mexico Medicaid False Claims Act.

590.    By virtue of the acts described above, Defendants, for the purpose of defrauding the New Mexico State Government, knowingly, with deliberate ignorance, or with reckless disregard presented and/or caused to be presented false claims for payment under Medicaid and

121

other New Mexico State funded programs to the State within the meaning of N.M. Stat. Ann. § 27-14-4(A).

591.    As a result, New Mexico State monies were lost through payments made in respect of the claims and other costs were sustained by the New Mexico State Government.

592.    Therefore, the New Mexico State Government has been damaged in an amount to be proven at trial.

593.    Additionally, the New Mexico State Government is entitled to the maximum penalty for each and every false claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

**COUNT LXXXVI**
**VIOLATION OF THE NEW MEXICO MEDICAID FALSE CLAIMS ACT**
**N.M. Stat. Ann. § 27-14-4(C)**

594.    Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

595.    This is a claim for penalties and treble damages under the New Mexico Medicaid False Claims Act.

596.    By virtue of the acts described above, Defendants, for the purpose of defrauding the New Mexico State Government, knowingly, with deliberate ignorance, or with reckless disregard made, used, and/or caused to be made or used, false records or statements to get false claims paid or approved under Medicaid and other New Mexico State funded programs within the meaning of N.M. Stat. Ann. § 27-14-4(C).

597.    As a result, New Mexico State monies were lost through payments made in respect of the claims and other costs were sustained by the New Mexico State Government.

598.    Therefore, the New Mexico State Government has been damaged in an amount to be proven at trial.

599.    Additionally, the New Mexico State Government is entitled to the maximum penalty for each and every false claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

### COUNT LXXXVII
### VIOLATION OF THE NEW MEXICO MEDICAID FALSE CLAIMS ACT
### N.M. Stat. Ann. § 27-14-4(D)

600.    Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

601.    This is a claim for penalties and treble damages under the New Mexico Medicaid False Claims Act.

602.    By virtue of the acts described above, Defendants have knowingly conspired together to defraud the New Mexico State Government under N.M. Stat. Ann. § 27-14-4(D).

603.    As a result, New Mexico State monies were lost through payments made in respect of the claims and other costs were sustained by the New Mexico State Government.

604.    Therefore, the New Mexico State Government has been damaged in an amount to be proven at trial.

605.    Additionally, the New Mexico State Government is entitled to the maximum penalty for each and every false claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

### COUNT LXXXVIII
### VIOLATION OF THE NEW MEXICO MEDICAID FALSE CLAIMS ACT
### N.M. Stat. Ann. § 27-14-4(E)

606.    Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

607.    This is a claim for penalties and treble damages under the New Mexico Medicaid False Claims Act.

608.    As set forth above, Defendants knowingly, with deliberate ignorance, or with reckless disregard made, used, or caused to be made or used false records or statements material to an obligation to pay or transmit money or property to the New Mexico State Government, or knowingly, with deliberate ignorance, or with reckless disregard concealed or knowingly, with deliberate ignorance, or with reckless disregard and improperly avoided or decreased an obligation to pay or transmit money or property to the New Mexico State Government in violation of N.M. Stat. Ann. § 27-14-4(E).

609.    As a result, New Mexico State monies were lost through payments made in respect of the claims and other costs were sustained by the New Mexico State Government.

610.    Therefore, the New Mexico State Government has been damaged in an amount to be proven at trial.

611.    Additionally, the New Mexico State Government is entitled to the maximum penalty for each and every false claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

## COUNT LXXXIX
## VIOLATION OF THE NEW YORK FALSE CLAIMS ACT
### N.Y. State Fin. Law § 189(1)(a)

612.    Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

613.    This is a claim for penalties and treble damages under the New York False Claims Act.

614.    By virtue of the acts described above, Defendants, for the purpose of defrauding the New York State Government, knowingly, with deliberate ignorance, or with reckless disregard presented and/or caused to be presented false claims for payment or approval under

Medicaid and other New York State funded programs to officers or employees or agents of the state within the meaning of N.Y. State Fin. Law § 189(1)(a).

615.    As a result, New York State monies were lost through payments made in respect of the claims and other costs were sustained by the New York State Government.

616.    Therefore, the New York State Government has been damaged in an amount to be proven at trial.

617.    Additionally, the New York State Government is entitled to the maximum penalty for each and every false claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

### COUNT XC
### VIOLATION OF THE NEW YORK FALSE CLAIMS ACT
### N.Y. State Fin. Law § 189(1)(b)

618.    Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

619.    This is a claim for penalties and treble damages under the New York False Claims Act.

620.    By virtue of the acts described above, Defendants, for the purpose of defrauding the New York State Government, knowingly, with deliberate ignorance, or with reckless disregard made, used, and/or caused to be made or used, false records or statements to get false claims paid or approved under Medicaid and other New York State funded programs within the meaning of N.Y. State Fin. Law § 189(1)(b).

621.    As a result, New York State monies were lost through payments made in respect of the claims and other costs were sustained by the New York State Government.

622.    Therefore, the New York State Government has been damaged in an amount to be proven at trial.

623.   Additionally, the New York State Government is entitled to the maximum penalty for each and every false claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

## COUNT XCI
## VIOLATION OF THE NEW YORK FALSE CLAIMS ACT
### N.Y. State Fin. Law § 189(1)(c)

624.   Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

625.   This is a claim for penalties and treble damages under the New York False Claims Act.

626.   By virtue of the acts described above, Defendants have knowingly conspired together to defraud the New York State Government under N.Y. State Fin. Law § 189(1)(c).

