## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** *ex rel.* | ) | **Case No. 1:14-cv-02535-ELH** |
| **DEBORAH SHELDON, as EXECUTRIX** | ) | |
| **OF THE ESTATE OF RELATOR TROY** | ) | **(Judge Ellen L. Hollander)** |
| **SHELDON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **-v-** | ) | |
| | ) | |
| **FOREST LABORATORIES, LLC, et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**PLAINTIFF/RELATOR DEBORAH SHELDON'S**
**MEMORANDUM IN OPPOSITION TO**
**DEFENDANTS FOREST LABORATORIES, LLC'S AND FOREST**
**PHARMACEUTICALS, INC.'S**
<u>**MOTION TO DISMISS PLAINTIFF/RELATOR'S AMENDED COMPLAINT**</u>

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................1

BACKGROUND ................................................................................................2

   A.  The Allegations in the First Amended Complaint .......................................2

   B.  The Best Price Statute and the Rebate Agreement ......................................5

   C.  CMS' Recent Rulemaking Supports Plaintiff................................................9

   D.  The DOJ Supports Plaintiff.........................................................................12

   E.  One Final Note on the Amended Complaint and
       Calculation of Best Price ...........................................................................14

   F.  Clarification of the Historical Procedural Posture .....................................17

LEGAL ARGUMENT........................................................................................19

   A.  Plaintiff's Amended Complaint Should Not Be Dismissed
       Under Rule 12(b)(6)....................................................................................19

      1.  Plaintiff Plausibly Pleads Falsity ........................................................20

         a.   The Rebate Statute and Rebate Agreement Require Stacking.......20

         b.   Defendants' Reliance on *Wilson* is Misplaced..............................24

      2.  Plaintiff Plausibly Pleads Scienter ......................................................25

         a.   Actual Knowledge ..........................................................................25

         b.   Deliberate Ignorance.....................................................................27

         c.   Reckless Disregard.........................................................................28

   B.  Plaintiff's Amended Complaint Should Not Be Dismissed
       Under Rule 9(b) ...........................................................................................30

   C.  Plaintiff's State FCA Claims Should Not Be Dismissed...........................30

CONCLUSION....................................................................................................30

i

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>                                                                       **Page(s)**

*Ali v. Fed. Bureau of Prisons*,
    552 U.S. 214 (2008)................................................................21

*Astra USA, Inc. v. Santa Clara County*,
    5, 7, 213 U.S. 110 (2011)...................................................5, 20

*Chevron, U.S.A., Inc. v. NRDC, Inc.*,
    467 U.S. 837 (1984)...........................................................22, 23

*Commodity Futures Trading Comm'n v. Schor*,
    478 U.S. 833 (1986)................................................................23

*Crespo v. Holder*,
    631 F.3d 130 (4th Cir. 2011) .................................................20

*Hardy Wilson Mem. Hosp. v. Sebelius*,
    616 F.3d 449 (5th Cir. 2010) .................................................23

*Harrison v. Westinghouse Savannah River Co.*,
    176 F.3d 776 (4th Cir. 1999) .................................................30

*Heckler v. Commun. Health Servcs.*,
    467 U.S. 51 (1984)..................................................................29

*In re Total Realty Mgmt., LLC*,
    706 F.3d 245 (4th Cir. 2013) .................................................20

*Lee v. Norfolk S. Ry. Co.*,
    802 F.3d 626 (4th Cir. 2015) .................................................20

*Pharmaceutical Research & Mfrs. of Am. v. Thompson*,
    362 F.3d 817 (D.C. Cir. 2004) ..............................................23

*Rock Island Ark. & La. R.R. v. United States*,
    254 U.S. 141 (1920)................................................................29

*SAS Inst., Inc. v. Iancu*,
    138 S. Ct. 1348 (2018)...........................................................21

*Sebelius v. Auburn Reg'l Med. Ctr.*,
    568 U.S. 145 (2013)................................................................22

*Shaw v. Brown & Williamson Tobacco Corp.*,
    973 F. Supp. 539 (D. Md. 1997)....................................................................30

*Transamerica Premier Life Ins. Co. v. Selman & Co., LLC*,
    401 F. Supp. 3d 576 (D. Md. 2019)...............................................................2

*United States v. Abdelshafi*,
    592 F.3d 602 (4th Cir. 2010) ........................................................................20

*United States ex rel. Drakeford v. Tuomey*,
    792 F.3d 364 (4th Cir. 2015) ...................................................................24, 25

*United States v. Maxwell*,
    285 F.3d 336 (4th Cir. 2002) ........................................................................21

*United States v. Mead Corp.*,
    533 U.S. 218 (2001) .....................................................................................22

*United States v. Powell*,
    680 F.3d 350 (4th Cir. 2012) ........................................................................20

*United States ex rel. Rostholder v. Omnicare, Inc.*,
    745 F.3d 694 (4th Cir. 2014) ........................................................................20

*United States ex rel. Schutte v. SuperValu, Inc.*,
    143 S. Ct. 1391 (2023)....................................1, 3, 18, 19, 24, 25, 26, 27, 28

*United States ex rel. Sheldon v. Allergan Sales, LLC*,
    24 F.4th 340 (4th Cir. 2022) ........................................................................18

*United States ex rel. Sheldon v. Allergan Sales, LLC*,
    49 F.4th 873 (4th Cir. 2022) ........................................................................18

**Statutes**

42 U.S.C. § 1395hh(a)(1)................................................................................23

42 U.S.C. § 1396r-8(c)(1)(C)........................................................................5, 6

42 U.S.C.A. § 1396r-8(c)...............................................................................14

**Other Authorities**

56 Fed. Reg. 7049 (Feb. 21, 1991) ............................................................5, 7, 21

71 Fed. Reg. 77174 (Dec. 22, 2006) ...............................................................7

72 Fed. Reg. 39199 (July 17, 2007)...........................................................................8

81 Fed. Reg. 5170 (Feb. 1, 2016) ............................................................................8

88 Fed. Reg. 34238 (May 26, 2023) ..................................................................1, 11

Order List, 600 U.S. _____ (June 30, 2023).........................................................18

Plaintiff/Relator Deborah Sheldon ("Plaintiff") respectfully submits this Memorandum in

Opposition to Defendants' Motion to Dismiss Amended Complaint ("Motion"; Dkt. 112) filed by

Defendants Forest Laboratories, LLC and Forest Pharmaceuticals, Inc. ("Defendants").

## I.    <u>INTRODUCTION</u>

Since the Court entered its November 6, 2020 Memorandum Opinion and Order granting

Defendants' original motion to dismiss (Dkt. 86, 87):

-    The Supreme Court reversed this Court's November 6, 2020 Memorandum
     Opinion and Order and remanded for further proceedings consistent with its
     expanded definition of scienter under the False Claims Act ("FCA").
     *United States ex rel. Schutte v. SuperValu, Inc.,* 143 S. Ct. 1391 (2023).

-    CMS has issued new rulemaking that identified this case by name, explicitly
     rejected this Court's November 6, 2020 Memorandum Opinion and Order;
     and confirmed to the entire industry that manufacturers have been required,
     and will continue to be required, to aggregate rebates – as Relator alleges in
     her Amended Complaint.
     (https://www.federalregister.gov/documents/2023/05/26/2023-
     10934/medicaid-program-misclassification-of-drugs-program-
     administration-and-program-integrity-updates) 88 Fed. Reg. 34238 (May
     26, 2023)[1]; and

-    The United States filed an Amicus Brief in the Fourth Circuit supporting
     Plaintiff's (and CMS') interpretation of the Medicaid Rebate Statute
     ("Rebate Statute"). *See Mar. 25, 2021 Brief for the United States of America
     as Amicus Curiae Supporting Appellant (Plaintiff).* [2]

Undaunted by this trifecta of adversity, Defendants have filed a new Motion and ask this

Court to ignore CMS; the DOJ; the Supreme Court; the plain language of the Rebate Statute and

Rebate Agreement; and the plain language of, and the reasonable inferences resulting from, the

allegations in Plaintiff's Amended Complaint.  Defendants' Motion should be denied at the Court's

earliest opportunity so that the case can proceed to the start of fact discovery, nine years after it

---

[1] The Complete CMS Notice is attached as Exhibit A.  Plaintiff has highlighted 34244 and 34260
for the Court's convenience.