627.   As a result, New York State monies were lost through payments made in respect of the claims and other costs were sustained by the New York State Government.

628.   Therefore, the New York State Government has been damaged in an amount to be proven at trial.

629.   Additionally, the New York State Government is entitled to the maximum penalty for each and every false claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

## COUNT XCII
## VIOLATION OF THE NEW YORK FALSE CLAIMS ACT
### N.Y. State Fin. Law § 189(1)(g-h)

630.   Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

631.   This is a claim for penalties and treble damages under the New York False Claims Act.

126

632.     As set forth above, Defendants knowingly, with deliberate ignorance, or with reckless disregard made, used, or caused to be made or used false records or statements material to an obligation to pay or transmit money or property to the New York State Government, or knowingly, with deliberate ignorance, or with reckless disregard concealed or knowingly, with deliberate ignorance, or with reckless disregard and improperly avoided or decreased an obligation to pay or transmit money or property to the New York State Government in violation of N.Y. State Fin. Law § 189(1)(g-h).

633.     As a result, New York State monies were lost through payments made in respect of the claims and other costs were sustained by the New York State Government.

634.     Therefore, the New York State Government has been damaged in an amount to be proven at trial.

635.     Additionally, the New York State Government is entitled to the maximum penalty for each and every false claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

## COUNT XCIII
## VIOLATION OF THE NORTH CAROLINA FALSE CLAIMS ACT
## N.C.G.S.A. § 1-607(a)(1)

636.     Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

637.     This is a claim for penalties and treble damages under the North Carolina False Claims Act.

638.     By virtue of the acts described above, Defendants, for the purpose of defrauding the North Carolina State Government, knowingly, with deliberate ignorance, or with reckless disregard presented and/or caused to be presented false or fraudulent claims for payment or

approval under Medicaid and other North Carolina funded programs within the meaning of N.C.G.S.A. § 1-607(a)(1).

639.   As a result, North Carolina monies were lost through payments made in respect of the claims and other costs were sustained by the North Carolina State Government.

640.   Therefore, the North Carolina State Government has been damaged in an amount to be proven at trial.

641.   Additionally, the North Carolina State Government is entitled to the maximum penalty for each and every false or fraudulent claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

## COUNT XCIV
## VIOLATION OF THE NORTH CAROLINA FALSE CLAIMS ACT
### N.C.G.S.A. § 1-607(a)(2)

642.   Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

643.   This is a claim for penalties and treble damages under the North Carolina False Claims Act.

644.   By virtue of the acts described above, Defendants, for the purpose of defrauding the North Carolina State Government, knowingly, with deliberate ignorance, or with reckless disregard made, used, and/or caused to be made or used, false records or statements to obtain payment or approval of claims by the State of North Carolina within the meaning of N.C.G.S.A. § 1-607(a)(2).

645.   As a result, North Carolina State monies were lost through payments made in respect of the claims and other costs were sustained by the North Carolina State Government.

646.   Therefore, the North Carolina State Government has been damaged in an amount to be proven at trial.

128

647.   Additionally, the North Carolina State Government is entitled to the maximum penalty for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

## COUNT XCV
## VIOLATION OF THE NORTH CAROLINA FALSE CLAIMS ACT
## N.C.G.S.A. § 1-607(a)(3)

648.   Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

649.   This is a claim for penalties and treble damages under the North Carolina False Claims Act.

650.   By virtue of the acts described above, Defendants have knowingly conspired together to defraud the North Carolina State Government under N.C.G.S.A. § 1-607(a)(3).

651.   As a result, North Carolina State monies were lost through payments made in respect of the claims and other costs were sustained by the North Carolina State Government.

652.   Therefore, the North Carolina State Government has been damaged in an amount to be proven at trial.

653.   Additionally, the North Carolina State Government is entitled to the maximum penalty for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

## COUNT XCVI
## VIOLATION OF THE NORTH CAROLINA FALSE CLAIMS ACT
## N.C.G.S.A. § 1-607(a)(7)

654.   Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

655.   This is a claim for penalties and treble damages under the North Carolina False Claims Act.

656.   As set forth above, Defendants knowingly, with deliberate ignorance, or with reckless disregard made, used, or caused to be made or used false records or statements material to an obligation to pay or transmit money or property to the North Carolina State Government, or knowingly, with deliberate ignorance, or with reckless disregard concealed or knowingly, with deliberate ignorance, or with reckless disregard and improperly avoided or decreased an obligation to pay or transmit money or property to the North Carolina State Government in violation of N.C.G.S.A. § 1-607(a)(7).

657.   As a result, North Carolina State monies were lost through payments made in respect of the claims and other costs were sustained by the North Carolina State Government.

658.   Therefore, the North Carolina State Government has been damaged in an amount to be proven at trial.

659.   Additionally, the North Carolina State Government is entitled to the maximum penalty for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

## COUNT XCVII
## VIOLATION OF THE OKLAHOMA MEDICAID FALSE CLAIMS ACT
### 63 Okl.St.Ann. § 5053.1(B)(1)

660.   Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

661.   This is a claim for penalties and treble damages under the Oklahoma False Claims Act.

662.   By virtue of the acts described above, Defendants, for the purpose of defrauding the Oklahoma State Government, knowingly, with deliberate ignorance, or with reckless disregard presented and/or caused to be presented false or fraudulent claims for payment or

approval under Medicaid and other Oklahoma State funded programs within the meaning of 63 Okl.St.Ann. § 5053.1(B)(1).