[2] The March 25, 2021 United States' Brief is attached as Exhibit B.

was filed.

## II.   BACKGROUND

### A.   The Allegations in the First Amended Complaint[3]

Lest Defendants forget, at the motion to dismiss stage, the Court must accept Plaintiff's factual allegations as true and must draw all reasonable inferences in favor of the plaintiff. *Transamerica Premier Life Ins. Co. v. Selman & Co., LLC*, 401 F. Supp. 3d 576, 587-88 (D. Md. 2019).  Defendants' attempts to insert new facts or contrary facts; argue facts inconsistent with the allegations in Plaintiff's Amended Complaint; or argue hypothetical situations inconsistent with the allegations in Plaintiff's Amended Complaint must be rejected.

Plaintiff's Amended Complaint (Dkt. 16) consists of more than 879 paragraphs and 179 pages.  In her Amended Complaint, Plaintiff alleges that Defendants, with actual knowledge of their Best Price obligations, failed to comply with their obligations and defrauded the Government of more than $680 million (Dkt. 16, Am. Comp. at 1-10, ¶¶ 54-121).  Plaintiff alleges that Defendants wanted to expand their business with long term care facilities in particular, and that the pharmacies at the long term care facilities, such as Pharmerica, refused to stock Defendants' drugs at their pharmacies unless they received a rebate or price discount.  (Dkt. 16, Am. Comp. at 1-2, 7-8, ¶¶ 56-68).  Plaintiff alleges an example where Defendants provided two rebates for a single drug unit dispensed to a patient at a long term care facility: (a) a 20-cent rebate to Humana or the commercial insurer of the patient; and (b) a 20-cent rebate to the pharmacy at the long term care facility (Pharmerica).  (Dkt. 16, Am. Comp. at 1-2, 7-8, ¶¶ 56-68).  Plaintiff alleges that this actual price realized for the single drug unit was therefore 60 cents (not the original $1 price and not 80 cents) – but Defendants did not report this actual price realized and did not include both

---

[3] For the Court's convenience, Plaintiff's Amended Complaint (Dkt. 16) is attached as Exhibit C.

discounts/rebates in calculating their Best Price for the particular drug.   Plaintiff alleges that Defendants made multiple false claims to the Government when falsely reporting Best Price for multiple drugs on an annual basis for several years, and thus defrauded the Government when reporting the wrong Best Price.  (Dkt. 16, Am. Comp. at 1-10, ¶¶ 33, 38-40, 58-70, 72-121).

In her Amended Complaint, Plaintiff clearly alleges falsity.   Plaintiff alleges that Defendants were required to aggregate all rebates and discounts that relate to a single drug unit to calculate Best Price – as a dollar amount to subtract from AMP under the Medicare Rebate Statute and their Rebate Agreement – and did not do so.  (Dkt. 16, Am. Comp. at 1-10, ¶¶ 54-73).  Plaintiff provides specific details regarding the Rebate Statute; Rebate Agreement; the Medicaid Program; Drug Reimbursement Under Medicaid; Medicaid Reimbursement Formulas; The Medicaid Drug Rebate Program; the Medicaid Drug Rebate Statute; the Medicaid Rebate Agreement; the 1991 and 1994 Program Releases; the 2005 GAO Report; the 2007 CMS rulemaking period and resulting regulations; Defendants' 2007 Letter to CMS; and the 2016 CMS rulemaking period and resulting regulations.  (Dkt. 16, Am. Comp. at ¶¶ 13-53).  Plaintiff provides specific calculations for specific drugs, for specific years, as specific examples of Defendants' fraudulent conduct and the submission of fraudulent claims.  (Dkt. 16, Am. Comp. at 5-6, 8-10, ¶¶ 72-121).

In her Amended Complaint, Plaintiff clearly alleges scienter.   As the Supreme Court recently confirmed in *Schutte*, the FCA identifies three separate, independent standards for scienter, any one of which is sufficient under the FCA: (1) actual knowledge: (2) deliberate ignorance; and (3) reckless disregard.   *United States ex rel. Schutte v. Supervalu, Inc*., 143 S. Ct. 1391, 1399 (2023).  Plaintiff alleges Defendants violated all three standards:

> 54.  Currently, and upon information and belief since at least FY2005, **Forest has knowingly, with deliberate ignorance, or with reckless disregard engaged in a systemic false and fraudulent scheme to defraud Medicaid out of significant amounts of money** based on Forest's willful failure to report accurate Best Price

3

to state Medicaid programs, resulting in lower Medicaid drug rebates being paid by
Forest to each state, and thereby causing a higher amount of Medicaid spending by
each state, which in turn causes the federal government to provide more Medicaid
spending to each state.

(Dkt. 16, Am. Comp. at ¶ 54).  Plaintiff does not just use the right terms – she provides specific

examples of scienter, including allegations that: (a) senior management of Defendants held

meetings and discussed that two rebates were paid on a single drug unit dispensed to a single

patient at long term care facilities, but chose not to change the way that they calculated and reported

Best Price; and (b) senior management deliberately chose not to use their internal review ("DNA")

process to catch double rebates with major Pharmacy Providers/GPO drug purchasers in the long

term care facility business.  (Dkt. 16, Am. Comp. at ¶¶ 69, 71).

In her Amended Complaint, Plaintiff also alleges a relevant timeframe for the fraudulent

conduct from FY2005 through the present.

54.  **Currently, and upon information and belief since at least FY2005,** …..

119.  All told, upon information and belief, for FY2005 to FY2014, Forest owes
Medicaid an additional reimbursement of about $686.64 Million as set forth above
for those drugs alone, **plus significant additional reimbursement owed from
FY2014 to the present……**

121.  Therefore, Forest's false and fraudulent conduct has resulted in state Medicaid
programs not receiving the lowest price available from Forest during the relevant
rebate periods on such drugs, inclusive of all discounts and rebates.  Forest's
violation of the Best Price reported to the Secretary has caused the federal
government to pay over $680 Million in Medicaid spending to various state
Medicaid programs than it should have under the Medicaid Drug Rebate Program
**from FY2005 through FY2014 alone, plus additional significant overpayments
from FY2014 to the present.**

(Dkt. 16, Am. Comp. at ¶¶ 54, 119, 121).  There is no plausible interpretation of the Amended

Complaint, and there is no reasonable inference that can be drawn from the allegations in the

Amended Complaint, to suggest that the relevant timeframe is anything less than 2005-present.

As discussed *infra*, Plaintiff's Amended Complaint contains sufficient allegations under both Rule 12(b)(6) and Rule 9(b).

### B.    The Best Price Statute And The Rebate Agreement

Plaintiff's claims focus on the Rebate Statute and the Rebate Agreement which unambiguously require the stacking of rebates and discounts related to a single drug unit based upon the "the lowest price available from the manufacturer," taking into account rebates that "adjust the prices actually realized." The legislative history, and CMS' 30-year history of interpretation and guidance, further supports this statutory interpretation.

Congress passed the Rebate Statute to ensure that manufacturers did not profit more from selling prescription drugs to Medicaid than they did from selling the same drugs to private entities. *See* 136 Cong. Rec. S 12954 (1990). One mechanism by which Congress achieved its goal is the "Best Price" provisions in the Rebate Statute and the Rebate Agreement. 42 U.S.C. § 1396r-8(c)(1)(C); 56 Fed. Reg. 7049 (Feb. 21, 1991); *see also Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110, 118 (2011) (The Rebate Statute's obligations and the "contractual obligations [of the Rebate Agreement], in short, are one and the same"). Congress designed and intended the Best Price provisions to ensure that the Government benefits from all rebates, discounts, and other price concessions given to any entity for a single drug unit. Best Price requires manufacturers to report the final lowest price "actually realized" by a manufacturer from a single drug unit. 56 Fed. Reg. 7049 (Feb. 21, 1991). This means the manufacturer must report the amount the manufacturer "actually realized" after aggregating any and all "cumulative discounts, rebates, or other arrangements" that "subsequently adjust the prices actually realized" by the manufacturer for a single drug unit. *Id.* The legislative intent of Congress is clear from the Rebate Statute and Rebate Agreement.