663.    As a result, Oklahoma State monies were lost through payments made in respect of the claims and other costs were sustained by the Oklahoma State Government.

664.    Therefore, the Oklahoma State Government has been damaged in an amount to be proven at trial.

665.    Additionally, the Oklahoma State Government is entitled to the maximum penalty for each and every false or fraudulent claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

**COUNT XCVIII**
**VIOLATION OF THE OKLAHOMA MEDICAID FALSE CLAIMS ACT**
**63 Okl.St.Ann. § 5053.1(B)(2)**

666.    Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

667.    This is a claim for penalties and treble damages under the Oklahoma False Claims Act.

668.    By virtue of the acts described above, Defendants, for the purpose of defrauding the Oklahoma State Government, knowingly, with deliberate ignorance, or with reckless disregard made, used, and/or caused to be made or used, false records or statements to obtain payment or approval of claims by the State of Oklahoma within the meaning of 63 Okl.St.Ann. § 5053.1(B)(2).

669.    As a result, Oklahoma State monies were lost through payments made in respect of the claims and other costs were sustained by the Oklahoma State Government.

670.    Therefore, the Oklahoma State Government has been damaged in an amount to be proven at trial.

671.   Additionally, the Oklahoma State Government is entitled to the maximum penalty for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

## COUNT XCIX
## VIOLATION OF THE OKLAHOMA MEDICAID FALSE CLAIMS ACT
### 63 Okl.St.Ann. § 5053.1(B)(3)

672.   Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

673.   This is a claim for penalties and treble damages under the Oklahoma False Claims Act.

674.   By virtue of the acts described above, Defendants have knowingly conspired together to defraud the Oklahoma State Government under 63 Okl.St.Ann. § 5053.1(B)(3).

675.   As a result, Oklahoma State monies were lost through payments made in respect of the claims and other costs were sustained by the Oklahoma State Government.

676.   Therefore, the Oklahoma State Government has been damaged in an amount to be proven at trial.

677.   Additionally, the Oklahoma State Government is entitled to the maximum penalty for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

## COUNT C
## VIOLATION OF THE OKLAHOMA MEDICAID FALSE CLAIMS ACT
### 63 Okl.St.Ann. § 5053.1(B)(7)

678.   Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

679.   This is a claim for penalties and treble damages under the Oklahoma False Claims Act.

132

680.     As set forth above, Defendants knowingly, with deliberate ignorance, or with reckless disregard made, used, or caused to be made or used false records or statements material to an obligation to pay or transmit money or property to the Oklahoma State Government, or knowingly, with deliberate ignorance, or with reckless disregard concealed or knowingly, with deliberate ignorance, or with reckless disregard and improperly avoided or decreased an obligation to pay or transmit money or property to the Oklahoma State Government in violation of 63 Okl.St.Ann. § 5053.1(B)(7).

681.     As a result, Oklahoma State monies were lost through payments made in respect of the claims and other costs were sustained by the Oklahoma State Government.

682.     Therefore, the Oklahoma State Government has been damaged in an amount to be proven at trial.

683.     Additionally, the Oklahoma State Government is entitled to the maximum penalty for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

### COUNT CI
### VIOLATION OF THE RHODE ISLAND FALSE CLAIMS ACT
### R.I. Gen. Laws § 9-1.1--3

684.     Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

685.     This is a claim for penalties and treble damages under the Rhode Island False Claims Act.

686.     By virtue of the acts described above, Defendants, for the purpose of defrauding the Rhode Island State Government, knowingly, with deliberate ignorance, or with reckless disregard presented and/or caused to be presented false or fraudulent claims for payment or

approval under Medicaid and other Rhode Island funded programs within the meaning of R.I. Gen. Laws § 9-1.1-1-3(a)(1).

687.    As a result, Rhode Island State monies were lost through payments made in respect of the claims and other costs were sustained by the Rhode Island State Government.

688.    Therefore, the Rhode Island State Government has been damaged in an amount to be proven at trial.

689.    Additionally, the Rhode Island State Government is entitled to the maximum penalty for each and every false or fraudulent claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

## COUNT CII
## VIOLATION OF THE RHODE ISLAND FALSE CLAIMS ACT
### R.I. Gen. Laws § 9-1.1-1-3(a)(2)

690.    Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

691.    This is a claim for penalties and treble damages under the Rhode Island False Claims Act.

692.    By virtue of the acts described above, Defendants, for the purpose of defrauding the Rhode Island State Government, knowingly, with deliberate ignorance, or with reckless disregard made, used, and/or caused to be made or used, false records or statements to obtain payment or approval of claims by the State of Rhode Island within the meaning of R.I. Gen. Laws § 9-1.1-1-3 (a)(2).

693.    As a result, Rhode Island State monies were lost through payments made in respect of the claims and other costs were sustained by the Rhode Island State Government.