The Rebate Statute sets forth the requirement that manufacturers must calculate Best Price by accounting for rebates and discounts provided to different entities.  The 1991 version of the Rebate Statute, which is largely the same today, defined "Best Price" as:

(c) Amount of rebate
  (1) Basic rebate for single source drugs and innovator multiple source drugs
* * *
**(C)** For the purposes of this paragraph, the term "best price" means, with respect to a single source drug or innovator multiple source drug of a manufacturer, **the lowest price available from the manufacturer to any wholesaler, retailer, nonprofit entity, or governmental entity** within the United States (excluding depot prices and single award contract prices, as defined by the Secretary, of any agency of the Federal Government).  The **best price shall be inclusive of cash discounts, free goods, volume discounts, and rebates**…..

42 U.S.C. § 1396r-8(c)(1)(C) (1991); *see also* 42 U.S.C. § 1396r-8(c)(1)(C) (2020).

Similarly, § I(d) of the Rebate Agreement specifies that a manufacturer's Best Price should be "calculated to include *all* sales and associated rebates, discounts and other price concessions *provided by the manufacturer to any entity*" for a single drug unit.

Rebate Agreement Between The Secretary of Health and Human Services (hereinafter referred to as "the Secretary") and The Manufacturer Identified in Section XI of this Agreement (hereinafter referred to as "the Manufacturer")

*I. Definitions*

***

(d) **"Best Price" means**, with respect to Single Source and Innovator Multiple Source Drugs, **the lowest price at which the manufacturer sells the Covered Outpatient Drug to any purchaser in the United States in any pricing structure** (including capitated payments), in the same quarter for which the AMP is computed.

**The best prices shall be inclusive of cash discounts, free goods, volume discounts, and rebates**, (other than rebates under section 1927 of the Act).
It shall be determined on a unit basis without regard to special packaging, labeling or identifiers on the dosage form or product or package, and shall not take into account prices that are Nominal in amount. For Bundled Sales, the allocation of the discount is made proportionately to the dollar value of the units of each drug sold

6

under the bundled arrangement.  **The best price for a quarter shall be adjusted by the Manufacturer if cumulative discounts, rebates or other arrangements subsequently adjust the prices actually realized.**

**\*\*\* (e) The rebate agreement shall be construed in accordance with Federal common law and ambiguities shall be interpreted in the manner which best effectuates the statutory scheme.**

56 Fed. Reg. 7049 (Feb. 21, 1991) (emphasis added).  Defendants signed Rebate Agreements and are bound by the terms.

For more than 30 years, CMS has provided guidance and promulgated regulations through rulemaking confirming that "Best Price" under the Rebate Statute and Rebate Agreement means the price actually realized by a drug manufacturer for a single drug unit after stacking any and all price concessions to all entities.  As outlined and explained in more detail in the Amended Complaint:

- _The 1991 and 1994 Program Releases._  In a 1991 Program Release, CMS instructed manufacturers that "you must revise AMPs and/or BPs to reflect the impact of cumulative discounts or other arrangements on the _prices actually realized_ in any quarter." (Medicaid Drug Rebate Program Release No. 2 (Aug. 9, 1991) (emphasis added).).  Again in 1994, CMS instructed manufacturers that "we consider any price adjustment which ultimately _affects the price actually realized by the manufacturer_ as 'other arrangements' and, as required by the Rebate Agreement, included in the calculations of AMP and best price." (Medicaid Drug Program Release No. 14 (Dec. 21, 1994) (emphasis added).).

- _The 2006 Proposed Rules_.  In late 2006, CMS issued proposed rules and sought public comments, which were due by February, 2007. _See_ 71 Fed. Reg. 77174 (Dec. 22, 2006).  In its preamble to the 2006 proposed rulemaking, CMS provided notice and guidance to the industry pertaining to Best Price, stating that Best Price "includes cash discounts, free goods that are contingent on any purchase requirement, volume discounts and rebates [. . .] which reduce the price paid," and that the "best price for a rebate period should be _adjusted by the manufacturer if cumulative discounts or other arrangements subsequently adjust the prices actually realized._" _Id._ at 77181.  CMS further stated that "_any price concession_ associated with [a] sale _should be netted out_ of the price _received by the manufacturer_ in calculating best price and best price should be adjusted by the manufacturer if other arrangements subsequently adjust the _prices_

7

*actually realized.*" *Id.* at 77182.  And that "[w]e propose to consider any price adjustment which ultimately affects those prices which are *actually realized by the manufacturer* as 'other arrangements' and that such adjustment should be included in the calculation of best price, except to the extent that such adjustments qualify as bona fide service fees." *Id.*

- *The 2007 Final Rules.*  On July 17, 2007, CMS issued its final rule with comments and responses.  Even though Forest and other manufacturers asked CMS to change the language in the preamble, CMS made *no changes* to the preamble.

  CMS also included extensive responses to comments upon the proposed regulations from manufacturers and others.  CMS' responses confirm that manufacturers are required to aggregate price concessions provided to different entities.

  **Comment: One commenter requested that when best price is determined, *customary prompt pay discounts extended to wholesalers should not be aggregated with price concessions available to an end–customer* under a contract administered through a wholesaler chargeback arrangement, regardless of whether the manufacturer negotiated the contract directly with the end–customer or with a third party.**

  **Response: *We do not agree*.  As we have previously stated, there is no basis to exclude these discounts.  *Both* the customary prompt pay discounts *and* other price concessions available to the end–customer are to be included in the determination of best price.**  (72 Fed. Reg. at 39199 (July 17, 2007) (emphasis added).).

- *The 2016 Final Rule with Comments and Responses.*  In 2016, CMS again reiterated the same consistent position: manufacturers must aggregate and report all rebates, discounts, and price concessions that affect the price actually realized by the manufacturer, even those provided to different entities.  One commenter suggested that, exactly like Forest's current argument, "CMS should adopt a policy where the manufacturer would only be required to combine price concessions on a single unit when . . . price concessions *will flow to a single entity*," and objected to including "in the best price available to one customer, as a price concession to that customer, a payment made to a completely different entity."  81 Fed. Reg. 5170, 5252– 53 (Feb. 1, 2016) (emphasis added).  Consistent with CMS' statements dating back to 1991 on this issue—as well as the clear language of the Rebate Statute, Rebate Agreement, and regulations—CMS rejected this argument, stating once more that "[a] manufacturer is responsible for including all price concessions that *adjust the price realized by the manufacturer* for the drug in its determination of best price," including

when price concessions are given to "two entities." *Id.* (emphasis added).

(Dkt. 16, Am. Comp. at ¶¶ 13-53).

In sum, the Rebate Statute and the Rebate Agreement ensure that manufacturers make no more from selling a drug to Medicaid than elsewhere. The sole way to achieve this goal – one that the Rebate Statute, Rebate Agreement, and CMS' guidance and regulations plainly require – is for manufacturers to aggregate price concessions when reporting the "Best Price" at which it sells a single drug unit. That is, a manufacturer must report the lowest amount it realizes on the sale of a single drug unit, not the highest rebate paid by only one particular party in the distribution chain.

### C.     **CMS Recent Rulemaking Supports Plaintiff**

If there was any doubt as to the proper interpretation of the Rebate Statute and Rebate Agreement, or the proper interpretation of the past 30 years of CMS guidance and rulemaking, CMS removed that doubt earlier this year. On May 26, 2023, CMS announced a proposed rule that: (a) explicitly reaffirmed its prior interpretations of the Rebate Statute and Rebate Agreement; and (b) explicitly rejected this Court's November 6, 2020 Memorandum Opinion and Order. CMS sent notice to the industry nationwide. CMS' rulemaking leaves no room for debate:

**D. Proposal To Account for Stacking When Determining Best Price— (§ 447.505)**

Section 1927(c)(1)(C) of the Act defines the term "best price" to mean with respect to a single source drug or innovator multiple source drug of a manufacturer (including the lowest price available to any entity for any such drug of a manufacturer that is sold under a new drug application approved under section 505(c) of the Federal Food, Drug, and Cosmetic Act), the lowest price available from the manufacturer during the rebate period to any wholesaler, retailer, provider, health maintenance organization, nonprofit entity, or governmental entity within the United States, subject to certain exceptions and special rules. The implementing regulations for the determination of best price are at § 447.505.