694.    Therefore, the Rhode Island State Government has been damaged in an amount to be proven at trial.

695.   Additionally, the Rhode Island State Government is entitled to the maximum penalty for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

## COUNT CIII
## VIOLATION OF THE RHODE ISLAND FALSE CLAIMS ACT
### R.I. Gen. Laws § 9-1.1-1-3(a)(3)

696.   Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

697.   This is a claim for penalties and treble damages under the Rhode Island False Claims Act.

698.   By virtue of the acts described above, Defendants have knowingly conspired together to defraud the Rhode Island State Government under R.I. Gen. Laws § 9-1.1-1-3(a)(3).

699.   As a result, Rhode Island State monies were lost through payments made in respect of the claims and other costs were sustained by the Rhode Island State Government.

700.   Therefore, the Rhode Island State Government has been damaged in an amount to be proven at trial.

701.   Additionally, the Rhode Island State Government is entitled to the maximum penalty for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

## COUNT CIV
## VIOLATION OF THE RHODE ISLAND FALSE CLAIMS ACT
### R.I. Gen. Laws § 9-1.1-1-3(a)(7)

702.   Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

703.   This is a claim for penalties and treble damages under the Rhode Island False Claims Act.

704. As set forth above, Defendants knowingly, with deliberate ignorance, or with reckless disregard made, used, or caused to be made or used false records or statements material to an obligation to pay or transmit money or property to the Rhode Island State Government, or knowingly, with deliberate ignorance, or with reckless disregard concealed or knowingly, with deliberate ignorance, or with reckless disregard and improperly avoided or decreased an obligation to pay or transmit money or property to the Rhode Island State Government in violation of R.I. Gen. Laws § 9-1.1-1-3 (a)(7).

705. As a result, Rhode Island State monies were lost through payments made in respect of the claims and other costs were sustained by the Rhode Island State Government.

706. Therefore, the Rhode Island State Government has been damaged in an amount to be proven at trial.

707. Additionally, the Rhode Island State Government is entitled to the maximum penalty for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

## COUNT CV
## VIOLATION OF THE TENNESSEE MEDICAID FALSE CLAIMS ACT
### Tenn. Code Ann. § 4-18-103(a)(1)

708. Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

709. This is a claim for penalties and treble damages under the Tennessee False Claims Act.

710. By virtue of the acts described above, Defendants, for the purpose of defrauding the Tennessee State Government, knowingly, with deliberate ignorance, or with reckless disregard presented and/or caused to be presented false claims for payment or approval under

136

Medicaid and other Tennessee State funded programs to officers or employees of the state within the meaning of Tenn. Code Ann. § 4-18-103(a)(1).

711.    As a result, Tennessee State monies were lost through payments made in respect of the claims and other costs were sustained by the Tennessee State Government.

712.    Therefore, the Tennessee State Government has been damaged in an amount to be proven at trial.

713.    Additionally, the Tennessee State Government is entitled to the maximum penalty for each and every false claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

## COUNT CVI
## VIOLATION OF THE TENNESSEE MEDICAID FALSE CLAIMS ACT
### Tenn. Code Ann. § 4-18-103(a)(2)

714.    Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

715.    This is a claim for penalties and treble damages under the Tennessee False Claims Act.

716.    By virtue of the acts described above, Defendants, for the purpose of defrauding the Tennessee State Government, knowingly, with deliberate ignorance, or with reckless disregard made, used, and/or caused to be made or used, false records or statements to get false claims paid or approved under Medicaid and other Tennessee State funded programs within the meaning of Tenn. Code Ann. § 4-18-103(a)(2).

717.    As a result, Tennessee State monies were lost through payments made in respect of the claims and other costs were sustained by the Tennessee State Government.

718.    Therefore, the Tennessee State Government has been damaged in an amount to be proven at trial.

719. Additionally, the Tennessee State Government is entitled to the maximum penalty for each and every false claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

## COUNT CVII
## VIOLATION OF THE TENNESSEE MEDICAID FALSE CLAIMS ACT
### Tenn. Code Ann. § 4-18-103(a)(3)

720. Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

721. This is a claim for penalties and treble damages under the Tennessee False Claims Act.

722. By virtue of the acts described above, Defendants have knowingly conspired together to defraud the Tennessee State Government under Tenn. Code Ann. § 4-18-103(a)(3).

723. As a result, Tennessee State monies were lost through payments made in respect of the claims and other costs were sustained by the Tennessee State Government.

724. Therefore, the Tennessee State Government has been damaged in an amount to be proven at trial.

725. Additionally, the Tennessee State Government is entitled to the maximum penalty for each and every false claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

## COUNT CVIII
## VIOLATION OF THE TENNESSEE MEDICAID FALSE CLAIMS ACT
### Tenn. Code Ann. § 4-18-103(a)(7)

726. Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

727. This is a claim for penalties and treble damages under the Tennessee False Claims Act.

728.    As set forth above, Defendants knowingly, with deliberate ignorance, or with reckless disregard made, used, or caused to be made or used false records or statements material to an obligation to pay or transmit money or property to the Tennessee State Government, or knowingly, with deliberate ignorance, or with reckless disregard concealed or knowingly, with deliberate ignorance, or with reckless disregard and improperly avoided or decreased an obligation to pay or transmit money or property to the Tennessee State Government in violation of Tenn. Code Ann. § 4-18-103(a)(7).

729.    As a result, Tennessee State monies were lost through payments made in respect of the claims and other costs were sustained by the Tennessee State Government.