* * *

9

**We addressed the question regarding stacking in the response to comments in the COD final rule, specifying that if multiple price concessions are provided to two entities for the same drug transaction, all discounts related to that transaction which adjust the price available from the manufacturer should be considered when determining best price**….

However, in the case *United States ex rel. Sheldon* v. *Allergan Sales, LLC.,* a relator alleged that a drug manufacturer failed to aggregate discounts provided to separate customers for purposes of determining best price, and the manufacturer argued that the stacking requirement was not sufficiently clear.   The district court granted Allergan's motion to dismiss, ruling that relator failed to plausibly allege either falsity or knowledge because Allergan's interpretation "is objectively reasonable" and CMS' rule had not specifically warned against it.   On appeal, a panel of the United States Court of Appeals for the Fourth Circuit stated that, in that case, the drug manufacturer had not been "warned . . . by the authoritative guidance from CMS" and that CMS had "failed to clarify" the stacking issue.   The Government filed an amicus brief supporting the relator's petition for rehearing en banc, which the Fourth Circuit granted.   Following argument, the Fourth Circuit issued its decision with no substantive opinion that vacated the prior panel decision and affirmed the district court by an equally divided court.

As noted, section 1927(c)(1)(C) of the Act defines the term "best price" to mean with respect to a single source drug or innovator multiple source drug of a manufacturer (including the lowest price available to any entity for any such drug of a manufacturer that is sold under a new drug application approved under section 505(c) of the Federal Food, Drug, and Cosmetic Act), the lowest price available from the manufacturer during the rebate period to any wholesaler, retailer, provider, health maintenance organization, nonprofit entity, or governmental entity within the United States.   **We interpreted this section expansively as the statute refers to a manufacturer's lowest price "available" "to any" entity on this statutory list.   That is, if a manufacturer provides a discount to a wholesaler, then a rebate to the provider who dispensed the drug unit, and then another rebate to the insurer who covered that drug unit, CMS has concluded that "best price" must include (or "stack") all the discounts and rebates associated with the final price, even if the entity did not buy the drug directly from the manufacturer. By stacking, best price reflects the lowest realized price at which the manufacturer made that drug unit available.   We also note that manufacturers are required to take rebates into account for multiple entities when calculating AMP, and for logical reasons, best price should do so as well, since including them in AMP and not accounting for them in best price could result in AMP being lower than best price.**

**Therefore, to remove any potential doubt prospectively, we are proposing to revise § 447.505(d)(3) to add to the existing regulatory statement that the manufacturer must adjust the best price for a covered outpatient drug for a rebate period if cumulative discounts, rebates or other arrangements to best**

**price eligible entities subsequently adjust the price available from the manufacturer for the drug.  We are adding the clarifying statement that cumulative discounts, rebates or other arrangements must be stacked to generate a final price realized by the manufacturer for a covered outpatient drug, <u>including discounts, rebates or other arrangements provided to different best price eligible entities.</u>**

https://www.federalregister.gov/documents/2023/05/26/2023-10934/medicaid-program-misclassification-of-drugs-program-administration-and-program-integrity-updates (emphasis added) 88 Fed. Reg. 34238 (May 26, 2023).

Defendants concede, as they must, that "CMS has issued a proposed rule that ….. seeks to impose a discount aggregation obligation on manufacturers."  (Dkt. 112, Defs. Memo. at 19).  Defendants also concede, as they must, that CMS' rulemaking is consistent with CMS' 2016 CMS commentary.  (Dkt. 112, Defs. Memo. at 19).  The message from CMS is crystal clear – aggregate all rebates and discounts related to a single drug unit, even if given to different entities that relate to the same drug unit (which is exactly what Plaintiff alleges in her Amended Complaint!).

Recognizing that CMS' rulemaking is fatal to their argument, Defendants desperately try to argue that CMS' proposed rule is only "prospective" (Dkt. 112, Defs. Memo. at 19-20), but that argument completely ignores CMS' references to its prior comments and prior rulemaking – the same comments and rulemaking that Plaintiff have cited and referenced above.  CMS did not change its position or announce a new position prospectively.  CMS is explicitly reinforcing and reconfirming its position from the past 30 years.  No reasonable person can read CMS' comments and conclude that CMS is proposing a different interpretation that only applies prospectively; to the contrary, CMS obviously proceeded with this new rulemaking to clarify its long-standing position in specific response to this Court's previous ruling.

In a final act of desperation, Defendants simply ask the Court to ignore CMS and characterize the proposed rulemaking as a "radical re-definition of Best Price that is inconsistent with CMS' longstanding view and flatly contrary to the text, purpose, structure and history of the

11

governing statute." (Dkt. 112, Defs. Memo at 19-20).  Defendants acknowledge that their position is inconsistent with CMS' interpretation of the Rebate Statute and Rebate Agreement, so they are left with no choice but to ask the Court to simply ignore CMS rulemaking.

The choice for the Court is stark and clear.  CMS engaged in rulemaking earlier this year to explicitly reaffirm its interpretation of the Rebate Statute (and Rebate Agreement) and to explicitly reject this Court's previous ruling.  CMS took the extraordinary steps of: (a) specifically identifying this case by name in its rulemaking process; and (b) specifically telling the pharmaceutical industry that the Court's previous ruling in this case should not be followed.  Today, Plaintiff asks the Court to accept and agree with CMS' interpretation of the Rebate Statute and Rebate Agreement, and Defendants ask the Court to ignore and snub CMS.  There is no middle ground.[4]

### D.      The DOJ Supports Plaintiff

Defendants correctly note that the United States did not intervene in the case in September of 2019 – but the United States' support of Plaintiff in this litigation is undeniable.  The United States filed an Amicus Brief in the Fourth Circuit in support of Plaintiff and the United States' position was direct and instructive.

> I.  Under the False Claims Act, a statement or claim is "false" if it is made in violation of the applicable law or regulations.  In such cases, courts assess falsity simply by determining whether the defendant violated the applicable law.  Here, the district court concluded that the relator failed to plausibly allege falsity, but did so without making the threshold legal determination whether defendant's alleged conduct violated the law.  Instead, the court stated that the applicable law was ambiguous and ended its analysis there.  That was error, and this Court should, at a minimum, reverse on this ground.

---

[4] In their Motion, Defendants cite to most of the same 30 year history of CMS rulemaking events that Plaintiff cites in her Amended Complaint, but Defendants interpret the history differently. Fortunately, the parties and the Court now have the added benefit of CMS' most recent rulemaking as an additional lens to view the 30 year history, and the picture is clear.

> **If the Court reaches the question, it should also conclude that relator plausibly alleged falsity.  Under the Medicaid Drug Rebate Statute and applicable regulations, drug manufacturers must report "best prices" that reflect all discounts and rebates for the sale of the same drug unit, even if the manufacturer provides those discounts to different entities in the chain of distribution.**
>
> **II.  The district court likewise erred in holding that relator failed to plausibly allege that Forest acted knowingly under the False Claims Act.  Relator made specific factual allegations that, if true, would support a reasonable inference that the defendant actually knew that it was submitting inflated "best price" reports that were false under the government's understanding of the term, or that it deliberately ignored or recklessly disregarded red flags to that effect. The district court was incorrect to conclude that the mere existence of regulatory ambiguity precluded those allegations.  The court also improperly took a fact question away from the jury by determining at the pleading stage that applicable regulatory guidance was insufficient to warn Forest away from its conduct.**

*See Mar. 25, 2021 United States Amicus Brief in the Fourth Circuit at 8-9*.  The United States was

crystal clear on falsity and the proper interpretation of the Rebate Statute.