730.    Therefore, the Tennessee State Government has been damaged in an amount to be proven at trial.

731.    Additionally, the Tennessee State Government is entitled to the maximum penalty for each and every false claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

## COUNT CIX
## VIOLATION OF THE TENNESSEE MEDICAID FALSE CLAIMS ACT
### Tenn. Code Ann. § 71-5-182(a)(1)(A)

732.    Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

733.    This is a claim for penalties and treble damages under the Tennessee Medicaid False Claims Act.

734.    By virtue of the acts described above, Defendants, for the purpose of defrauding the Tennessee State Government, knowingly, with deliberate ignorance, or with reckless disregard presented and/or caused to be presented to the state claims for payment under the

Medicaid program knowing such claims were false or fraudulent within the meaning of Tenn. Code Ann. § 71-5-182(a)(1)(A).

735.    As a result, Tennessee State monies were lost through payments made in respect of the claims and other costs were sustained by the Tennessee State Government.

736.    Therefore, the Tennessee State Government has been damaged in an amount to be proven at trial.

737.    Additionally, the Tennessee State Government is entitled to the maximum penalty for each and every false or fraudulent claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

**COUNT CX**
**VIOLATION OF THE TENNESSEE MEDICAID FALSE CLAIMS ACT**
**Tenn. Code Ann. § 71-5-182(a)(1)(B)**

738.    Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

739.    This is a claim for penalties and treble damages under the Tennessee Medicaid False Claims Act.

740.    By virtue of the acts described above, Defendants, for the purpose of defrauding the Tennessee State Government, knowingly, with deliberate ignorance, or with reckless disregard made, used, and/or caused to be made or used, records or statements to get false or fraudulent claims under the Medicaid program paid for or approved by the state knowing such record or statement were false within the meaning of Tenn. Code Ann. § 71-5-182(a)(1)(B).

741.    As a result, Tennessee State monies were lost through payments made in respect of the claims and other costs were sustained by the Tennessee State Government.

742.    Therefore, the Tennessee State Government has been damaged in an amount to be proven at trial.

743.   Additionally, the Tennessee State Government is entitled to the maximum penalty for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

## COUNT CXI
## VIOLATION OF THE TENNESSEE MEDICAID FALSE CLAIMS ACT
### Tenn. Code Ann. § 71-5-182(a)(1)(C)

744.   Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

745.   This is a claim for penalties and treble damages under the Tennessee Medicaid False Claims Act.

746.   By virtue of the acts described above, Defendants have knowingly conspired together to defraud the Tennessee State Government under Tenn. Code Ann. § 71-5-182(a)(1)(C).

747.   As a result, Tennessee State monies were lost through payments made in respect of the claims and other costs were sustained by the Tennessee State Government.

748.   Therefore, the Tennessee State Government has been damaged in an amount to be proven at trial.

749.   Additionally, the Tennessee State Government is entitled to the maximum penalty for each and every false or fraudulent claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

## COUNT CXII
## VIOLATION OF THE TENNESSEE MEDICAID FALSE CLAIMS ACT
### Tenn. Code Ann. § 71-5-182(a)(1)(D))

750.   Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

751.    This is a claim for penalties and treble damages under the Tennessee Medicaid False Claims Act.

752.    By virtue of the acts described above, Defendants, for the purpose of defrauding the Tennessee State Government, knowingly, with deliberate ignorance, or with reckless disregard made, used, and/or caused to be made or used, records or statements to get false or fraudulent claims under the Medicaid program paid for or approved by the state knowing such record or statement were false within the meaning of Tenn. Code Ann. § 71-5-182(a)(1)(D).

753.    As a result, Tennessee State monies were lost through payments made in respect of the claims and other costs were sustained by the Tennessee State Government.

754.    Therefore, the Tennessee State Government has been damaged in an amount to be proven at trial.

755.    Additionally, the Tennessee State Government is entitled to the maximum penalty for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

## COUNT CXIII
## VIOLATION OF THE TEXAS MEDICAID FRAUD PREVENTION LAW
### Tex. Hum. Res. Code § 36.002(1)

756.    Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

757.    This is a claim for restitution, interest, penalties and double damages under the Medicaid Fraud Prevention Law.

758.    By virtue of the acts described above, the Defendants, for the purpose of defrauding the Texas State Government, knowingly, with deliberate ignorance, or with reckless disregard or intentionally made, and/or caused to be made, false statements or representations of

material facts on applications for contracts, benefits, or payments under the Medicaid program, within the meaning of Tex. Hum. Res. Code § 36.002(1).

759.    As a result, Texas State monies were lost through payments made in respect of the false statements or representations and other costs were sustained by the Texas State Government.

760.    Therefore, the Texas State Government has been damaged in an amount to be proven at trial.

761.    Additionally, the Texas State Government is entitled to the maximum penalty for each and every unlawful act committed by the Defendants under this provision. Tex. Hum. Res. Code § 36.052(3)(B).

**COUNT CXIV**
**VIOLATION OF THE TEXAS MEDICAID FRAUD PREVENTION LAW**
**Tex. Hum. Res. Code § 36.002(4)(B)**

762.    Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

763.    This is a claim for restitution, interest, penalties and double damages under the Medicaid Fraud Prevention Law.

764.    By virtue of the acts described above, the Defendants, for the purpose of defrauding the Texas State Government, knowingly, with deliberate ignorance, or with reckless disregard or intentionally made, caused to be made, induced, and/or sought to induce, the making of false statements or misrepresentations of material fact concerning information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program, within the meaning of Tex. Hum. Res. Code § 36.002(4)(B).