> **[I]f the Court reaches this question, it should hold that relator has plausibly alleged that Forest violated the "best price" requirement by failing to aggregate discounts and rebates offered to multiple entities for the same drug units.**

                                         * * *

> **The Medicaid Rebate Statute defined the drug manufacturer's "best price" as "the lowest price available from the manufacturer... to any wholesaler, retailer, non-profit entity or governmental entity which shall be inclusive of cash discounts..... volume discounts and rebates. 42 U.S.C. 1396r-8(c )(1)(C )(i), (i)(1) (emphasis added).  "Congress' use of the word "any" suggests an intent to use that term expansively."** *Smith v. Berryhill*, **139 U.S. 1765, 1774 (2019) (alterations and quotation marks omitted).  And an expansive interpretation is particularly appropriate because Congress intended to "give Medicaid the benefit of the best price for which a manufacturer sells a prescription drug to any public or private purchaser."** Reading the word "any" to mean "any single" entity would lead to anomalous results that contradict that purpose.  It would mean that if a manufacturer contracts with several entities for the sale of the same drug unit, and spreads its discounts among those entities, the "best price" would reflect only one of several discounts, and Medicaid programs would therefore pay a higher amount for the drug than what the manufacturer realized from private sales.

* * *

> **[T]he question is how to apply the statute and regulations to the context of a complex sale where a manufacturer contracts with several entities for the sale of the same drug unit, and spreads discounts or rebates to all of them. <u>The text, context, and history of the statute and applicable regulations all point to the same conclusion: the "manufacturer's best price" includes all of those discounts.</u>**

*See Mar. 25, 2021 United States Amicus Brief in the Fourth Circuit at* 15-19 (emphasis added).

The position of the United States (who remains a real party in interest even in a declined case) cannot be more clear: (a) the Rebate Statute and Rebate Agreement require stacking of rebates and discounts to different entities for a single drug unit because that is the price actually realized; and (b) Plaintiff has adequately pled falsity and scienter such that dismissal at the motion to dismiss stage was, and is, inappropriate. Defendants' Motion is fundamentally inconsistent with the United States' position outlined above.

**E.      <u>One Final Note On The Amended Complaint And Calculation Of Best Price</u>**

As outlined in Plaintiff's Amended Complaint, Best Price is not an abstract concept. The Rebate Statute contains a specific formula for calculating the rebate that Defendants owed to the States. The Rebate Statute requires Defendants to calculate the States' Medicaid rebate as **"the difference between the average manufacturer price and the best price."** 42 U.S.C.A. § 1396r-8(c) (emphasis added). Defendants cannot simply say Best Price is the single highest rebate paid to a downstream customer of its wholesaler and ignore the formula.

The Amended Complaint contains several examples of calculating the rebate of AMP minus Best Price in dollar amounts. By way of example: (a) AMP is $1.00. (Dkt. 16, Am. Comp. at ¶ 58); (b) Best Price must be calculated as a dollar amount to subtract from AMP (Dkt. 16, Am. Comp. at ¶¶ 29-35); (c) Defendants sold Drug X to McKesson for $1.00. (Dkt. 16, Am. Comp. at

¶¶ 60-61); (d) For McKesson to sell Drug X, Defendants had to pay both Pharmerica a 20-cent rebate and Humana a 20-cent rebate (Dkt. 16, Am. Comp. at ¶¶ 58, 61); (e) Thus, the Best Price is 60 cents (AMP of $1.00 minus Best Price of both necessary rebates to make the sale of 20 cents and 20 cents). (Dkt. 16, Am. Comp. at ¶ 68).  The Court must accept these facts in the Amended Complaint as true.  If Defendants only paid one of the two rebates, there would be no sale.  Thus, the actual price realized by Defendants is 60 cents.

The 2005 GAO Report provided a diagram specifically explaining how to calculate Best Price – the Net Amount Actually Realized – in a transaction involving rebates and discounts provided to two different entities for the same drug unit.



(Dkt. 16, Am. Comp. at ¶ 38).  Plaintiff modeled their diagram from Figure 1 above when explaining Defendants' failure to aggregate rebates and discounts for a single drug unit in the long-term care pharmacy scenario, by giving another example of a Best Price calculation.

(Dkt. 16, Am. Comp. at ¶ 39).  Plaintiff then provided multiple, specific Best Price calculations

for specific drugs for specific years; for example:

> 92.     Upon information and belief, Forest's net sales for Namenda were about
> $1.3 Billion, at least 10% of which were Medicaid sales – $130 Million.  Upon
> information and belief, Forest' highest reported Best Price rebate percentage for
> Namenda in FY2011 was the statutory rebate percentage of 23.1% based upon the
> maximum rebate of 11% given by Forest on the Commercial side of its business.
> Accordingly, Medicaid received a reimbursement from Forest of about $30.03
> Million (0.231 * $130 Million).  However, upon information and belief, Namenda
> was dispensed to patients in Pharmacy Provider Facilities with private insurance
> with Pharmacy Providers/GPOs receiving a maximum discount/rebate of 14% and
> commercial insurance companies, again, receiving up to a 11% rebate on the same
> dispensed drug.  However, Forest knowingly, with deliberate ignorance, or with
> reckless disregard ignored such double rebates, while also purposefully or with
> reckless disregard failing to implement the DNA process in the Pharmacy
> Provider/GPO market to identify such double rebates, despite knowing, or it should
> have known, upon information and belief, that at least 7% of Pharmacy Provider
> patients receiving Namenda had private insurance.  Therefore, taking into account
> such double rebates, Medicaid should have received an additional 1.9% rebate
> (11% Commercial rebate + 14% Pharmacy Provider/GPO rebate – 23.1% reported
> Best Price rebate = 1.9% under rebate), resulting in Forest owing Medicaid an
> additional reimbursement of about $2.47 Million (0.19 * $130 Million) for
> Namenda in FY2011.

(Dkt. 16, Am. Comp. at ¶ 92; *see also* 5-6, 8-10, ¶¶72-121).

The point is that Defendants ignore each of the specific calculations of Best Price alleged in the Amended Complaint as a dollar amount to subtract from AMP, as required by the Rebate Statute and Rebate Agreement.  Defendants have never even addressed Plaintiff's specific factual allegations pertaining to the amount of money Defendants received per drug unit to calculate Best Price as a dollar amount based upon the "the lowest price available from the manufacturer," taking into account rebates that "adjust the prices actually realized."

In sum, when the Court begins with the Rebate Statute's formula of AMP minus Best Price in terms of dollar amounts, Defendants' entire argument regarding the single highest rebate falls apart.  The only plausible calculation of the Medicaid rebate that Defendants owe the States based on AMP minus Best Price is the dollar amount calculation consisting of the price Defendants actually realized taking into account the money they received and paid out in rebates necessary to make the sale of a single drug unit.  There would be no sale of the single drug unit without both the Pharmerica 12 cent rebate and the Humana 20 cent rebate.  Thus, the lowest price available from Defendants, in this example, for Drug X is 68 cents.  Defendants cannot cherry-pick when both rebates are needed for the drug unit transaction.  If one is missing, there is no sale of the drug unit.  Thus, the dollar amount of Best Price (68 cents) must include all money received by Defendants ($1.00) less all money paid by Defendants (32 cents) in order to sell a single drug unit. That is the only way Best Price can be calculated as a dollar amount pertaining to the sale of Drug X.  That is the only way the required statutory formula works, i.e. AMP minus Best Price.  And that is what Plaintiff alleges with specificity in the Amended Complaint.

### F.    <u>Clarification Of The Historical Procedural Posture</u>

While the parties agree that the case is back before the Court, Defendants make two misrepresentations regarding the procedural posture that need to be corrected.

17

First, Defendants repeatedly refer the Court to the Fourth Circuit 2-1 panel decision as instructive and helpful (Dkt. 112, Defs. Memo. at  10, 11, 12, 15, 16, 19), but they fail to inform the Court that the Fourth Circuit *en banc* vacated the panel decision.  After a panel issued a 2-1 ruling, the Fourth Circuit granted Relator's petition for en banc review and ***vacated*** the panel decision.  After an *en banc* oral argument, the Fourth Circuit *en banc* court did not come to consensus on any issue, with an equal number of votes to reverse and affirm the district court's decision.  As a result:

> On rehearing en *banc*, the panel opinions in *United States ex rel. Sheldon v. Allergan Sales, LLC*, 24 F.4th 340 (4th Cir. 2022) are ***vacated***, and the judgment of the district court is affirmed by an equally divided court.