765.     As a result, Texas State monies were lost through payments made in respect of the false statements or representations and other costs were sustained by the Texas State Government.

766.     Therefore, the Texas State Government has been damaged in an amount to be proven at trial. Additionally, the Texas State Government is entitled to the maximum penalty for each and every unlawful act committed by the Defendants under this provision. Tex. Hum. Res. Code § 36.052(3)(B).

**COUNT CXV**
**VIOLATION OF THE TEXAS MEDICAID FRAUD PREVENTION LAW**
**Tex. Hum. Res. Code § 36.002(9)**

767.     Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

768.     This is a claim for restitution, interest, penalties and double damages under the Texas Medicaid Fraud Prevention Law.

769.     By virtue of the acts described above, Defendants have knowingly conspired together to defraud the Texas State Government under Tex. Hum. Res. Code § 36.002(9).

770.     As a result, Texas State monies were lost through payments made in respect of the false statements or representations and other costs were sustained by the Texas State Government.

771.     Therefore, the Texas State Government has been damaged in an amount to be proven at trial.

772.     Additionally, the Texas State Government is entitled to the maximum penalty for each and every unlawful act committed by the Defendants under this provision. Tex. Hum. Res. Code § 36.052(3)(B).

## COUNT CXVI
## VIOLATION OF THE TEXAS MEDICAID FRAUD PREVENTION LAW
### Tex. Hum. Res. Code § 36.002(12)

773. Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

774. This is a claim for restitution, interest, penalties and double damages under the Texas Medicaid Fraud Prevention Law.

775. As set forth above, Defendants knowingly, with deliberate ignorance, or with reckless disregard made, used, or caused to be made or used false records or statements material to an obligation to pay or transmit money or property to the Texas State Government, or knowingly, with deliberate ignorance, or with reckless disregard concealed or knowingly, with deliberate ignorance, or with reckless disregard and improperly avoided or decreased an obligation to pay or transmit money or property to the Texas State Government in violation of Tex. Hum. Res. Code § 36.002(12).

776. As a result, Texas State monies were lost through payments made in respect of the false statements or representations and other costs were sustained by the Texas State Government.

777. Therefore, the Texas State Government has been damaged in an amount to be proven at trial. Additionally, the Texas State Government is entitled to the maximum penalty for each and every unlawful act committed by the Defendants under this provision. Tex. Hum. Res. Code § 36.052(3)(B).

## COUNT CXVII
## VIOLATION OF THE VIRGINIA FRAUD AGAINST TAXPAYERS ACT
### Va. Code Ann. § 8.01-216.3(A)(1)

778. Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

779.    This is a claim for penalties and treble damages under the Virginia Fraud Against Taxpayers Act.

780.    By virtue of the acts described above, Defendants, for the purpose of defrauding the Virginia Commonwealth Government, knowingly, with deliberate ignorance, or with reckless disregard presented and/or caused to be presented false or fraudulent claims for payment or approval under Medicaid and other Virginia Commonwealth funded programs to officers or employees of the Commonwealth within the meaning of Va. Code Ann. § 8.01-216.3(A)(1).

781.    As a result, Virginia Commonwealth monies were lost through payments made in respect of the claims and other costs were sustained by the Virginia Commonwealth Government.

782.    Therefore, the Virginia Commonwealth Government has been damaged in an amount to be proven at trial.

783.    Additionally, the Virginia Commonwealth Government is entitled to the maximum penalty for each and every false or fraudulent claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

## COUNT CXVIII
## VIOLATION OF THE VIRGINIA FRAUD AGAINST TAXPAYERS ACT
### Va. Code Ann. § 8.01-216.3(A)(2)

784.    Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

785.    This is a claim for penalties and treble damages under the Virginia Fraud Against Taxpayers Act.

786.    By virtue of the acts described above, Defendants, for the purpose of defrauding the Virginia Commonwealth Government, knowingly, with deliberate ignorance, or with reckless disregard made, used, and/or caused to be made or used, false records or statements to get false

146

or fraudulent claims paid or approved by the Commonwealth under Medicaid and other Virginia

Commonwealth funded programs within the meaning of Va. Code Ann. § 8.01-216.3(A)(2).

787.    As a result, Virginia Commonwealth monies were lost through payments made in

respect of the claims and other costs were sustained by the Virginia Commonwealth

Government.

788.    Therefore, the Virginia Commonwealth Government has been damaged in an

amount to be proven at trial.

789.    Additionally, the Virginia Commonwealth Government is entitled to the

maximum penalty for each and every false or fraudulent claim paid or approved arising from the

Defendants' fraudulent conduct as described herein.

**COUNT CXIX**
**VIOLATION OF THE VIRGINIA FRAUD AGAINST TAXPAYERS ACT**
**Va. Code Ann. § 8.01-216.3(A)(3))**

790.    Relator incorporates by reference the allegations set forth in the preceding

paragraphs as though fully set forth herein.

791.    This is a claim for penalties and treble damages under the Virginia Fraud Against

Taxpayers Act.

792.    By virtue of the acts described above, Defendants have knowingly conspired

together to defraud the Virginia Commonwealth Government under Va. Code Ann. § 8.01-

216.3(A)(3).