*United States ex rel. Sheldon v. Allergan Sales, LLC*, 49 F.4th 873 (4th Cir. 2022) (*en banc*) (emphasis added).  The 2-1 Fourth Circuit panel decision is not valid authority – neither the majority decision that Defendants reference and the fiery dissenting opinion.  It is a little disingenuous, and a little dangerous, for Defendants to consistently refer the Court to a 2-1 panel decision as reliable authority that was expressly vacated by the Fourth Circuit *en banc*.

Second, Defendants represent that the Supreme Court reversed the Fourth Circuit.  That is not really true.  The mandate from the Supreme Court is specific that "**The petition for a writ is granted.  The judgment is vacated….**"  [Order List, 600 U.S. ____ (June 30, 2023)]  The only "judgment" was this Court's judgment because the Fourth Circuit *en banc* affirmed by an equally divided court.  The Fourth Circuit took no action on remand from the Supreme Court because the Fourth Circuit did not issue an opinion, ruling, or judgment that needed further reconsideration. The Supreme Court reversed this Court's judgment and remanded for new proceedings in light of its *Schutte* opinion.

So, to be clear with the historical and current procedural posture:

- The United States formally supported Plaintiff and specifically asked the Fourth Circuit to reverse this Court's November 6, 2020 Opinion and Order (and agreed with Plaintiff's interpretation of the Rebate Statute and Rebate Agreement).

- The Supreme Court specifically reversed and remanded this Court's November 6, 2020 Opinion and Order.

- CMS instituted rulemaking earlier this year to specifically confirm to the industry its disagreement with this Court's November 6, 2020 Opinion and Order.

- Defendants renewed Motion asks the Court to: (a) ignore the United States' position on the interpretation of the Rebate Statute and Rebate Agreement; (b) ignore CMS' position in recent rulemaking specifically intended to refute this Court's prior ruling; (c) ignore the Supreme Court's reversal and *Schutte* decision; (d) ignore the allegations in our 179-page Amended Complaint; and (e) reaffirm this Court's November 6, 2020 Opinion and Order on different grounds.

Defendants ask this Court to rewrite the rules for the entire health care industry by issuing a ruling on a motion to dismiss in this case that guts CMS' longstanding position on the Rebate Statute and Rebate Agreement and CMS' unequivocal position expressed in the current rulemaking process – when CMS promulgated its rulemaking months ago to avoid this precise scenario. With all due respect, the Court should not go down that path.

The Court should deny Defendants' Motion at its earliest opportunity.

## II.   LEGAL ARGUMENT

### A.   Plaintiff's Amended Complaint Should Not Be Dismissed Under Rule 12(b)(6)

The Court is well versed in the appropriate standards related to this Motion. For purposes of testing the sufficiency of Plaintiff's allegations that Defendants violated §§ 3729(a)(1)(A) & (B) of the FCA, the Court must determine whether Plaintiff: (1) plausibly alleged that Defendants made a false statement or engaged in a fraudulent course of conduct that was material in causing the government to pay out money or to forfeit moneys due to it and (2)

19

alleged that Defendants did this with the requisite scienter.  *See United States ex rel. Rostholder v. Omnicare, Inc.*, 745 F.3d 694, 700 (4th Cir. 2014).  As outlined above and below, Plaintiff has sufficiently and plausibly alleged Defendants violated the FCA.

### 1.   Plaintiff Plausibly Pleads Falsity

### a.   The Rebate Statute And Rebate Agreement Require Stacking

The rules for statutory interpretation are well settled:  "[w]hen interpreting a statute, [courts must] 'first and foremost strive to implement congressional intent by examining the plain language of the statute.'"  *United States v. Powell*, 680 F.3d 350, 355 (4th Cir. 2012) (citing *United States v. Abdelshafi*, 592 F.3d 602, 607 (4th Cir. 2010)).  Courts must "give the terms their ordinary, contemporary, common meaning, absent an indication Congress intended [it] to bear some different import."  *Crespo v. Holder*, 631 F.3d 130, 133 (4th Cir. 2011) (citation omitted) (alteration in original).  "If the plain language is unambiguous, [the court] need look no further."  *Lee v. Norfolk S. Ry. Co.*, 802 F.3d 626, 631 (4th Cir. 2015) (citation omitted).  That said, "[t]o determine a statute's plain meaning, [courts] not only look to the language itself, but also the specific context in which the language is used, and the broader context of the statute as a whole."  *In re Total Realty Mgmt., LLC*, 706 F.3d 245, 251 (4th Cir. 2013) (citation omitted).  Again, the Supreme Court, addressing the relationship between the Rebate Statute and Rebate Agreement, has held that the "statutory and contractual obligations, in short, are one and the same."  *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110, 118 (2011).  When interpreting the Rebate Statute, therefore, courts should view it through the lens provided by the Rebate Agreement—and vice versa.  Reading the Rebate Statute and Rebate Agreement as context for each other, and considering the plain language that Congress used, it is clear that they should be read broadly to mean the lowest price actually realized by the manufacturer on a single unit of a drug after

accounting for every price concession to any entity in the distribution chain.  In short, the Rebate Statute and Rebate Agreement read together clearly define Best Price as "the lowest price available from the manufacturer," taking into account any rebates that "adjust the prices actually realized."

Both the Supreme Court and the Fourth Circuit have held that "any" is an expansive term. *See SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348 (2018); *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 218–19 (2008); *United States v. Maxwell*, 285 F.3d 336 (4th Cir. 2002).  Similarly, § I(d) of the Rebate Agreement specifies that a manufacturer's Best Price should be "calculated to include *all* sales and associated rebates, discounts and other price concessions *provided by the manufacturer to any entity*" for a single drug "unit" such that the price is "adjusted *by the manufacturer* if cumulative discounts, rebates or other arrangements subsequently *adjust the prices actually realized*."  56 Fed. Reg. 7049 (Feb. 21, 1991) (emphasis added).  Thus, like the Rebate Statute, the Rebate Agreement includes the expansive term "any" when addressing how Best Price is calculated.

Moreover, if there are any ambiguities regarding whether to include a rebate or discount, the Rebate Agreement specifically provides:  "The Rebate Agreement shall be construed in accordance with Federal common law and ambiguities shall be interpreted in the manner which best effectuates the statutory scheme."  56 Fed. Reg. 7049 (Feb. 21, 1991).  The fundamental purpose of the statutory scheme is to provide the Government with the best price offered for a particular drug unit, so stacking rebates and discounts for a particular drug unit should have been the default.

The Rebate Statute and Rebate Agreement are plain and unambiguous.  Best Price means: the lowest price available from the manufacturer to any single or combination of covered entities; Best Price is the price actually realized by the manufacturer after including all cash discounts, free

goods, volume discounts, and rebates regardless who received that concession. The Court should conclude that the Rebate Statute and Rebate Agreement require aggregating rebates and discounts for a particular drug unit when they "adjust the prices actually realized" by the manufacturer, consistent with the United States and CMS' analysis identified above.

The United States and CMS have provided the Court with a roadmap for its statutory construction analysis and they provide helpful guidance. This Court now has the benefit of their recent work and recent rulemaking to take into account in adjudicating the current Motion. If the Court determines that the Rebate Statute and Rebate Agreement are ambiguous, however, the Court should defer to CMS' interpretation of the Rebate Statute and Rebate Agreement, including CMS' recent rulemaking efforts earlier this year. Under the *Chevron* framework, the Court should defer to the Secretary and CMS' consistent guidance and regulations interpreting the text of the Rebate Statute and Rebate Agreement. Pursuant to the Supreme Court's decision in *Chevron, U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837, 844 (1984) and the *Chevron* progeny, courts defer to an agency's "reasonable interpretation" of an ambiguous statute. *See id.* at 844. Importantly, "[a] court *must uphold* the Secretary's judgment as long as it is a permissible construction of the statute." *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 158 (2013) (emphasis added) (citation omitted); *see also Chevron*, 467 U.S. at 843, n.11. It is appropriate for a court to defer to the agency under the *Chevron* doctrine when the agency possesses congressionally delegated authority "to make rules carrying the force of law" and if "the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001). Congressionally delegated authority is often conveyed through the agency's power to engage in notice-and-comment rulemaking, as is the case here. *See id.* at 230 & n.12 (collecting cases).