793.    As a result, Virginia Commonwealth monies were lost through payments made in

respect of the claims and other costs were sustained by the Virginia Commonwealth

Government.

794.    Therefore, the Virginia Commonwealth Government has been damaged in an

amount to be proven at trial.

795.    Additionally, the Virginia Commonwealth Government is entitled to the maximum penalty for each and every false or fraudulent claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

## COUNT CXX
## VIOLATION OF THE VIRGINIA FRAUD AGAINST TAXPAYERS ACT
### Va. Code Ann. § 8.01-216.3(A)(7)

796.    Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

797.    This is a claim for penalties and treble damages under the Virginia Fraud Against Taxpayers Act.

798.    As set forth above, Defendants knowingly, with deliberate ignorance, or with reckless disregard made, used, or caused to be made or used false records or statements material to an obligation to pay or transmit money or property to the Virginia Commonwealth Government, or knowingly, with deliberate ignorance, or with reckless disregard concealed or knowingly, with deliberate ignorance, or with reckless disregard and improperly avoided or decreased an obligation to pay or transmit money or property to the Virginia Commonwealth Government in violation of Va. Code Ann. § 8.01-216.3(A)(7).

799.    As a result, Virginia Commonwealth monies were lost through payments made in respect of the claims and other costs were sustained by the Virginia Commonwealth Government.

800.    Therefore, the Virginia Commonwealth Government has been damaged in an amount to be proven at trial.

801.    Additionally, the Virginia Commonwealth Government is entitled to the maximum penalty for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

**COUNT CXXI**
**VIOLATION OF THE WASHINGTON MEDICAID FRAUD**
**FALSE CLAIMS ACT**
**Rev. Code Wash. §74.66.020(1)(a)**

802.    Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

803.    This is a claim for penalties and treble damages under the Washington False Claims Act.

804.    By virtue of the acts described above, Defendants, for the purpose of defrauding the Washington State Government, knowingly, with deliberate ignorance, or with reckless disregard presented and/or caused to be presented false or fraudulent claims for payment or approval under Medicaid and other Washington State funded programs within the meaning of Rev. Code. Wash. §74.66.020(1)(a).

805.    As a result, Washington State monies were lost through payments made in respect of the claims and other costs were sustained by the Washington State Government.

806.    Therefore, the Washington State Government has been damaged in an amount to be proven at trial.

807.    Additionally, the Washington State Government is entitled to the maximum penalty for each and every false or fraudulent claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

**COUNT CXXII**
**VIOLATION OF THE WASHINGTON MEDICAID FRAUD**
**FALSE CLAIMS ACT**
**Rev. Code Wash. §74.66.020(1)(b)**

808.    Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

809. This is a claim for penalties and treble damages under the Washington State False Claims Act.

810. By virtue of the acts described above, Defendants, for the purpose of defrauding the Washington State Government, knowingly, with deliberate ignorance, or with reckless disregard made, used, and/or caused to be made or used, false records or statements to obtain payment or approval of claims by Washington State within the meaning of Rev. Code Wash. §74.66.020(1)(b).

811. As a result, Washington State monies were lost through payments made in respect of the claims and other costs were sustained by the Washington State Government.

812. Therefore, the Washington State Government has been damaged in an amount to be proven at trial.

813. Additionally, the Washington State Government is entitled to the maximum penalty for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

## COUNT CXXIII
## VIOLATION OF THE WASHINGTON MEDICAID FRAUD
## FALSE CLAIMS ACT
### Rev. Code Wash. §74.66.020(1)(c)

814. Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

815. This is a claim for penalties and treble damages under the Washington False Claims Act.

816. By virtue of the acts described above, Defendants have knowingly conspired together to defraud the Washington State Government under Rev. Code Wash. §74.66.020(1)(c).

817. As a result, Washington State monies were lost through payments made in respect of the claims and other costs were sustained by the Washington State Government.

818. Therefore, the Washington State Government has been damaged in an amount to be proven at trial.

819. Additionally, the Washington State Government is entitled to the maximum penalty for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

## COUNT CXXIV
## VIOLATION OF THE WASHINGTON MEDICAID FRAUD
## FALSE CLAIMS ACT
### Rev. Code Wash. §74.66.020(1)(g)

820. Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

821. This is a claim for penalties and treble damages under the Washington False Claims Act.

822. As set forth above, Defendants knowingly, with deliberate ignorance, or with reckless disregard made, used, or caused to be made or used false records or statements material to an obligation to pay or transmit money or property to the Washington State Government, or knowingly, with deliberate ignorance, or with reckless disregard concealed or knowingly, with deliberate ignorance, or with reckless disregard and improperly avoided or decreased an obligation to pay or transmit money or property to the Washington State Government in violation of Rev. Code Wash. §74.66.020(1)(g).

823. As a result, Washington State monies were lost through payments made in respect of the claims and other costs were sustained by the Washington State Government.

824.    Therefore, the Washington State Government has been damaged in an amount to be proven at trial.

825.    Additionally, the Washington State Government is entitled to the maximum penalty for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

**COUNT CXXV**
**VIOLATION OF THE WISCONSIN FALSE CLAIMS ACT**
**W.S.A. 20.931(2)(a)**

826.    Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

827.    This is a claim for penalties and treble damages under the Wisconsin False Claims Act.

828.    By virtue of the acts described above, Defendants, for the purpose of defrauding the Wisconsin State Government, knowingly, with deliberate ignorance, or with reckless disregard presented and/or caused to be presented false or fraudulent claims for payment or approval under Medicaid and other Wisconsin State funded programs within the meaning of W.S.A. 20.931(2)(a).