Furthermore, when Congress has declined to act on repeated opportunities to alter or amend a statute or to revoke the Secretary's rulemaking authority, it constitutes persuasive evidence the agency interpretation is the one Congress intended. *Auburn Reg'l Med. Ctr.*, 568 U.S. at 159 (Supreme Court explained Congress amended § 1395 several times, but left untouched Secretary's rulemaking authority and outer time limit set by Secretary for an extension upon a showing of good cause); *see also Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 846 (1986) (Congress' choice not to amend a provision interpreted by Agency is "persuasive evidence that the [Agency's] interpretation is the one intended by Congress."). Here, Congress amended the Rebate Statute multiple times after the Rebate Agreement was published and after CMS issued notice and comment rulemaking guidance. Thus, Congress has approved CMS' definition of Best Price.

Congress gave the Secretary broad and express authority to "prescribe such regulations as may be necessary to carry out the administration of [Medicare and Medicaid] . . . ." 42 U.S.C. § 1395hh(a)(1). Specifically, "[i]n the case of the Medicaid payment statute, Congress expressly conferred on the Secretary authority to review and approve state Medicaid plans as a condition to disbursing federal Medicaid payments," and "the Secretary is charged with ensuring that each state plan complies with a vast network of specific statutory requirements, *see generally* § 1396a, including the prescription rebate agreement provision in section 1396r-8." *Pharmaceutical Research & Mfrs. of Am. v. Thompson*, 362 F.3d 817, 822 (D.C. Cir. 2004); *see also Hardy Wilson Mem. Hosp. v. Sebelius*, 616 F.3d 449, 457 (5th Cir. 2010) (Congress' delegation of authority to the agency in the Medicare area is "extremely broad.") (citation omitted).

While there is debate in certain cases about the scope and appropriateness of *Chevron* deference, that is not this case. Here, pursuant to Congress' express and broad delegation of authority, the Secretary and CMS have entered into uniform Rebate Agreements and issued

guidance and notice-and-comment rulemaking expressly requiring manufacturers aggregate all rebates, discounts, and price concessions across all entities that adjust the price actually realized by the manufacturer for a single drug unit when calculating Best Price. As outlined above, the Secretary and CMS have issued consistent interpretation, guidance, and rulemaking for over 30 years, and the Secretary and CMS could not have been more clear on their interpretation and guidance earlier this year.

It is clear that the Rebate Statute and Rebate Agreement are unambiguous and require aggregation of rebates and discounts provided to different entities for the same drug unit price and the United States and CMS have provided the roadmap for that analysis. If the Court determines that the Rebate Agreement and Rebate Agreement are ambiguous, the Court should defer to CMS' interpretation of the Rebate Agreement and Rebate Statute which have all been done through notice and comment rulemaking.

### b.       Defendants' Reliance on *Wilson* is Misplaced

Defendants' reliance on *Wilson* for the proposition that the defunct "objective falsehood" test somehow still applies to FCA "falsity" is misplaced and contradicted by both *Drakeford* and *Schutte*. *See United States ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 383-84 (4th Cir. 2015); *United States ex rel. Schutte v. SuperValu, Inc.*, 143 S. Ct. 1391 (2023). First, even prior to *Schutte*, the Fourth Circuit in *Drakeford* specifically clarifies that *falsity* is a legal issue and therefore requires an objective evaluation by the court as to the meaning of the law; whereas *scienter* looks to whether the defendant knowingly submitted false claims, which is a subjective element and question for the jury. *Drakeford*, 792 F.3d at 383-84 (the "objective inquiry" relates to whether the claim itself is false, i.e., either the defendant complied with the law or it didn't; whereas scienter, by contrast, is the only subjective inquiry"). Earlier this year, the Supreme Court made

clear in *Schutte* that the 'two essential elements of an FCA violation are: (1) the falsity of the claim; and (2) the defendant's knowledge of the claim's falsity. *Schutte*, 143 S. Ct. at 1398. In doing so, the Court flatly rejected the so-called "objective falsity" requirement and held instead that the "FCA's scienter element refers to respondents' knowledge and subjective beliefs – not to what an objectively reasonable person may have known or believed. *Id.* In short, after *Drakeford* and *Schutte*, there is no such thing as an 'objective falsehood" for determining FCA falsity. *Id.* ("FCA's scienter element refers to respondent's knowledge and subjective beliefs – not to what an objectively reasonable person may have known or believed.").

Defendants' reliance on *Wilson* is simply misplaced and is inconsistent with *Schutte* and *Drakeford*.

### 2.      Plaintiff Plausibly Pleads Scienter

The Supreme Court set the standard for scienter analysis in the FCA context in *Schutte*.

> [T]he FCA defines the term 'knowingly' as encompassing three mental states: First, that the person 'has actual knowledge of the information,' § 3729(b)(1)(A)(i). Second, that the person 'acts in deliberate ignorance of the truth or falsity of the information,' § 3729(b)(1)(A)(ii). And, third, that the person 'acts in reckless disregard of the truth or falsity of the information,' § 3729(b)(1)(A)(iii). In short, **either** actual knowledge, deliberate ignorance, or recklessness will suffice.

143 S. Ct. at 1399. *Schutte* also makes clear that scienter is a fact-specific inquiry, not appropriate for resolution at the motion to dismiss stage.

Plaintiff's Amended Complaint alleges three separate fact patterns where Defendants acted separately with: (1) actual knowledge; (2) deliberate ignorance; and (3) reckless disregard. Only one is needed to prove a FCA violation. *Id.* Unfortunately, Defendants miscite *Schutte* in their Motion and continue to improperly conflate the Supreme Court's direction to lower courts.

### a.      Actual Knowledge

First, the Amended Complaint alleges Defendants acted with *actual knowledge* by failing

to use the dollar amount of "price actually realized" when reporting Best Price.  (Dkt. 16, Am. Comp. at 1-5, ¶¶ 47, 54, 62, 69-71).  "Actual knowledge" means when "that the person 'has actual knowledge of the information."  *Schutte*, 143 S. Ct. at 1399.  The Court also noted in a footnote that the FCA term "information" does not merely refer "to purely factual information, like the number of drugs sold.  But the definition of 'information' is broad, referring to all 'knowledge obtained from investigation, study, or instruction.'"  *Id.* at n. 3 (cites omitted).

Here, the Amended Complaint alleges that the Rebate Statute and Rebate Agreement, plus a plethora of agency guidance, makes clear that the manufacturer must base Best Price calculation in a dollar amount based upon the "price actually realized" by Defendants, not simply the highest rebate paid.  (Dkt. 16, Am. Comp. at 1-10, ¶¶ 13-53).  Defendants knew of the formula in the Rebate Statute and the specific language in the Rebate Agreement because they signed and agreed to use that definition for Best Price and was aware of 30 years of CMS guidance and participated in the process by submitting comments.  The Amended Complaint specifically alleges that Defendants had actual knowledge that Best Price meant the price actually realized by Defendants, and not the single highest rebate paid to one entity in the distribution chain.  (Dkt. 16, Am. Comp. at 47, 62, 69-71).  A jury could find actual knowledge based upon the communications Defendants had with CMS on the topic.

In addition, the Amended Complaint also alleges that high level management meetings occurred where aggregation was discussed, and Defendants intentionally applied the definition of aggregation used here to their commercial customers but not to customers in the long term care arena.  The Amended Complaint alleges that Defendants told those in the chain of a sale that only one entity could receive a rebate. (Dkt. 16, Am. Comp. at ¶¶ 69-71).  However, Defendants chose to give multiple rebates to certain preferred customers in order to break into new markets, but did

not report the rebates in Best Price to CMS.  (Dkt. 16, Am. Comp. at ¶¶ 69-71).

### b.   <u>Deliberate Ignorance</u>

Second, the Amended Complaint alleges Defendants acted with *deliberate ignorance*. (Dkt. 16, Am. Comp. at ¶¶ 48-51, 54).   The Supreme Court stated that deliberate ignorance "encompasses defendants who are aware of a substantial risk that their statements are false, but intentionally avoid taking steps to confirm the statement's truth or falsity." *Schutte*, 143 S. Ct. at 1399.  The Court also made clear that deliberate ignorance is a stand-alone way of proving a FCA violation, even absent actual knowledge.