829.    As a result, Wisconsin State monies were lost through payments made in respect of the claims and other costs were sustained by the Wisconsin State Government.

830.    Therefore, the Wisconsin State Government has been damaged in an amount to be proven at trial.

831.    Additionally, the Wisconsin State Government is entitled to the maximum penalty for each and every false or fraudulent claim presented and caused to be presented by Defendants and arising from their fraudulent conduct as described herein.

## COUNT CXXVI
## VIOLATION OF THE WISCONSIN FALSE CLAIMS ACT
### W.S.A. 20.931(2)(b)

832.    Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

833.    This is a claim for penalties and treble damages under the Wisconsin False Claims Act.

834.    By virtue of the acts described above, Defendants, for the purpose of defrauding the Wisconsin State Government, knowingly, with deliberate ignorance, or with reckless disregard made, used, and/or caused to be made or used, false records or statements to obtain payment or approval of claims by the Wisconsin State Government within the meaning of W.S.A. 20.931(2)(b).

835.    As a result, Wisconsin State monies were lost through payments made in respect of the claims and other costs were sustained by the Wisconsin State Government.

836.    Therefore, the Wisconsin State Government has been damaged in an amount to be proven at trial.

837.    Additionally, the Wisconsin State Government is entitled to the maximum penalty for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

## COUNT CXXVII
## VIOLATION OF THE WISCONSIN FALSE CLAIMS ACT
### W.S.A. 20.931(2)(c)

838.    Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

839.    This is a claim for penalties and treble damages under the Wisconsin False Claims Act.

840. By virtue of the acts described above, Defendants have knowingly conspired together to defraud the Wisconsin State Government under W.S.A. 20.931(2)(c).

841. As a result, Wisconsin State monies were lost through payments made in respect of the claims and other costs were sustained by the Wisconsin State Government.

842. Therefore, the Wisconsin State Government has been damaged in an amount to be proven at trial.

843. Additionally, the Wisconsin State Government is entitled to the maximum penalty for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

## COUNT CXXVIII
## VIOLATION OF THE WISCONSIN FALSE CLAIMS ACT
### W.S.A. 20.931(2)(g)

844. Relator incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

845. This is a claim for penalties and treble damages under the Wisconsin False Claims Act.

846. As set forth above, Defendants knowingly, with deliberate ignorance, or with reckless disregard made, used, or caused to be made or used false records or statements material to an obligation to pay or transmit money or property to the Wisconsin State Government, or knowingly, with deliberate ignorance, or with reckless disregard concealed or knowingly, with deliberate ignorance, or with reckless disregard and improperly avoided or decreased an obligation to pay or transmit money or property to the Wisconsin State Government in violation of W.S.A. 20.931(2)(g).

847. As a result, Wisconsin State monies were lost through payments made in respect of the claims and other costs were sustained by the Wisconsin State Government.

848.    Therefore, the Wisconsin State Government has been damaged in an amount to be proven at trial.

849.    Additionally, the Wisconsin State Government is entitled to the maximum penalty for each and every false or fraudulent claim paid or approved arising from the Defendants' fraudulent conduct as described herein.

## PRAYER FOR RELIEF

WHEREFORE, the United States and Relator demand that judgment be entered against the Defendants and in favor of the Relator and the United States as follows:

1.    On the first through one hundred and twenty-eight causes of action under the federal false claims act (and as amended) and equivalent state statutes, for the amount of the United States' and states' damages, multiplied by three as required by law, and such civil penalties as are permitted or required by law;

2.    That the Relator be awarded the maximum share amount allowed pursuant to 31 U.S.C. § 3730(d) and applicable state law;

3.    That the Relator be awarded all costs and expenses of this action, including attorney fees, expenses and costs as permitted by 31 U.S.C. § 3730(d) and applicable state law.

4.    That the United States, the States, and Relator receive all such other relief as may be just and proper.

## REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

Respectfully submitted,

Joel Hesch, Esq.
The Hesch Firm, LLC
3540 Ridgecroft Dr.
Lynchburg, VA 24503
Phone: (434) 592-4251
Md. Bar (1988) D. Md. (06350)

Gregory M. Utter (*Ohio Bar No.* 0032528)
(*pro hac vice pending*)
Joseph M. Callow, Jr. (*Ohio Bar No.* 0061814)
(*pro hac vice pending*)
KEATING MUETHING & KLEKAMP PLL
One East Fourth St., Suite 1400
Cincinnati, Ohio 45202-3752
Phone: (513) 579-6538
Fax: (513) 579-6457
Email: gmutter@kmklaw.com
        jcallow@kmklaw.com

*Attorneys for Relator John Doe*

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing was served this 8th day of

August, 2014, via Federal Express upon the following:

Hon. Eric H. Holder, Jr.
Attorney General of the United States
950 Pennsylvania Avenue, NW
Room 4400
Washington, D.C. 20530-0001

Hon. Rod J. Rosenstein
United States Attorney
District of Maryland
36 S. Charles Street
4th Floor
Baltimore, MD 21201

Joel Hesch

5493120.7

157