Here, the Relator alleges Defendants acted with deliberate ignorance. Specifically, Defendants hired outside counsel to ask CMS to change its rules regarding the term Best Price to eliminate aggregation.  (Dkt. 16, Am. Comp. at ¶¶ 48-51).  The Amended Complaint alleges:

> [T]hrough counsel Forest acknowledged the language of the proposed rule 'suggests that CMS views best price as the net amount realized by the manufacturer on a sale rather than the lowest price to a particular customer,' so Forest argued it is 'critical that the final rule clarify that only discounts and price concessions to the same entity to which a drug is sold should be included in the computation of best price' and 'prices to unrelated entities in the chain of distribution should not be aggregated . . . even if they concern the same unit of a drug.'

(Dkt. 16, Am. Comp. at ¶ 48 (citing February 20, 2007 Comments submitted to CMS by McKenna, Long and Aldridge, Counsel for Forest Laboratories, Inc.)).  CMS did not change its language in response to the inquiry.  A jury could easily find that Defendants acted with deliberate ignorance by hiring an attorney to ask CMS to change its regulations because Defendants knew that CMS viewed Best Price as the "*net amount realized*" whereas Defendants were reading Best Price as the single highest rebate paid to a single entity.  Indeed, Defendants asked CMS to change the regulations – and CMS did not. (Dkt. 16, Am. Comp. at  ¶¶ 41-52). Thus, a jury could readily find deliberate ignorance where Defendants had enough of a concern to hire outside counsel to write a

letter to CMS during notice and comment rulemaking pertaining to the very heart of the issue in this case and framing the issue nearly the same as in this lawsuit.  However, when Defendants did not get the response they wanted, Defendants simply cut off all communications with CMS and continued to wrongly calculate Best Price quarter after quarter, year after year.  (Dkt. 16, Am. Comp. at ¶¶ 49-50).  Defendants could and should have simply given CMS a three-sentence statement of the factual way it pays rebates and asked if aggregation was required.  The Supreme Court made clear that burying one's head in the sand is actionable deliberate ignorance under the FCA.  Plaintiff alleges that Defendants buried their heads in the sand when CMS did not change the language in the rulemaking process.  A jury could find deliberate ignorance based on the facts alleged.

### c.     Reckless Disregard

Finally, the Amended Complaint alleges that Defendants acted with *reckless disregard*. The Supreme Court specifically addressed reckless disregard in *Schutte*.  According to the Court, "the term 'reckless disregard' similarly captures defendants who are conscious of a substantial and unjustifiable risk that their claims are false, but submit the claims anyway."  *Schutte.*, 143 S. Ct. at 1399.  The Court went on to hold that after the fact justifications or clever arguments created by legal counsel are not permitted.  Indeed, "the focus is not, as respondents would have it, on *post hoc* interpretations that might have rendered their claims accurate. It is instead on what the defendant knew when presenting the claim."  *Id.* at 1401.  The Court also stated that *Safeco* is not applicable, which is the case the district court relied heavily upon in dismissing the Complaint. *Id.* at 1402–03.

Here, the Rebate Agreement, which Defendants signed and the Supreme Court said has the same force of law as the Rebate Statute, put Defendants on notice that Best Price means the price

28

a drug manufacturer actually realizes on a sale of a single drug unit, and not simply the highest rebate.  The Amended Complaint alleges that the Rebate Agreement itself and a plethora of agency guidance makes clear that the manufacturer must base Best Price calculation in a dollar amount based upon the price actually realized by Defendants and not simply the amount of a single highest rebated paid to one entity.  (Dkt. 16, Am. Comp. at ¶¶ 27-47, 54).  The Amended Complaint alleges that Defendants were conscious of a substantial and unjustifiable risk that their claims were false but submitted them anyway.   (Dkt. 16, Am. Comp. at ¶¶  47-71).   Indeed, Defendants acknowledged as much in the letter their attorneys wrote to CMS as part of the notice and comment rulemaking.   Specifically, Defendants' legal counsel admitted that the proposed regulation "suggests that CMS views best price as the net *amount realized* by the manufacturer on a sale *rather than* the lowest price to a particular customer." (Dkt. 16, Am. Comp. at ¶ 48).  When CMS did not change the language, Defendants took the proverbial ostrich head in the sand approach and did nothing.  .Dkt. 16, Am. Comp. at ¶¶ 49-50).  Defendants once again ignored these facts and submitted false Best Price claims quarter after quarter, year after year.

In sum, the Relator must prove only one of three forms of scienter under the FCA. Each form of scienter is standalone, and each has its own standards.  The Amended Complaint alleges a plethora of facts establishing each type of scienter sufficient for a jury to find: (1) actual knowledge, (2) deliberate ignorance, and (3) reckless disregard.  The allegations are more than sufficient at the motion to dismiss stage.

Accordingly, Defendants Rule 12 argument should be rejected.[5]

---

[5] These statements of the law by the Supreme Court must also be read in conjunction with other settled principles that require defendants to "turn square corners" when "seek[ing] to spend the Government's money"—imposing on any such party "a duty to familiarize itself with the legal requirements for cost reimbursement." *Heckler v. Commun. Health Servcs.,* 467 U.S. 51, 63, 64 (1984) (quoting *Rock Island Ark. & La. R.R. v. United States*, 254 U.S. 141, 143 (1920)).

**B.**     **Plaintiff's Amended Complaint Should Not Be Dismissed Under Rule 9(b)**

"A court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied: (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial; and (2) that plaintiff has substantial prediscovery evidence of those facts."  *Harrison v. Westinghouse Savannah River Co*., 176 F.3d 776, 783-84 (4th Cir. 1999). Moreover, Rule 9(b) is "less strictly applied with respect to claims of omission of material facts, as opposed to affirmative misrepresentations, because an omission cannot be described in terms of place, contents of the misrepresentation or the identity of the person making the misrepresentation."  *Shaw v. Brown & Williamson Tobacco Corp*., 973 F. Supp. 539, 552 (D. Md. 1997).  Plaintiff's 179-page Amended Complaint identifies the who, what, when, where, why and how of the fraudulent conduct, and identifies examples of specific drugs and specific calculations for specific years.  Defendants are clearly on notice, and have been for the past nine years.

Defendants' Rule 9(b) argument should be rejected.

**C.**     **Plaintiff's State FCA Claims Should Not Be Dismissed**

For the same reasons that Plaintiff's federal FCA claims should not be dismissed, Plaintiff's State law FCA claims should not be dismissed as well.

**IV.**    **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' Motion at its earliest opportunity. [6]

---

Contractors and other providers are expected to determine—before they claim public funds— whether their claims are eligible.  *Id.*  Part of turning square corners is that when the company has any reasonable doubt as to its position or eligibility for the funds it must seek clarification..

[6] Plaintiff believes that her 179-page Amended Complaint satisfies Rule 9(b).  If the Court disagrees, Plaintiff requests leave to amend to address any deficiency.

December 8, 2023                          Respectfully submitted,

                                         */s/ Joel D. Hesch*
                                         Joel D. Hesch, Esq. (Md. Bar 1988; D. Md. 06350)
                                         THE HESCH FIRM, LLC
                                         3540 Ridgecroft Dr.
                                         Lynchburg, VA 24503
                                         Phone: (434) 229-8677
                                         Email: joel@howtoreportfraud.com

                                         Joseph M. Callow, Jr. (Ohio Bar No. 0061814)
                                         Gregory M. Utter (Ohio Bar No. 0032528)
                                         CALLOW + UTTER LAW GROUP
                                         8044 Montgomery Road, Suite 170
                                         Cincinnati, Ohio 45236
                                         Phone: (513) 378-0141
                                         jcallow@callowandutter.com
                                         gmutter@callowandutter.com

                                         *Attorneys for Deborah Sheldon, as Executrix of the
                                         Estate of Relator Troy Sheldon*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was electronically filed using the Court's ECF system on this December 8, 2023. Parties will receive notice through the ECF system.

                                         */s/ Joel D. Hesch*
                                         Joel D. Hesch

31