IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES *ex rel.* DEBORAH
SHELDON,

    *Plaintiffs*,

    *v.*

FOREST LABORATORIES, LLC, *et
al.*

    *Defendants*.

Civil Action No. ELH-14-2535

### MEMORANDUM OPINION

This *qui tam* case concerns an allegedly fraudulent reporting scheme under the Medicaid

Drug Rebate Statute (the "Rebate Statute").  *See* 42 U.S.C. § 1396r-8.

Pursuant to the False Claims Act ("FCA" or the "Act"), 31 U.S.C. §§ 3729 *et seq.*, and

analogous State statutes, Troy Sheldon, as Relator,[1] filed suit on behalf of the United States, as

well as numerous states and the District of Columbia (collectively, the "*Qui Tam* States"),[2] against

his former employer, Forest Laboratories, LLC, as well as Forest Pharmaceuticals, Inc.

(collectively, "Forest").  *See* ECF 16 ("Amended Complaint").[3]

---

[1] Mr. Sheldon died on November 10, 2017.  His wife, Deborah Sheldon, as Executrix of
the Estate of Troy Sheldon, was substituted as the plaintiff on March 19, 2018.  ECF 31 (Order
Granting Motion to Substitute Party).  I shall refer to the plaintiff generically as "Sheldon," the
"Relator," or the "plaintiff."  I shall refer to Troy Sheldon as "Mr. Sheldon."

[2] The *qui tam* states are California; Colorado; Connecticut; Florida; Georgia; Hawaii;
Illinois; Indiana; Iowa; Louisiana; the Commonwealth of Massachusetts; Michigan; Minnesota;
Montana; Nevada; New Hampshire; New Jersey; New Mexico; New York; North Carolina;
Oklahoma; Rhode Island; Tennessee; Texas; Vermont; the Commonwealth of Virginia;
Washington; and Wisconsin.  The District of Columbia is also a *qui tam* plaintiff.  Maryland and
Delaware were *qui tam* plaintiffs, but withdrew from the suit.  *See Docket*; ECF 46.

[3] Another defendant, Allergan PLC, was dismissed from the suit by joint stipulation.  ECF
71; ECF 75.

Sheldon filed the initial Complaint (ECF 1), under seal, on August 11, 2014. *See* 31 U.S.C. § 3730(b)(2). The Amended Complaint followed on August 30, 2016, and was also filed under seal. ECF 16.

In the 179-page Amended Complaint (ECF 16), Sheldon alleges that between 2005 and 2014, Forest, "a leading manufacturer of pharmaceutical drugs," defrauded the government and the *Qui Tam* States of more than $680 million. *Id.* at 6. In particular, Sheldon claims that Forest failed to include certain customer price concessions in its calculation of "Best Price,"[4] as that term is defined at 42 U.S.C. § 1396r-8(b)(3)(A)(i)(II) and in related regulations. *Id.* According to the Relator, "Forest paid rebates to two separate customers on the same dispensed drug units provided to the same patient." *Id.*; *see also id.* ¶¶ 60, 61, 66–68. The Relator argues that Forest was obligated to calculate "Best Price" by aggregating, or adding, the two rebates. *Id.* at 6–7.

The government conducted a lengthy investigation of the allegations, and the suit remained sealed during that period of time. *See* ECF 17; ECF 21; ECF 23; ECF 24; ECF 26; ECF 30; ECF 33; ECF 35; ECF 37; ECF 39.[5] Eventually, on September 17, 2019, the United States and the *Qui Tam* States declined to intervene. ECF 41. Thereafter, on October 16, 2019, the suit was unsealed. ECF 42.

Defendant moved to dismiss the suit, pursuant to Fed. R. Civ. P. 12(b)(6) and Fed. R. Civ. P. 9(b). ECF 72. By Memorandum Opinion and Order of November 6, 2020, I dismissed the Amended Complaint for failure to state a claim. *See* ECF 86; ECF 87; ECF 92; *United States ex*

---

[4] Following the example of Sheldon in the Amended Complaint, I shall capitalize "Best Price," unless the term appears otherwise in quoted material.

[5] The analogous state *qui tam* statutes also provide for initial filing of a *qui tam* complaint under seal, to permit the state to investigate the claim and determine whether it wishes to intervene.

*rel. Sheldon v. Forest Labs., LLC*, 499 F. Supp. 3d 184 (D. Md. 2020) (*Sheldon I*).[6]  I concluded that the Relator failed to plead falsity and scienter, as required under the FCA.  ECF 92 at 43. [7]

Forest noted an appeal to the Fourth Circuit.  ECF 88.  For nearly three years thereafter, the suit wended a tortuous way through the appellate process.  The judgment of dismissal was affirmed twice by the Fourth Circuit, first by a divided panel, *see United States ex rel. Sheldon v. Allergan Sales, LLC*, 24 F.4th 340 (4th Cir. 2022) (*Sheldon II*), and then, after a rehearing *en banc*, "by an equally divided court."  *United States ex rel. Sheldon v. Allergan Sales, LLC*, 49 F.4th 873 (Mem) (4th Cir. 2022) (*Sheldon III*).  On June 30, 2023, the Supreme Court granted *certiorari*, vacated the judgment of dismissal, and remanded the case to the Fourth Circuit "for further consideration in light of *United States ex rel. Schutte v. Supervalu, Inc.*, 598 U.S. [739] (2023)," which the Supreme Court had decided on June 1, 2023.  *See United States ex rel. Sheldon v. Allergan Sales, LLC*, 143 S. Ct. 2686 (2023) (*Sheldon IV*).[8]  By Order of August 2, 2023, the

---

[6] Consistent with my practice, I did not designate the Memorandum Opinion for publication.  But, the Court's Memorandum Opinion was selected for publication in the Federal Supplement.  In the course of reviewing the Memorandum Opinion for purposes of print publication, I made a handful of minor and non-substantive corrections, primarily with respect to typographical errors and citations.  *Compare* ECF 86 *with* ECF 92.  The Order was unchanged.

In this Memorandum Opinion, I cite to the revised version of the Memorandum Opinion, docketed at ECF 92.  In addition, I refer to ECF 92 as the Memorandum Opinion of November 6, 2020, although it was not docketed until February 6, 2021.

[7] I also rejected defendant's claim that the public disclosure bar of the FCA warranted dismissal.  ECF 92 at 25–31.  In addition, the Relator conceded that the federal conspiracy claim (Count III) and claims under New Hampshire's FCA were subject to dismissal.  *See* ECF 79 at 43 n.16; ECF 92 at 25.  The Relator has not reasserted this concession in the Opposition.  *See* ECF 117.

[8] Sheldon states that the Supreme Court "reversed [the district court's] November 6, 2020 Memorandum Opinion and Order . . . ."  ECF 117 at 6.  In fact, the Court *vacated* the "[j]udgment," without specifying whether the judgment in question was that of the district court or the court of appeals.  *Sheldon IV*, 143 S. Ct. at 2686.

Fourth Circuit remanded the case to the District Court, with instructions to reconsider the suit "in light of" *Schutte*.  ECF 100.

Forest has again moved to dismiss the Amended Complaint.  ECF 112.  The motion is supported by a memorandum (ECF 112-1) and eight exhibits.  ECF 112-2 to ECF 112-7 (collectively, the "Motion").  Sheldon opposes the Motion.  ECF 117 ("Opposition").  The Opposition is supported by 299 pages of exhibits.  ECF 117-1 to ECF 117-8 (collectively, the "Opposition").  Forest has replied.  ECF 118 ("Reply").  The Reply is supported by four exhibits. ECF 118-1 to ECF 118-4 (collectively, the "Reply").

In addition, Forest filed a "Notice of Supplemental Authority," drawing the Court's attention to a recent announcement by the Centers for Medicare & Medicaid Services ("CMS"). ECF 121 ("Notice").  The Notice is supported by an exhibit containing the announcement by CMS. ECF 121-1 ("Press Release").  Sheldon responded.  ECF 122 ("Notice Response").

In their respective submissions, both sides reference the Supreme Court's decision in *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council*, 467 U.S. at 837 (1984).  *See*, *e.g.*, ECF 112-1 at 23–24; ECF 117 at 27.  However, on June 28, 2024, the Supreme Court announced that "*Chevron* is overruled."  *See Loper Bright Enterprises v. Raimondo*, ___ U.S. ___, 144 S.Ct. 2244, 2273 (2024).  Therefore, by letter of July 3, 2024 (ECF 125), I invited the parties to address the impact of *Loper*, if any, on their positions.  On July 10, 2024, both parties filed a response addressing the significance of *Loper*.  ECF 126 (Forest); ECF 127 (Sheldon).  And, on July 15, 2024, each side filed a reply to the opposing party's supplemental submission.  ECF 128 (Forest); ECF 129 (Sheldon).

No hearing is necessary to decide the Motion.  *See* Local Rule 105.6.  For the reasons that follow, I shall again grant the Motion and dismiss the case.

4

## I.      Factual Background

The Amended Complaint (ECF 16), which was considered by this Court in the Memorandum Opinion of November 6, 2020 (*Sheldon I*, ECF 86; ECF 92), contains 133 counts.[9] It remains the operative complaint.  Therefore, I shall generally restate here the factual summary presented in my Memorandum Opinion of November 6, 2020.  *See* ECF 86; ECF 92.  However, when necessary, I replace citations to exhibits to correspond with the exhibits pertaining to the current Motion.

### A.  The Parties

Forest was a Delaware limited liability company with its principal place of business in New Jersey.  ECF 16, ¶ 9.  It manufactured, sold, and distributed prescription drug products in the United States.  *Id.* ¶ 10.

According to the parties, as of January 1, 2018, Forest Laboratories, LLC and Forest Pharmaceuticals, Inc. merged into Allergan Sales, LLC ("Allergan"), and "no longer exist."  ECF 71, ¶ 3.  Allergan is the successor in interest to the two Forest entities.  *Id.*  By Order of March 3, 2020, Allergan was "substituted as a named defendant" for the Forest entities.  ECF 75.[10]

---

[9]  Sheldon has asserted his federal claims under four subsections of two versions of the FCA: 31 U.S.C. §§ 3729(a)(1), (a)(2), (a)(3), (a)(7), from the 1990 version of the FCA, and 31 U.S.C. §§ 3729(a)(1)(A), (a)(1)(B), (a)(1)(C), and (a)(1)(G), from the 2009 version of the FCA. The suit also includes claims under the laws of the *Qui Tam* States.

Despite the large number of counts, Sheldon did not use Arabic numerals to label the counts (*e.g.*, 1, 2, 3 . . . ).  Instead, Sheldon uses Roman numerals.  So, for example, the last count, asserted under Wisconsin law, is labeled "Count CXXXIII".

[10]Despite the Order of March 3, 2020 (ECF 75), defendants continue to refer to themselves collectively as "Forest."  *See* ECF 112 (Motion); ECF 118 (Reply).  In addition, the Fourth Circuit panel majority referred to defendants collectively as "Forest," although the caption of the case in the Fourth Circuit reflects the change in defendants' name.  *See Sheldon II*, 24 F.4th at 346 n.1. Like the parties, I shall refer to defendants collectively as "Forest."  And, I shall use the case caption that appears on the parties' briefs.

Mr. Sheldon worked for Forest from the 1990s until he was terminated in 2014.  ECF 16, ¶ 55.  He served "in managerial roles and had responsibilities over billions in revenues [sic] streams, overseeing many sales representatives, and overseeing Pharmacy Provider and GPO [group purchasing organization] account managers."  *Id.*  Moreover, Mr. Sheldon was "directly involved in the launch, marketing and sale of Forest['s]" drugs, which included negotiating discounts, rebates, and other incentives to drug purchasers.  *Id.*  Mr. Sheldon claimed that he "ha[d] direct, personal knowledge of the drug rebates and other discounts given to Forest customers that impact the reported Best Price for each drug."  *Id.* ¶¶ 55, 62.

### B.  Medicaid Drug Rebate Program

Medicaid is a joint federal-state program that pays for medical expenses for low-income individuals.  ECF 16, ¶ 13; *see Pharm. Rsch. & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 650 (2003).  The expenses include prescription drugs.  *Id.*; *see* 42 U.S.C. § 1396d(a)(12).

Congress enacted the Rebate Statute in 1990[11] in order "[t]o make sure that Medicaid programs receive 'the benefit of the best price for which a manufacturer sells a prescription drug to any public or private purchaser.'"  *Sheldon II*, 24 F.4th at 345 (citation omitted); *see* ECF 16, ¶ 26; Omnibus Budget Reconciliation Act of 1990, 104 Stat. 1388-145 (Nov. 5, 1990). According to the Relator, "the overarching purpose of the Best Price rebate mechanism is to reduce total Medicaid expenditures by giving the government the benefit of purchasing a drug at the lowest price per unit that a manufacturer has actually realized (*i.e.*, received) in selling that drug on the open market."  ECF 16, ¶ 26.

---

[11] The Relator incorrectly states that Congress enacted the Rebate Statute in 1991.  *See* ECF 16, ¶ 27.

The Rebate Statute defines "Best Price" as follows, 42 U.S.C. § 1396r-8:[12]

> The term "best price" means, with respect to a single source drug or innovator multiple source drug of a manufacturer (including the lowest price available to any entity for any such drug of a manufacturer that is sold under a new drug application approved under section 505(c) of the Federal Food, Drug, and Cosmetic Act), the lowest price available from the manufacturer during the rebate period to any wholesaler, retailer, provider, health maintenance organization, nonprofit entity, or governmental entity within the United States . . . .

Forest was a participant in the Medicaid Drug Rebate Program ("Rebate Program"). ECF 16, ¶ 12. The Rebate Program implements the provisions of the Rebate Statute. *See Medicaid Drug Rebate Program (MDRP)*, MEDICAID.GOV (February 12, 2024), https://perma.cc/LQ99-E2G9. "Approximately 780 drug manufacturers currently participate in th[e] program." *Id.*

State Medicaid programs reimburse health care providers for prescription drugs. ECF 16, ¶ 15. On a quarterly basis, each state submits a claim to the Department of Health and Human Services ("HHS") "for payment of the federal share of the state's Medicaid spending, including prescription drug reimbursements." *Id.*

Drug manufacturers such as Forest usually do not submit claims for reimbursement directly to Medicaid. *Id.* ¶ 18. Rather, "Forest markets its drug products to its customers, who then purchase the products either directly or through wholesalers, based on a price the customers negotiated with Forest." *Id.* Customers might also purchase products through Group Purchasing Organizations ("GPOs"), which negotiate prices on behalf of Forest's customers. *Id.* After

---

[12] The Amended Complaint provides the definition of "best price" contained in the Rebate Statute, "[a]s originally enacted in 1991." ECF 16, ¶ 27. However, the Rebate Statute has since been amended several times. *See, e.g.,* Omnibus Budget Reconciliation Act of 1993, 107 Stat. 312 (Aug. 10, 1993). The Amended Complaint does not provide the text of the current version. Instead, it simply states that the "current Rebate Statute remains substantively the same today." ECF 16, ¶ 27. Throughout this Memorandum Opinion, I cite and refer to the current version of the Rebate Statute, 42 U.S.C. § 1396r-8.

dispensing or administering the drugs purchased from Forest, the customers submit claims for the drugs to Medicaid. *Id.* ¶ 19.

The drugs at issue in this case include Celexa, Lexapro, Armour Thyroid, Levothroid, Namenda, and many others. *Id.* ¶¶ 17, 56. The Food and Drug Administration ("FDA") assigns each drug product "a unique 11-digit, 3-segment number, known as the National Drug Code . . . ." *Id.* ¶ 17. Under the Food, Drug and Cosmetic Act, 21 U.S.C. § 301 *et seq.*, pharmaceutical drug companies must submit to the FDA a listing of every drug product in commercial distribution. *See* 21 U.S.C. § 355.

Medicaid drug reimbursement formulas vary by state. ECF 16, ¶ 22. But, state Medicaid programs generally reimburse providers based upon the lower of the estimated acquisition cost ("EAC") as determined by the state, the maximum allowable cost set by the state, or the provider's usual and customary charge. *Id.* Under 42 C.F.R. § 447.301, "EAC" is defined in relevant part as "the agency's best estimate of the price generally and currently paid by providers for a drug[.]" *Id.* ¶ 21.

Under the terms of the Rebate Statute, a drug manufacturer seeking coverage under Medicaid "must enter into a Rebate Agreement with the Secretary of HHS in order for its covered outpatient drugs" to qualify for federal payment under Medicaid. *Id.* ¶ 29 (citing 42 U.S.C. § 1396r-8(a)(1)). In 1991, CMS promulgated a regulation that contained language to be included in any Rebate Agreement between HHS and a drug manufacturer participating in the Rebate Program. 56 Fed. Reg. 7049 (Feb. 21, 1991); *see* ECF 112-2 ("Rebate Agreement"). Pursuant to the Rebate Statute and the standard Rebate Agreement, a manufacturer has "two primary obligations." ECF 16, ¶ 29.

First, the manufacturer must send a quarterly report to the Secretary of HHS disclosing the "Average Manufacturer Price" ("AMP") and "Best Price" for its covered drugs.  *Id.* ¶ 30; *see* 42 U.S.C. § 1396r-8(b)(3)(A); *Sheldon II*, 24 F.4th at 345.  CMS then calculates the rebate amount that the manufacturer must pay to the states for each drug.  42 U.S.C. § 1396r-8(b)(3)(A).

In general, AMP is defined as the average price that a wholesaler or retailer pays directly to the manufacturer for a product, on a per unit basis.  ECF 16, ¶ 30; 42 U.S.C. § 1396r-8(k)(1)(A). And, the Rebate Agreement defines "Best Price" as follows, ECF 112-2 (56 Fed. Reg. 7049 (Feb. 21, 1991)), at 3; ECF 16, ¶ 30 (emphasis omitted):

> (d) "Best Price" means, with respect to Single Source and Innovator Multiple Source Drugs, the lowest price at which the manufacturer sells the Covered Outpatient Drug to any purchaser in the United States in any pricing structure (including capitated payments), in the same quarter for which the AMP is computed.  Best price includes prices to wholesalers, retailers, nonprofit entities, or governmental entities within the States (excluding Depot Prices and Single Award Contract Prices of any agency of the Federal Government).  Federal Supply Schedule prices are included in the calculation of the best price.
>
> The best prices shall be inclusive of cash discounts, free goods, volume discounts, and rebates, (other than rebates under section 1927 of the Act).
>
> It shall be determined on a unit basis without regard to special packaging, labeling or identifiers on the dosage form or product or package, and shall not take into account prices that are Nominal in amount.  For Bundled Sales, the allocation of the discount is made proportionately to the dollar value of the units of each drug sold under the bundled arrangement.  The best price for a quarter shall be adjusted by the Manufacturer if cumulative discounts, rebates or other arrangements subsequently adjust the prices actually realized.

According to the Relator, the Rebate Agreement "makes clear that the 'best price' manufacturers are required to report and the government is entitled to receive is the final lowest price a manufacturer receives for a single drug unit (*e.g.*, per pill) after taking into account any and all pricing arrangements with any and all entities."  ECF 16, ¶ 31.

Second, under the Rebate Statute and Rebate Agreement, the manufacturer is obligated to "pay each state a quarterly rebate equal to the total number of drug units . . . purchased by the state Medicaid program times the greater of (1) the statutory minimum rebate percentage, or (2) the difference between the AMP and the Best Price." *Id.* ¶ 33 (citing 42 U.S.C. § 1396r-8(c)(1)(A)). For the rebate period from December 31, 1995, until January 1, 2010, the statutory minimum rebate percentage was 15.1%. ECF 16, ¶ 33. For the rebate period after December 31, 2009, the statutory minimum rebate percentage is 23.1%, with exceptions not pertinent here. *Id.* (citing 42 U.S.C. § 1396r-8(c)(1)(B)(i),(iii)).

Based on a manufacturer's reported AMP and Best Price, the Secretary of HHS, through CMS, calculates the quarterly Unit Rebate Amount used by each state Medicaid program "to invoice the manufacturer for the rebate based on each state's utilization of the drug." ECF 16, ¶ 34. The "rebate amount paid by a manufacturer to a state reduces the amount spent by the state" and thus "reduces the amount of Medicaid spending that the federal government provides to the state." *Id.* ¶ 35 (citing 42 U.S.C. § 1396r-8(b)(1)(B)). In other words, "Federal payments to each state are reduced by the rebates that the State receives from manufacturers." *Sheldon II*, 24 F.4th at 345 (citing 42 U.S.C. § 1396r-8(b)(1)(B)).

In 1991 and 1994, CMS issued program releases regarding the requirements of the Rebate Statute and Rebate Agreement for calculation of the Best Price. ECF 16, ¶ 36. In the release from August 1991, CMS stated, ECF 112-3 (Medicaid Drug Rebate Program Release No. 2), at 2; ECF 16, ¶ 36 (emphasis omitted):

> The Average Manufacturer Price (AMP) is calculated as a weighted average based on sales, whereas the Best Price (BP) is the lowest price for a drug product in any package size for any quantity sold. It is not weighted but represents the single best price (that is not nominal) at which any package size of the product was sold in the quarter.

And, with respect to discounts and other price arrangements, CMS explained: "As stated in paragraphs I(a) and I(d) of the rebate agreement, you must revise AMPs and/or BPs to reflect the impact of cumulative discounts or other arrangements on the prices actually realized in any quarter." ECF 112-3 (Medicaid Drug Rebate Program Release No. 2) at 3; ECF 16, ¶ 36.

Moreover, in the December 1994 release, CMS stated, in part, ECF 112-4 (Medicaid Drug Rebate Program Release No. 14), at 2 (ellipses in ECF 112-4); ECF 16, ¶ 37:

> [I]n accordance with sections I(a) and I(d) of the rebate agreement, AMP and best price data ". . . must be adjusted by the Manufacturer if . . . other arrangements subsequently adjust the prices actually realized." Thus, we consider any price adjustment which ultimately affects the price actually realized by the manufacturer as "other arrangements" and, as required by the rebate agreement, included in the calculations of AMP and best price.

According to the Relator, the releases by CMS establish that "the clear requirement of 'best price' under the Rebate Statute and Rebate Agreement is to calculate the final lowest price *actually realized* by a manufacturer for a single drug unit after taking into account any and all pricing arrangements." ECF 16, ¶ 37 (emphasis in original).

In 2005, the Government Accountability Office ("GAO") issued a report to Congress noting differences in the way drug manufacturers calculated Best Price and AMP "in a situation involving two different rebates to two different entities (a prompt pay discount given by a manufacturer to a wholesaler, and a second discount given by the manufacturer to the end purchaser through a chargeback relationship). . . ." *Id.* ¶ 38. The report explained that some manufacturers "correctly combined both of these rebates which involved *two separate entities* in order to properly arrive at the lowest 'net price realized' by the manufacturer[,]" but others did not. *Id.* (emphasis in original). The Relator asserted: "Forest has taken the same erroneous position as the manufacturers in the 2005 GAO report." *Id.* ¶ 39.

11

In addition to the program releases from the 1990s, in 2006 and 2007, CMS provided guidance on reporting requirements in the form of comments and proposed and final regulations. On December 22, 2006, CMS issued a proposed rule relating to Best Price and sought public comment. *Id.* ¶ 41. The proposed rule stated, *id.* (quoting 71 Fed. Reg. 77174, 77181–82 (Dec. 22, 2006)) (emphasis omitted):[13]

> Consistent with these [Medicaid Rebate Statute] provisions and the national rebate agreement, it has been our policy that in order to reflect market transactions, the best price for a rebate period should be adjusted by the manufacturer if cumulative discounts or other arrangements subsequently adjust the prices actually realized.
>
> Because best price represents the lowest price available from the manufacturer to any entity with respect to a single source drug or innovator multiple source drug of a manufacturer, including an authorized generic, any price concession associated with that sale should be netted out of the price received by the manufacturer in calculating best price and best price should be adjusted by the manufacturer if other arrangements subsequently adjust the prices actually realized.

The final rule issued by CMS provides, ECF 16, ¶ 42 (quoting 42 C.F.R. § 447.505(a), (e) (2007)) (emphasis omitted):[14]

> (a) Best price means, … the lowest price available from the manufacturer during the rebate period to any entity in the United States in any pricing structure (including capitated payments), in the same quarter for which the AMP is computed. Best price shall be calculated to include all sales and associated rebates, discounts and other price concessions provided by the manufacturer to any entity unless the sale, discount, or other price concession is specifically excluded by statute or regulation or is provided to an entity specifically excluded by statute or regulation from the rebate calculation.
>
> ***
>
> (e) Further clarification of best price.
>
> (1) Best price shall be net of cash discounts, free goods that are contingent on any purchase requirement, volume discounts, customary prompt pay discounts, chargebacks, returns, incentives, promotional fees, administrative fees, service

---

[13] This was previously submitted by Sheldon as an exhibit.  *See* ECF 79-5.

[14] This was previously submitted by Sheldon as an exhibit.  *See* ECF 79-3.

fees (except bona fide service fees), distribution fees, and any other discounts or price reductions and rebates, other than rebates under section 1927 of the Act, which reduce the price available from the manufacturer.

***

(3) The manufacturer must adjust the best price for a rebate period if cumulative discounts, rebates, or other arrangements subsequently adjust the prices available from the manufacturer.

CMS also published guidance and responses to comments from manufacturers and others who responded to the proposed regulations. ECF 16, ¶ 43. According to the Relator, "CMS's published guidance and comments accompanying the regulations leave no doubt that all rebates and price concessions among all entities must be aggregated to arrive at the price 'actually realized' by the drug manufacturer for a single drug unit." *Id.*

During the rulemaking, CMS specifically addressed in comments two situations involving discounts to multiple entities. *Id.* ¶ 44. In a scenario involving both a prompt pay discount and a chargeback, which the Relator considers "directly analogous to Forest's situation," the Relator claims that CMS "explicitly refuted the argument that such rebates did not need to be aggregated." *Id.* ¶ 45. In particular, in a proposed rule, CMS stated, *id.* (quoting 72 Fed. Reg. 39142, 39199 (Jul. 17, 2007)) (emphasis omitted):

> *Comment:* One commenter requested that when best price is determined, customary prompt pay discounts extended to wholesalers should not be aggregated with price concessions available to an end-customer under a contract administered through a wholesaler chargeback arrangement, regardless of whether the manufacturer negotiated the contract directly with the end-customer or with a third party.

> *Response:* We do not agree. As we have previously stated, there is no basis to exclude these discounts. Both the customary prompt pay discounts and other price concessions available to the end-customer are to be included in the determination of best price.

And, with respect to a scenario involving "multiple entities in the context of [Pharmacy Benefit Managers ("PBMs")]," CMS said, ECF 16, ¶ 46 (quoting 72 Fed. Reg. at 39198) (emphasis omitted):

> *Comment*: Several commenters stated that some industry analysts appeared to misread the proposed rule to suggest that manufacturers may be obligated to add concessions paid to PBMs to the concessions paid to customers of the PBMs in calculating best price. This would effectively call for the combining of two separate prices, one offered to a PBM and the other to a customer of a PBM. The commenter stated that the statute is quite clear in defining best price as the lowest price to "any wholesaler, retailer, provider, health maintenance organization, non–profit entity, or government entity…." The commenters argued that if Congress had intended anything other than a customer-by-customer analysis of separate prices, the statute would have combined each customer with the word "and" instead of the disjunctive "or." The commenters requested that CMS reaffirm that best price is the lowest price available from the manufacturers reflecting concessions provided by the manufacturers.
>
> *Response*: We do not agree with the commenters.  Although we have deleted the requirement that manufacturers include PBM rebates and discounts and other price concessions in best price. . . .  Best price is designed to reflect the lowest price available from the manufacturer to any purchaser, inclusive of rebates, discounts, or price concessions that adjust the price realized. Where PBM rebates, discounts, or price concessions do not operate to adjust prices, they should not be included in the best price calculation.

The Relator posits: "Just as the Rebate Statute, Rebate Agreement, and Regulations require that two rebates to two different entities in two separate transactions be combined in the prompt pay/chargeback scenario (and in the context of PBMs), so too must Forest combine two rebates to two different entities for the same drug for purposes of reporting Best Price."  ECF 16, ¶ 47.

On February 20, 2007, the law firm of McKenna Long & Aldridge, as counsel for Forest, submitted a letter to CMS in response to CMS's request for comments on the proposed regulations. *Id.* ¶ 48; ECF 112-5 ("McKenna Letter").  In the letter, counsel noted that the statutory definition of Best Price, which the proposed rule adopted, "has always been interpreted to mean the single

lowest price to a particular customer unless the customer or transaction is exempt." ECF 112-5 at

14. The McKenna Letter also stated, *id.* at 14-15:

> [L]anguage in the preamble to the proposed rule suggests that CMS views best price
> as the net amount realized by the manufacturer on a sale rather than the lowest price
> to a particular customer. It is critical that the final rule clarify that only discounts
> and price concessions to the same entity to which a drug is sold should be included
> in the computation of best price to that entity…. In sum, prices to unrelated entities
> in the chain of distribution should not be aggregated in determining the single
> lowest price to an entity, even if they concern the same unit of a drug.

Other drug manufacturers also submitted public comments. For example, in a letter dated

February 20, 2007, Reed Smith, "counsel for an anonymous leading pharmaceutical company,"

ECF 16, ¶ 52, stated that "CMS should clarify that the reference to 'all sales and discounts' and

'to any entity' are not intended to require a manufacturer to aggregate discounts offered to <u>different</u>

entities when determining BP." ECF 112-6 ("Reed Smith Letter"), at 10 (emphasis in original);

*see* ECF 16, ¶ 52. The Reed Smith Letter also posited, ECF 112-6 at 10: "Unlike AMP, which

clearly contemplates that prices be aggregated to determine an 'average' amount, the [Best Price]

is the single lowest price at which the manufacturer sells the product to a single customer. Thus,

it is inappropriate to require a manufacturer to 'stack' discounts offered at one level of the

pharmaceutical delivery system (e.g., to a wholesaler) on top of discounts offered at a completely

different level of that system (e.g., to a retailer or health plan)."

Moreover, in a letter dated February 20, 2007, the law firm of Covington & Burling LLP

("Covington"), "counsel for a variety of pharmaceutical clients," noted that the "ambiguity [in

language about cumulative discounts] leaves room for considerable manipulation of best price."

ECF 112-7 ("Covington Letter"), at 7; *see* ECF 16, ¶ 52. Based on the Rebate Statute's definition

of Best Price, Covington concluded that "it is not appropriate to consider discounts other than the

discounts offered to one customer when determining best price, for those other discounts are never

15

available to that customer." ECF 112-7 at 7. Therefore, Covington requested "that CMS clarify that discounts to a single entity should be cumulated, but discounts to different purchasers should not be cumulated, when determining best price." *Id.*; *see* ECF 16, ¶ 52.

In February 2016, CMS issued a final rule interpreting "Best Price." *See* 81 Fed. Reg. 5710 (Feb. 1, 2016). This rule includes the following passages, 81 Fed. Reg. at 5252–53:

> Comment: One commenter noted that unlike the AMP final rule, which suggested that manufacturers must "stack" price concessions provided to any single best price-eligible entity on a single unit of a product, neither the preamble nor the regulatory text of the proposed rule specifically address stacking. The commenter requested that CMS adopt a policy with regard to the requirement to stack in best price when two different price concessions are provided to two different contracted entities. Specifically, the commenter believed that CMS should adopt a policy where the manufacturer would only be required to combine price concessions on a single unit when it has actual knowledge of, or documentation that reflects that the price concessions will flow to a single entity. Further, the commenter requested guidance as to what degree of relationship that two separate but related entities must have for them to be deemed a "single entity" for best price stacking purposes.

> Another commenter was concerned that the proposed rule would redefine best price to include within a single price to a particular customer all rebates and payments "associated" with that transaction. The commenter believed this to be a vague term which does not clearly state that the associated payment must be provided to the same entity to which the product is sold. The commenter further noted that this would be a significant change to the definition of best price in statute and the national rebate agreement. Therefore, the commenter objected to the definition as it would require manufacturers to include in the best price available to one customer, as a price concession to that customer, a payment made to a completely different entity and the commenter believed this was a significant change to the statutory and contract definition.

> Response: A manufacturer is responsible for including all price concessions that adjust the price realized by the manufacturer for the drug in its determination of best price. If a manufacturer offers multiple price concessions to two entities for the same drug transaction, such as rebates to a PBM where the rebates are designed to adjust prices at the retail or provider level and discounts to a retail community pharmacy's final drug price, all discounts related to that transaction which adjust the price available from the manufacturer should be considered in the manufacturer's final price of that drug when determining the best price to be reported for the drug. We believe this policy is consistent with current § 447.505(e)(3), which requires that if cumulative discounts subsequently adjust the

price available from the manufacturer, they should be included in the best price calculation.

### C. Forest's Rebate Program

The Relator asserts that Forest engaged in a practice that fraudulently reduced the Best Price it reported to the Secretary of HHS, in violation of its reporting obligation under the Rebate Statute and Rebate Agreement.  ECF 16 at 6.  According to plaintiff, Mr. Sheldon discovered while employed at Forest "that Forest was knowingly, with deliberate ignorance, or with reckless disregard failing to account for the double-rebates being provided by Forest to two separate customers on the same dispensed drug units to the same patient in Forest's Pharmacy Provider/GPO Market."  *Id.* ¶ 56.  Plaintiff maintains that this practice resulted in "the false and fraudulent reporting of Best Price to the Secretary [of HHS] for Forest's pharmaceutical drug products in such markets." *Id.*

In the commercial market, "Forest negotiates with private insurance companies to have its drugs placed on the private insurance company's drug formulary."  *Id.* ¶ 57.[15]  The Relator asserts that, "[i]n exchange for [a private insurance company] placing Forest's drugs not only on its formulary, but also at a preferred tier" on its formulary, Forest pays private insurance companies a "negotiated rebate" on each drug "based upon the number of dispensed drug units" for which the insurer pays.  *Id.* ¶ 58.  Forest accounts for this rebate in calculating Best Price and uses this price "to set the overall Best Price for its drugs."  *Id.*

Forest also negotiates with Pharmacy Providers and GPOs for its drugs to be "disbursed by long term care, rehabilitation/transitional, short term stay and group home facilities, as well as through home delivery."  *Id.* ¶ 59.  These sales represent a significant amount of Forest's business.

---

[15] A drug formulary is a private insurance company's "list of preferred prescription drugs, both generic and brand name," usually organized into different tiers with different co-payment amounts.  ECF 16, ¶ 57.

*Id.*  "For example, in FY2008, combined sales to Pharmacy Provider Facilities for Lexapro, Namenda and Bystolic alone totaled over $526 million, which was about 14.5% of the $3.6 billion in total sales [Forest received] for those drugs."  *Id.*  The same year, Forest paid Pharmacy Providers over $35 million in rebates, which constituted about 10 percent of the total rebates paid by Forest in 2008.  *Id.*

Ordinarily, Pharmacy Providers and GPOs purchase Forest's drugs indirectly through a third-party wholesaler pursuant to a purchasing agreement between Forest and the Pharmacy Provider or GPO.  *Id.* ¶ 60.  As part of those agreements, the third-party wholesaler sells the drugs to the Pharmacy Provider or GPO at a discount, "which it then charges back to Forest."  *Id.*  The Pharmacy Providers and GPOs "are also paid a negotiated rebate by Forest on each drug. . . ."  *Id.*  Before 2009, this rebate amount was based on the number of drug units purchased by a Pharmacy Provider or GPO.  *Id.*  However, the rebate amount is now based on "the number of dispensed drug units to patients made inside each respective Pharmacy Provider Facility."  *Id.*  According to the Relator, in calculating Best Price, Forest is required to aggregate the discounts and rebates provided to all participants in the chain of distribution, including the Pharmacy Providers, GPOs, and insurance companies.  *Id.* at 8.

The Relator alleges that Forest "does not account for such double rebates and other discounts in determining a drug's Best Price if the drug is dispensed at a Pharmacy Provider Facility."  *Id.* ¶ 66.  Instead, Forest reports Best Price to HHS based only on the rebate or discount given to the private insurance company. *Id.*  As a result, argues the Relator, Forest falsely reports to the government a "higher Best Price" for drugs dispensed in a Pharmacy Provider Facility, and consequently Forest pays less in Medicaid drug rebates to the state Medicaid programs than it

should, which "results in the federal government paying more in Medicaid spending . . . and states are similarly damaged because they are not receiving their proper rebates." *Id.*

In 2008, top-level managers at Forest "held meetings and prepared reports focusing on the fact that two rebates were occasionally claimed or paid on the same drug being dispensed to a single patient." *Id.* ¶ 69.  The managers were concerned that a patient might have both primary and secondary private medical insurance that would each pay a portion of the patient's drug treatment and then each seek a rebate on the same drug disbursements, creating a double rebate on the same dispersed drug. *Id.*  In response, Forest implemented a data audit process for all rebate claims submitted to Forest by private insurance companies in the commercial market and contracted with Data Niche & Associates ("DNA") to develop a data scrubbing process. *Id.*  The process identified outliers in a customer's rebate submissions, including double rebate claims for the same dispensed drug units to the same patient, so that Forest does not pay for both claims. *Id.*  The Relator asserts that Forest initiated this audit because it was "[a]ware of the potential Best Price violation based upon double rebate claims from its customers." *Id.*

According to the plaintiff, "Forest deliberately chose not to institute the DNA process on the Pharmacy Provider/GPO side to avoid negatively impacting its relationships with major Pharmacy Provider/GPO drug purchasers and preserve shareholder profits." *Id.* ¶ 71.  Therefore, Forest continued to pay double rebates without accounting for them in its Best Price calculations.

Further, the Relator alleges that Forest's failure to account for these "double rebates" resulted in significant overpayments by Medicaid since 2005. *Id.* ¶ 72.  The Relator estimates the overpayments amount to approximately $686.64 million, "plus significant additional reimbursement owed from FY2014 to the present." *Id.* ¶ 119.  The Relator reached this estimate by applying a similar formula to calculate the additional amount that Forest should have paid in

Medicaid rebates for each relevant drug for each fiscal year between 2005 and 2014.  *Id.* ¶¶ 72–119.  The drugs in issue include Celexa, Lexapro, Namenda, Namenda XR, Bystolic, Savella, Viibryd, Fetzima, Tudorza, Daliresp, Saphris, Linzess, Campral, Armour Thyroid, Levothroid, Thyrolar, Tiazac, and Combunox.  *Id.* ¶¶ 17, 56.

To calculate the amount that Forest should have paid in rebates for each drug, the Relator first alleges, "[u]pon information and belief," the amount of Forest's net sales for that drug in a fiscal year.  *See, e.g., id.* ¶ 72.  Next, the Relator avers that, "[u]pon information and belief," Forest's highest reported Best Price rebate percentage for that drug was either "the statutory rebate percentage" for some drugs, *see, e.g., id.*, or based on the Best Price set by the maximum rebate given by Forest on the commercial side of its business.  *See, e.g., id.* ¶ 73.  Medicaid received a reimbursement based on this amount.  *Id.*

Additionally, Sheldon posits that, "[u]pon information and belief," the drug was dispensed to a certain percentage of patients in Pharmacy Provider Facilities with private insurance, and the Pharmacy Providers and GPOs received the maximum possible discount from Forest.  *Id.*  The commercial insurance companies also received their designated rebate on the same dispersed drug. *Id.*  Sheldon then calculates the additional rebate that Medicaid should have received by adding together the commercial rebate and the Pharmacy Provider/GPO rebate and subtracting the reported Best Price.  *Id.*  In this way, Sheldon determines the additional amount that Forest should have paid in Medicaid rebates for that drug in that year.  *Id.*

For example, plaintiff alleges, *id.* ¶ 72 (emphasis omitted):

Upon information and belief, in FY2005, Forest's net sales for Celexa were about $653 Million, at least 20% of which were Medicaid sales - $130.6 Million.  Upon information and belief, Forest's highest reported Best Price rebate percentage for Celexa in FY2005 was the statutory rebate percentage of 15.1%, based upon the maximum rebate of 15% given by Forest on the Commercial side of its business. Accordingly, Medicaid received a reimbursement from Forest of about $19.72

Million (0.151 * $130.6 Million).  However, upon information and belief, Celexa was dispersed to patients in Pharmacy Provider Facilities with private insurance, with Pharmacy Providers/GPOs receiving a maximum discount/rebate of 12% and commercial insurance companies, again, receiving up to a 15% rebate on the same dispersed drug.  However, Forest knowingly, with deliberate ignorance, or with reckless disregard ignored such double rebates, while also purposefully or with reckless disregard failing to implement the DNA process in the Pharmacy Provider/GPO market to identify such double rebates, despite knowing, or it should have known, upon information and belief, that at least 15% of Pharmacy Provider patients receiving Celexa had private insurance.  Therefore, taking into account such double rebates, Medicaid should have received an additional 11.9% rebate (15% Commercial rebate + 12% Pharmacy Provider/GPO rebate – 15.1% reported Best Price rebate = 11.9% under-rebate), resulting in Forest owing Medicaid an additional reimbursement of about $15.54 Million (0.119 * $130.6 Million) for Celexa in FY2005.

## II.  Procedural History

As indicated, the Amended Complaint was unsealed in October 2019.  ECF 42.  In March 2020, defendant moved to dismiss, pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b).  ECF 72 ("First Motion to Dismiss").  The Relator opposed the First Motion to Dismiss.  ECF 79; ECF 79-1 to ECF 79-5.  By Memorandum Opinion (ECF 86; ECF 92) and Order (ECF 87) of November 6, 2020, I granted the First Motion to Dismiss, and dismissed the Amended Complaint for failure to state a claim.  *See Sheldon I*, 499 F. Supp. 3d 184.  In particular, I concluded that, given the significant ambiguity in the term "Best Price," the Relator had not sufficiently alleged that Forest made a "false" claim to the government, or that Forest "knowingly" made such a claim.  *Sheldon I*, 499 F. Supp. 3d at 213.  Sheldon noted an appeal to the Fourth Circuit.  ECF 88.

On January 5, 2022, a divided panel of the Fourth Circuit affirmed the dismissal of Sheldon's Complaint.  *Sheldon II*, 24 F.4th 340.  Writing for the majority, Judge Wilkinson evaluated the sufficiency of Sheldon's allegations concerning scienter according to the standard provided by *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47 (2007).  He explained that, under the *Safeco* standard, a court "first ask[s] whether defendant's interpretation was objectively reasonable

and then determine[es] whether authoritative guidance might have warned defendant away from that reading." *Sheldon II*, 24 F.4th at 347 (citing *Safeco*, 551 U.S. at 69–70).  Applying this standard, the Court determined that "Forest's reading of the Rebate Statute was . . . objectively reasonable" and that "Forest was not warned away from its reading by authoritative guidance from CMS."  *Sheldon II*, 24 F.4th at 351.  Therefore, the Court concluded that Forest did not act "knowingly" within the meaning of the FCA.  *Id.* at 356.  The Court majority also observed that Sheldon did not allege reckless disregard or deliberate indifference. *Id.* at 344.  The Court did not reach the issue of falsity.  *See id.* at 346 n.2.

Judge Wynn dissented.  *Id.* at 357–77.  In his view, the majority had erred by "importing [the] *Safeco*" standard, which was originally developed as an interpretation of "reckless disregard" under the Fair Credit Reporting Act ("FCRA"), "into the [FCA]."  *Id.* at 361.  Moreover, Judge Wynn argued that, even if the *Safeco* standard were appropriately applied to Sheldon's scienter allegations, Sheldon had sufficiently alleged that Forest's interpretation of "Best Price" was objectively unreasonable and that Forest had been "warned away from" that incorrect interpretation.  *Id.* at 371–76.

The Fourth Circuit subsequently granted rehearing *en banc*.  *United States ex rel. Sheldon v. Allergan Sales, LLC*, 2022 WL 1467710 (4th Cir. May 10, 2022).  On September 23, 2022, the Court issued a one-sentence per curiam Order, which stated:  "On rehearing en banc, the panel opinions in *United States ex rel. Sheldon v. Allergan Sales, LLC*, 24 F.4th 340 (4th Cir. 2022), are vacated, and the judgment of the district court is affirmed by an equally divided court."  *Sheldon*

*III*, 49 F.4th at 874.[16]  Thereafter, Sheldon filed a petition for *certiorari* in the Supreme Court.  *See Sheldon v. Allergan Sales, LLC*, No. 22-593.

On June 1, 2023, the Supreme Court decided *United States ex rel. Schutte v. Supervalu, Inc.*, 598 U.S. 739 (2023).  Then, on June 30, 2023, the Supreme Court issued a three-sentence opinion in this case, in which it granted *certiorari*, vacated the judgment of dismissal, and remanded the case to the Fourth Circuit "for further consideration in light of" *Schutte*.  *Sheldon IV*, 143 S. Ct. 2686 (2023).    And, on August 2, 2023, the Fourth Circuit entered an Order remanding the case to this Court, with the instruction to reconsider the suit "in light of" *Schutte*.  ECF 100.  The mandate issued on August 24, 2023.  ECF 109.

Upon remand, plaintiff filed a motion asking the Court to "issue a scheduling order allowing the parties to commence discovery."  ECF 104-1 at 4; *see* ECF 104 ("Request for Discovery").  Sheldon argued that she was "entitled to conduct fact discovery to further support her allegations" concerning Forest's "knowledge and subjective beliefs."  ECF 104-1 at 3.  Forest opposed the Request for Discovery as "premature."  ECF 105 at 1.  In Forest's view, it was entitled to an opportunity to contest the sufficiency of plaintiff's allegations concerning falsity and scienter under the standard announced in *Schutte*.  *Id.* at 3. Therefore, Forest asked the Court to "set a briefing schedule for [Forest] to file a new motion to dismiss in light of an intervening change in the law."  ECF 105 at 1.

---

[16] The en banc majority in the Fourth Circuit did not adopt the panel majority's opinion.  Therefore, "[t]he vacated panel decision . . . carries no precedential weight."  *United States v. Bowman*, 106 F.4th 293, 304 (4th Cir. 2024) (citing *Quesinberry v. Life Ins. of N. Am.*, 987 F.2d 1017, 1029 n.10 (4th Cir. 1993) (en banc)).  Nevertheless, the Fourth Circuit has noted that "the public and the 'legal community as a whole' . . . retain some benefit from [a] panel opinion even if vacated, because the exchange of ideas between the panel and the dissent . . . remain[s] available as a persuasive source."  *Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives*, 14 F.4th 322, 328 (4th Cir. 2021).

Following a telephone conference on August 30, 2023, the Court entered a Scheduling Order. ECF 111. It provided, *inter alia*, that Forest was to file its "motion to dismiss by the close of business on October 16, 2023." Forest filed the Motion on that date. ECF 112. After two extensions (ECF 114; ECF 116), plaintiff filed her Opposition on December 8, 2023. ECF 117. Forest replied on January 23, 2024. ECF 118. The Notice (ECF 121) and Notice Response (ECF 122) followed in May 2024.

### III.   Standards of Review

Defendant has moved to dismiss under Fed. R. Civ. P. 12(b)(6) and Fed. R. Civ. P. 9(b). I discuss each rule, in turn.

### A.  Fed. R. Civ. P. 12(b)(6)

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6). *Nadendla v. WakeMed*, 24 F.4th 299, 304–05 (4th Cir. 2022); *Fessler v. Int'l Bus. Machs. Corp.*, 959 F.3d 146, 152 (4th Cir. 2020); *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom. McBurney v. Young*, 569 U.S. 221 (2013). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). *See Migdal v. Rowe Price-Fleming Int'l Inc.*, 248 F.3d 321, 325–26 (4th Cir. 2001); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002). It provides that a complaint must contain a "short and plain statement of the claim showing that the

pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The purpose of the rule is to provide the defendant with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007).

To survive a motion under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570*; see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (citation omitted) ("Our decision in Twombly expounded the pleading standard for 'all civil actions' . . . ."); *see also Fauconier v. Clarke*, 966 F.3d 265, 276 (4th Cir. 2020); *Paradise Wire & Cable Defined Benefit Pension Plan*, 918 F.3d at 317–18; *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id*. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

A plaintiff need not include "detailed factual allegations" to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11 (2014) (per curiam). However, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

In other words, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation

of the elements of a cause of action," it is insufficient.  *Twombly*, 550 U.S. at 555.  "[A]n

unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim of

relief.  *Iqbal*, 556 U.S. at 678.  Instead, to satisfy the minimal requirements of Rule 8(a)(2), the

complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of

action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote

and unlikely."  *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, "a court 'must accept as true all of the factual

allegations contained in the complaint,' and must 'draw all reasonable inferences [from those facts]

in favor of the plaintiff.'"  *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019) (alteration

in *Retfalvi*) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th

Cir. 2011)); *see Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v.

Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015).  However, "a court is not required to

accept legal conclusions drawn from the facts."  *Retfalvi*, 930 F.3d at 605 (citing *Papasan v. Allain*,

478 U.S. 265, 286 (1986)); *see Glassman v. Arlington Cnty.*, 628 F.3d 140, 146 (4th Cir. 2010).

"A court decides whether [the pleading] standard is met by separating the legal conclusions

from the factual allegations, assuming the truth of only the factual allegations, and then

determining whether those allegations allow the court to reasonably infer" that the plaintiff is

entitled to the legal remedy sought.  *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th.

Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).  But, "[m]ere recitals of a cause of action, supported

only by conclusory statements, are insufficient to survive" a Rule 12(b)(6) motion.  *Morrow v.

Navy Federal Credit Union*, 2022 WL 2526676, at *2 (4th Cir. July 7, 2022).

When ruling on a Rule 12(b)(6) motion, courts ordinarily do not "'resolve contests

surrounding the facts, the merits of a claim, or the applicability of defenses.'"  *King v. Rubenstein*,

825 F.3d 206, 214 (4th Cir. 2016) (citation omitted); *see Bing v. Brio Sys.*, LLC, 959 F.3d 605, 616 (4th Cir. 2020).  But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan*, 553 F.3d 334, 336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint.*' " *Goodman*, 494 F.3d at 464 (emphasis in *Goodman*) (quoting *Forst*, 4 F.3d at 250); *see L.N.P. v. Kijakazi*, 64 F.4th 577, 585–86 (4th Cir. 2023).

It is well settled that a plaintiff may not cure a defect in a complaint or otherwise amend a complaint by way of opposition briefing. *See, e.g., De Simone v. VSL Pharmaceuticals*, 36 F.4th 518, 531 (4th Cir. 2022) (recognizing that, generally, new arguments cannot be raised in a reply brief); *Henderson v. City of Roanoke*, 2022 WL 704351, at *3 (4th Cir. Mar. 9, 2022) (per curiam) ("[N]o litigant is exempt from the well-established rule 'that parties cannot amend their complaints through briefing or oral advocacy.'") (quoting *So. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013)); *Glenn v. Wells Fargo Bank, N.A.*, DKC-15-3058, 2016 WL 3570274, at *3 (D. Md. July 1, 2016) (declining to consider declaration attached to brief opposing motion to dismiss because, among other things, it included allegations not included in the suit); *Zachair Ltd. v. Driggs*, 965 F. Supp. 741, 748 n.4 (D. Md. 1997) (stating that a plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint"), *aff'd*, 141 F.3d 1162 (4th Cir. 1998).

As noted, both sides have filed exhibits in support of their respective submissions.  *See* ECF 112-2 to ECF 112-7; ECF 117-1 to ECF 117-8; ECF 118-1 to ECF 118-4; ECF 121-1.

In particular, in support of the Motion, Forest has filed a copy of a Rebate Agreement between Forest and the Secretary of the Department of Health and Human Services (ECF 112-2); a copy of Medicaid Drug Rebate Program Release No. 2 (ECF 112-3); a copy of Medicaid Drug Rebate Program Release No. 14 (ECF 112-4); the McKenna Letter submitted on Forest's behalf on February 20, 2007 (ECF 112-5); the Reed Smith Letter, dated February 20, 2007 (ECF 112-6); the Covington Letter, dated February 20, 2007 (ECF 112-7); and a letter to CMS from the Pharmaceutical Research and Manufacturers of America (ECF 112-8, "PhRMA Letter").  And, in support of the Notice, Forest filed the Press Release, which is titled "CMS Statement on Misclassification of Drugs, Program Administration and Program Integrity Updates Under the Medicaid Drug Rebate Program (MDRP) Proposed Rule (CMS-2434-P)."  ECF 121-1.

Forest also filed four exhibits in support of the Reply.  *See* ECF 118-1 to ECF 118-4.  These exhibits contain letters to CMS from pharmaceutical manufacturers and trade associations commenting a proposed rule published by CMS on May 23, 2023.  *See* 88 Fed. Reg. 34238 (May 26, 2023).

In support of the Opposition, Sheldon has filed a copy of the May 23, 2023 proposed rule (ECF 117-1; ECF 117-2); a copy of an *amicus curiae* brief filed in the Fourth Circuit by the United States, in support of the Relator (ECF 117-3 to ECF 117-5, "Government Brief"); and a copy of the Amended Complaint (ECF 117-6).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'"  *Zak v. Chelsea Therapeutics Int'l, Ltd.*,

28

780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448).  *See Goines*, 822 F.3d at 166 (a court may properly consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits"); *see also Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).  In contrast, the court "may not consider any documents that are outside of the complaint, or not expressly incorporated therein[.]" *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013), *abrogated on other grounds by Reed v. Town of Gilbert*, 576 U.S. 155 (2015); *see Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).

Under limited circumstances, when resolving a Rule 12(b)(6) motion, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015).  In particular, a court may "consider a document submitted by the movant that [is] not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Goines*, 822 F.3d at 166 (citations omitted); *see also Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019); *Woods v. City of Greensboro*, 855 F.3d 639, 642 (4th Cir. 2017), *cert. denied sub nom.*, *City of Greensboro v. BNT Ad Agency, LLC*, 583 U.S. 1044 (2017); *Kensington Volunteer Fire Dep't v. Montgomery Cnty.*, 684 F.3d 462, 467 (4th Cir. 2012).

To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011)) (emphasis in original) (citation omitted); *see also Brentzel v. Fairfax Transfer and Storage, Inc.,* 2021 WL 6138286, at *2 (4th Cir. Dec. 29, 2021) (per curiam); Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

In addition, "a court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb*, 791 F.3d at 508; *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.,* 637 F.3d 462, 466 (4th Cir. 2011), *cert. denied*, 565 U.S. 825 (2011); *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). However, under Fed. R. Evid. 201, a court may only take judicial notice of adjudicative facts if they are "not subject to reasonable dispute," in that they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

The Rebate Agreement (ECF 112-2) is frequently referred to in the Amended Complaint. *See, e.g.,* ECF 16, ¶ 23. Moreover, it "gives rise to the legal right[] asserted," *Chesapeake Bay Found.*, 794 F. Supp. 2d at 611, insofar as it establishes the reporting obligation allegedly breached by Forest. I am satisfied that it is integral to the suit. Therefore, I may consider the Rebate Agreement (ECF 112-2) without converting the Motion to one for summary judgment.

The materials contained in the remaining exhibits—Medicaid Drug Rebate Program Release No. 2 (ECF 112-3); Medicaid Drug Rebate Program Release No. 14 (ECF 112-4); the various letters to CMS (ECF 112-5 to ECF 112-8; ECF 118-1 to ECF 118-4); the May 26, 2023,

proposed rule (88 Fed. Reg. 34238; ECF 117-1; ECF 117-2); the Government Brief (ECF 117-3 to ECF 117-5); and the Press Release (ECF 121-1)—are publicly available and their authenticity is not disputed.  Therefore, I may take judicial notice of them.  *See* ECF 92 at 22 (taking judicial notice of letters to CMS, the program releases, and several regulations or proposed rules). [17]

I may also take judicial notice of the contents of the Federal Register and the Code of Federal Regulations.  *See City of Columbus v. Trump*, 453 F. Supp. 3d 770, 795 (D. Md. 2020) ("[A] court may generally take judicial notice of materials published in the Federal Register without converting the motion to one for summary judgment."); 44 U.S.C. § 1507 ("The contents of the Federal Register shall be judicially noticed . . . ."); *United States v. Sauls*, 981 F. Supp. 909, 925 n.10 (D. Md. 1997) (observing that court may "take judicial notice of . . . the Code of Federal Regulations").

However, judicial notice of the materials described above is limited to "their existence and contents."  *Sauls*, 981 F. Supp. at 925 n.10.  Therefore, although I may take judicial notice of the fact that certain statements were made in a document, I may "not take judicial notice of the truth" of those statements.  *See In re Mun. Mortg. & Equity, LLC, Sec. and Derivative Litig.*, 876 F. Supp. 2d 616, 626 n.7 (D. Md. 2012).

### B.  Fed. R. Civ. P. 9(b)

Fed. R. Civ. P. 9(b) states: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."

---

[17] Curiously, Sheldon filed a copy of the Amended Complaint as an exhibit to its Opposition.  *See* ECF 117-6.  It should go without saying that a court considering a motion to dismiss may consider the complaint the defendant seeks to dismiss, whether or not it is attached as an exhibit to a submission.

A suit brought under the FCA sounds in fraud, and thus is "subject to" Rule 9(b), which requires that claimants plead fraud with particularity." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783–84 (4th Cir. 1999).  Under the heightened pleading standard of Rule 9(b), a plaintiff alleging claims that sound in fraud "'must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'" *United States ex rel. Nathan v. Takeda Pharms. N.A., Inc*., 707 F.3d 451, 455 (4th Cir. 2013) (citation omitted); *see United States ex rel. Owens v. First Kuwaiti Gen'l Trading & Contracting Co.*, 612 F.3d 724, 731 (4th Cir. 2010); *see also Harrison*, 176 F.3d at 784.

In other words, "'Rule 9(b) requires plaintiffs to plead the who, what, when, where, and how: the first paragraph of any newspaper story.'" *Crest Constr. II, Inc. v. Doe*, 660 F.3d 346, 353 (8th Cir. 2011) (citation omitted); *see United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008).  "A 'complaint fails to meet the particularity requirements of Rule 9(b) when a plaintiff asserts merely conclusory allegations of fraud against multiple defendants without identifying each individual defendant's participation in the alleged fraud.'" *Kimberlin v. Hunton & Williams LLP*, GJH-15-723, 2016 WL 1270982, at *7 (D. Md. Mar. 29, 2016) (citing *Adams v. NVR Homes, Inc.*, 193 F.R.D. 243, 250 (D. Md. 2000)).

Rule 9(b) serves several purposes.  In *Harrison*, 176 F.3d 776, the Court said, *id.* at 784 (citation omitted):

> "First, the rule ensures that the defendant has sufficient information to formulate a defense by putting it on notice of the conduct complained of . . . .  Second, Rule 9(b) exists to protect defendants from frivolous suits.  A third reason for the rule is to eliminate fraud actions in which all the facts are learned after discovery.  Finally, Rule 9(b) protects defendants from harm to their goodwill and reputation."

The "'clear intent of Rule 9(b) is to eliminate fraud actions in which all the facts are learned through discovery after the complaint is filed.'"  *Id.* at 789 (citation omitted); *see Kellogg Brown & Root, Inc.*, 525 F.3d at 380 ("[I]f allowed to go forward, Relators' FCA claim would have to rest primarily on facts learned through the costly process of discovery.  This is precisely what Rule 9(b) seeks to prevent.").

However, by its plain text, Rule 9(b) permits general averment of aspects of fraud that relate to a defendant's state of mind.  "A court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts."  *Id.*  Moreover, Rule 9(b) is "less strictly applied with respect to claims of fraud by concealment" or omission of material facts, as opposed to affirmative misrepresentations, because "an omission 'cannot be described in terms of the time, place, and contents of the misrepresentation or the identity of the person making the misrepresentation."  *Shaw v. Brown & Williamson Tobacco Corp.*, 973 F. Supp. 539, 552 (D. Md. 1997) (quoting *Flynn v. Everything Yogurt*, HAR-92-3421, 1993 WL 454355, at *9 (D. Md. Sept. 14, 1993)).

Several cases have clarified Rule 9(b)'s "who," "what," and "when" requirements in the context of the Act.  As to "who," in FCA cases where the defendant is a corporate entity, Rule 9(b) requires the plaintiff to name the individuals involved in the allegedly fraudulent conduct.  *See, e.g.*, *United States ex rel. Robinson v. Northrop Corp.*, 149 F.R.D. 142, 145 (N.D. Ill. 1993) (stating that Rule 9(b) requires a plaintiff asserting a FCA claim against a corporate defendant to specify the "identity and/or role of the individual employee involved in the alleged fraud.").  With respect to "what," a plaintiff must show a link between allegedly wrongful conduct and a claim for

payment actually submitted to the government.  *See, e.g.*, *United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1311 (11th Cir. 2002) (noting that Rule 9(b) "does not permit a False Claims Act plaintiff merely to describe a private scheme in detail but then to allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted, were likely submitted[,] or should have been submitted to the Government."), *cert. denied*, 537 U.S. 1105 (2003).  Finally, as to "when," Rule 9(b) requires a plaintiff to allege with particularity the dates of the supposed fraudulent conduct. *See, e.g.*, *United States ex rel. Cericola v. Fed. Nat'l Mortg. Ass'n*, 529 F. Supp. 2d 1139, 1146 (C.D. Cal. 2007) (stating that Rule 9(b)'s requirements were not fulfilled when, among other deficiencies, a plaintiff's complaint alleged that FCA violations occurred between 1995 and 1998 but did not allege any specific dates).

## IV.    Discussion

Forest argues that the Amended Complaint is subject to dismissal on three grounds.  *See* ECF 112-1 at 16–38.  First, Forest posits that the Relator failed to allege that the price reports submitted by Forest were "'false'" within the meaning of the FCA.  *Id.* at 17 (quoting *United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 674–75 (5th Cir. 2003) (en banc)).  Second, Forest contends that the Relator did not sufficiently allege that Forest "'knowingly'" submitted false price reports.  ECF 112-1 at 32 (quoting 31 U.S.C. § 3729(a)(1)).  And third, Forest asserts that the Relator did not plead fraud with particularity, as required by Fed. R. Civ. P. 9(b).  ECF 112-1 at 35.  Sheldon disputes each contention.  *See* ECF 117 at 24–35.[18]

As noted, a panel of Fourth Circuit judges affirmed dismissal of the Amended Complaint on the ground that Forest did not act knowingly within the meaning of the FCA.  *Sheldon II*, 24

---

[18] Sheldon does not dispute that it is appropriate to dismiss the state law claims if the Court dismisses the claims under the FCA.  *See* ECF 117 at 35.

F.4th at 356; *id.* at 346 n.2.  Nonetheless, Forest now devotes most of its argument for dismissal to the question of falsity, rather than scienter.  *Compare* ECF 112-1 at 17–32 *with id.* at 32–35.

Forest's change in focus is understandable, given that the Fourth Circuit, sitting *en banc*, vacated the panel majority's opinion, *see Sheldon III*, 49 F.4th at 874, and the Supreme Court in *Schutte*, 598 U.S. at 754, concluded that the *Safeco* scienter standard, which had been applied by the Fourth Circuit's panel majority, *see Sheldon II*, 24 F.4th at 348, does not govern in FCA cases. In my view, however, these developments do not change the outcome previously arrived at by this Court.  The Relator's allegations of scienter remain insufficient, even when evaluated under the "subjective" standard set forth in *Schutte*, 598 U.S. 739.  Alternatively, the Relator has not sufficiently alleged that Forest's price reports were "false" within the meaning of the FCA.

In the discussion that follows, I first review the principles governing scienter under the FCA, with particular attention to the Supreme Court's discussion of scienter in *Schutte*, 598 U.S. 739.  I then evaluate the sufficiency of the Relator's allegations concerning scienter in light of *Schutte* and other applicable law.  Thereafter, I turn to the question of the Relator's allegations regarding falsity.

As I proceed in my analysis, I am mindful of what the Fourth Circuit recognized years ago in *Rehab. Ass'n of Va., Inc. v. Kozlowski*, 42 F.3d 1444, 1450 (4th Cir. 1994):  Medicaid statutes and regulations "are among the most completely impenetrable texts within human experience." *See also Sheldon II*, 24 F.4th at 353.  Indeed, it is probably an understatement to say that "[c]alculation of a manufacturer's 'average' and 'best' prices . . . is a complex enterprise."  *Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 115 (2011).

## A.

The FCA protects the government fisc by "impos[ing] civil liability on persons who knowingly submit false claims for goods and services to the United States." *United States ex rel. Beauchamp v. Academi Training Ctr.*, 816 F.3d 37, 39 (4th Cir. 2016); *see Rostholder v. Omnicare, Inc.*, 745 F.3d 694, 700 (4th Cir. 2014), *cert. denied*, 574 U.S. 819 (2014).[19]  In order to prevent fraud that might otherwise evade detection and to supplement government enforcement, the FCA permits a private individual, a whistleblower known as a relator, to file a civil lawsuit on behalf of the government against those who defraud the federal government. *Id.*  To encourage such suits, the statute allows the successful relator to collect a portion of the government's recovery. *See* 31 U.S.C. § 3730(b); *see also Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401, 404 (2011); *United States ex rel. Bunk & Ammons v. Gov't Logistics N.V.*, 842 F.3d 261, 265 n.3 (4th Cir. 2016); *ACLU v. Holder*, 673 F.3d 245, 246–51 (4th Cir. 2011) (describing history and current provisions of FCA).

"In general, a False Claims Act relator is required to allege four elements:[] (1) 'there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a "claim").'" *United States ex rel. Taylor v. Boyko*, 39 F.4th 177, 188 (4th Cir. 2022) (quoting *Harrison*, 176 F.3d at 788); *see Rostholder*, 745 F.3d at 700.

With respect to the element of scienter, the FCA imposes liability only when a person "knowingly" makes a false claim to the government. 31 U.S.C. § 3279(a)(1)(A).  "[T]he terms

---

[19] In 2009, Congress amended the FCA by passing the Fraud Enforcement and Recovery Act of 2009 ("FERA"), 123 Stat. 1617 (May 20, 2009).  FERA changed the numbering of 31 U.S.C. § 3729(a), amended the language of the statute to include an express materiality requirement for the false record provisions in § 3729(a)(2), and changed the definition of "obligation" in § 3729(a)(7).

'knowing' and 'knowingly' . . . mean that a person, with respect to information . . . (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information . . . ." *Id.* § 3279(b)(1)(A); *see United States ex rel. Complin v. North Carolina Baptist Hospital*, 818 F. App'x 179, 182 (4th Cir. 2020).  The scienter requirement is "'rigorous'" and constitutes a "key element of an FCA claim," even at the motion to dismiss stage.  *Complin*, 818 F. App'x at 183 (quoting *Universal Health Servs., Inc., v. United States*, 579 U.S. 176, 192 (2016)); *see also Complin*, 818 F. App'x at 183 n.5 (noting that scienter may be resolved on a motion to dismiss).

The Supreme Court provided an exegesis of the FCA's scienter element in *Schutte*, 598 U.S. 739.  In that case, the relators alleged that the defendants, who were operators of national retail drug pharmacies, violated the FCA by inaccurately reporting their "usual and customary" drug prices to Medicare and Medicaid for reimbursement.  *Id.* at 743, 745.  The pharmacies had operated "price-match programs" by which they "would match a competitor's lower price [for a particular drug] at a customer's request."  *Id.* at 745.  The plaintiffs contended that the discounted prices made available to customers pursuant to the price-match programs "were actually [the pharmacies'] 'usual and customary prices.'"  *Id.* at 746.  However, according to the plaintiffs, "rather than submitting those lower prices for reimbursement," the pharmacies "instead reported their higher, non-discounted prices."  *Id.*  The district court granted summary judgment in favor of the defendants based on the scienter element.  *Id.* at 747.

In interpreting the FCA's scienter element, the Supreme Court "start[ed] . . . with the text of the FCA."  *Schutte*, 598 U.S. at 749-50.  The Court observed that, under 31 U.S.C. § 3729(b)(1)(A)(i)–(iii), "either actual knowledge, deliberate ignorance, or recklessness . . . suffice" for liability under the FCA.  *Schutte*, 598 U.S. at 750.  According to the Court, this "three-

part test largely tracks the traditional common-law scienter requirement for claims of fraud." *Id.* (citations omitted).   Therefore, the Court determined that scienter under the FCA, like scienter under common law fraud, "ordinarily 'depends on a subjective test' and the defendant's 'culpable state of mind.'"   *Id.* at 752 (quoting Restatement (Third) of Torts § 10, Comment *a*).   In other words, "[t]he FCA's scienter element refers to [a defendant's] knowledge and subjective beliefs— not to what an objectively reasonable person may have known or believed."   *Schutte*, 598 U.S. at 749.

The Court "assume[d] . . . that [the pharmacies'] 'usual and customary' prices were," in fact, "their discounted ones . . . ."   *Id.* at 752–53.   Nonetheless, the Court acknowledged a "difficulty" in resolving the question of scienter, because "the phrase 'usual and customary' [was], on its face, less than perfectly clear."   *Id.* at 752.   Indeed, the pharmacies argued that, given "the inherent ambiguity of the phrase ['usual and customary'] . . . they could not have 'known' that their claims were inaccurate because they could not have 'known' what the phrase 'usual and customary' actually meant."   *Id.* at 753.   "The most that is possible, [the pharmacies] posit[ed], is that they took a (correct) guess."   *Id.*

The Court disagreed.   It explained that, "[a]lthough the terms, in isolation, may have been somewhat ambiguous, that ambiguity [did] not preclude [the pharmacies] from having learned their correct meaning—or, at least, becoming aware of a substantial likelihood of the terms' correct meaning."   *Id.*   "To illustrate why," the Court offered the example of "a hypothetical driver who sees a road sign that says 'Drive Only Reasonable Speeds.'"   *Id.*   The Court explained, *id.*:

> That driver, without any more information, might have no way of knowing what
> speeds are reasonable and what speeds are too fast. But then assume that the same
> driver was informed earlier in the day by a police officer that speeds over 50 mph are
> unreasonable and then noticed that all the other cars around him are going only
> 48 mph. In that case, the driver might know that "Reasonable Speeds" are anything
> under 50 mph; or, at the least, he might be aware of an unjustifiably high risk that

anything over 50 mph is unreasonable. Indeed, if the same police officer later pulled the driver over, we imagine that he would be hard pressed to argue that some other person might have understood the sign to allow driving at 80 mph.

In the Court's view, the pharmacies, like the hypothetical driver, had "received notice," *id.* at 754, of the "correct meaning" of the term at issue. *Id.* at 753. In particular, the pharmacies "received notice," sometimes "from the same entities to which they reported their prices," that "the phrase 'usual and customary' referred to their discounted prices . . . comprehended those notices and then tried to hide their discounted prices." *Id.* at 754. "If that is true," the Court reasoned, "then perhaps respondents actually knew what the phrase meant; or perhaps respondents were aware of an unjustifiably high risk that the phrase referred to their discounted prices." *Id.* In either case, they would have acted with the scienter required for liability under the FCA. Therefore, the Court concluded that a defendant could have the requisite scienter if he "correctly understood" the obligation to submit "'usual and customary' drug prices" for reimbursement, notwithstanding any ambiguity in the meaning of the phrase, and nonetheless submitted claims that he thought were "inaccurate." *Id.* at 743.

The Court also addressed the pharmacies' invocation of the scienter standard in *Safeco*, 551 U.S. 47. According to the pharmacies, *Safeco* established that a defendant could not "knowingly" make a false claim under a statute unless the "defendant's 'reading of the statute' was 'objectively unreasonable.'" *Schutte*, 598 U.S. at 754 (quoting *Safeco*, 551 U.S. at 69). The Court found the pharmacies' argument unavailing, for two reasons. *See id.* at 754–55.

First, the Court observed that "*Safeco* interpreted a different statute, the FCRA, which ha[s] a . . . *mens rea* standard, 'wilfully,'" that is different from the standard in the FCA. *Id.* at 754 (quoting 15 U.S.C. § 1681n(a)) (additional citation and internal quotation marks omitted). In the

Court's view, the *Safeco* standard "was ultimately tied to the FCRA's particular text," and could not control the Court's construction of the text in the FCA.  *Id.*

Second, the Court maintained that "*Safeco* did not . . . set forth the purely objective safe harbor that [the pharmacies] invoke[d]."  *Id.* at 755.  The Court asserted: "Nothing in *Safeco* suggests that [a court] should look to facts that the defendant neither knew nor had reason to know at the time he acted.'"  *Id.* (quoting *Halo Elecs, Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 106 (2016)) (alteration in *Schutte*).  Nor, in the Court's view, did *Safeco* authorize a court to "look to legal interpretations that [the pharmacies] did not believe or have reason to believe at the time they submitted their claims."  *Schutte*, 598 U.S. at 755.

## B.

To evaluate the sufficiency of the Relator's allegations concerning scienter, I must determine whether the allegations in the Amended Complaint, if proven, would establish that Forest had "actual knowledge" that its "Best Price" reports were false, 31 U.S.C. § 3729(b)(1)(A)(i); or "act[ed] in deliberate ignorance of the truth or falsity of the" reports, *id.* § 3729(b)(1)(A)(ii); or "act[ed] in reckless disregard of the truth or falsity of the" reports.  *Id.* § 3729(b)(1)(A)(iii).

Consistent with *Schutte*, 598 U.S. at 749, I conduct this inquiry by considering the allegations insofar as they concern Forest's "knowledge and subjective beliefs—not . . . what an objectively reasonable person may have known or believed."[20]  Nevertheless, I am mindful that

---

[20] *Schutte* came to the Supreme Court following discovery and an award of summary judgment.  The posture of a case under Fed. R. Civ. P. 56 is generally quite different from the posture of a case under Rule 12(b)(6).  Nonetheless, I see no reason why the *Schutte* standard should not apply with equal force in the evaluation of a motion to dismiss.  Nor, in my view, is there any reason to think that the *Schutte* standard upset the well-established rule that a court may "decid[e] the issue of scienter at the Rule 12(b)(6) motion-to-dismiss stage."  *Complin*, 818 F.

direct proof of scienter is often unavailable, because, as juries are often instructed, "there is no way of directly scrutinizing the workings of the human [or corporate] mind."  1A Fed. Jury Prac. & Instr. § 17:07 (6th ed. 2024).

The Relator's claim that Forest acted with the requisite scienter largely depends on the contention that any person or entity familiar with the Rebate Statute, the Rebate Agreement, and related regulations—such as Forest—would have known that the law required aggregation of discounts.[21]  In other words, the Relator's claim that Forest had culpable "subjective beliefs," *Schutte*, 598 U.S. at 749, depends on a subsidiary claim regarding the *objective* meaning of the Rebate Statute and related materials: namely, that these materials clearly require aggregation. Sheldon argues that, given the objective meaning of these materials, and Forest's assumed familiarity with them, a factfinder could infer that Forest acted with the requisite scienter. Therefore, to evaluate the sufficiency of Sheldon's allegation that Forest acted with culpable "subjective beliefs," *id.*, I must conduct an unmistakably *objective* inquiry into the meaning of the Rebate Statute, Rebate Agreement, and related regulations.

In general, the task of determining the meaning of a statute begins with the statutory text. *See Lovo v. Miller*, 107 F.4th 199, 207 (4th Cir. 2024) ("We begin that inquiry with the text itself."); *Shaiban v. Jaddou*, 97 F.4th 263, 265 (4th Cir. 2024) ("When we interpret statutes, our starting point is the text of the statute itself.") (citation omitted); *Murphy v. Smith*, 583 U.S. 220,

---

App'x at 183 n.5 (citing *Rostholder*, 745 F.3d at 703).  In any event, I have been directed to assess the suit in light of *Schutte*, and I shall do so.

[21] I say "largely" because the Amended Complaint contain two allegations of scienter that do not depend on such an assumption: the allegation that Forest organized an internal audit to identify instances of multiple rebates, ECF 16, ¶ 69, and the allegation that Forest, through counsel, "acknowledged" in the McKenna Letter (ECF 112-5 at 14) that aggregation was required.  ECF 16, ¶ 48.

223 (2018) ("As always, we start with the specific statutory language in dispute.").  In addition to the words themselves, a court should consider the words' "'context and . . . their place in the overall statutory [or regulatory] scheme.'" *Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 275 (2023) (citation omitted); *see Lovo*, 107 F.4th at 213; *Gundy v. United States*, 588 U.S. 128, 141 (2019); *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666 (2007).

Words that are not defined in the statute are "'interpreted as taking their ordinary, contemporary, common meaning.'" *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014) (citation omitted); *accord Lovo*, 107 F.4th at 206; *United States v. George*, 946 F.3d 643, 645 (4th Cir. 2020).  To determine a term's "'plain or common meaning,'" a court may consult a dictionary. *In re Construction Supervision Services, Inc.*, 753 F.3d 124, 128 (4th Cir. 2014) (quoting *Blakely v. Wards*, 738 F.3d 607, 611 (4th Cir. 2013) (internal citations omitted)); *see Davidson v. United Auto Credit Corp.*, 65 F.4th 124, 129 (4th Cir. 2023).  But, "[c]ontext could of course warrant departing from a term's dictionary definition."  *Lovo*, 107 F.4th at 207.

A court's interpretation of a statute may also be informed by the statute's history and purpose. *See Gundy*, 588 U.S. at 140.  However, a court may "not resort to legislative history to cloud a statutory text that is clear." *Ratzlaf v. United States*, 510 U.S. 135, 147–48 (1994). Therefore, "[i]f the meaning of the text is plain . . . that meaning controls." *Raplee v. United States*, 842 F.3d 328, 332 (4th Cir. 2016).

A court should "construe[] a regulation using the same rules applicable to statutory construction."  *United States v. Moriello*, 980 F.3d 924, 934 (4th Cir. 2020) (citing *Harris v. Norfolk S. Ry. Co.*, 784 F.3d 954, 962 (4th Cir. 2015)).  In particular, the words of a regulation, like those of a statute, must be read "'in their context and with a view to their place in the overall [regulatory] scheme.'" *Mohamed v. Bank of Am. N.A.*, 93 F.4th 205, 211 (4th Cir. 2024) (alteration

in original) (quoting *Lynch v. Jackson*, 853 F.3d 116, 121 (4th Cir. 2017)).  Moreover, a court must "endeavor to avoid interpretations of one provision that would render other provisions surplusage." *Lovo*, 107 F.4th at 213; *see United States v. Briley*, 770 F.3d 267, 273 (4th Cir. 2014).

As noted, the Rebate Statute defines "Best Price" as follows, 42 U.S.C. § 1396r-8:

The term "best price" means, with respect to a single source drug or innovator multiple source drug of a manufacturer (including the lowest price available to any entity for any such drug of a manufacturer that is sold under a new drug application approved under section 505(c) of the Federal Food, Drug, and Cosmetic Act), the lowest price available from the manufacturer during the rebate period to any wholesaler, retailer, provider, health maintenance organization, nonprofit entity, or governmental entity within the United States . . . .

As an initial matter, I do not consider Forest's assumed familiarity with the statutory definition of "Best Price" a sufficient basis to establish that Forest acted with "actual knowledge" that its reports were false.  31 U.S.C. § 3729(b)(1)(A)(i).  Nor, in my view, can the statutory text alone establish that Forest "act[ed] in deliberate ignorance," *id.* § 3729(b)(1)(A)(ii), or "reckless disregard of the truth or falsity" of its reports.  *Id.* § 3729(b)(1)(A)(iii).

The parties disagree about the significance of the term "any" as it appears in the Rebate Statute, 42 U.S.C. § 1396r-8(c)(1)(C).  *Compare* ECF 112-1 at 20 *with* ECF 117 at 26.  As indicated, the Best Price is defined as "the lowest price available from the manufacturer to any . . . [customer] . . . . The best price shall be inclusive of discounts . . . and rebates . . . ."  *Id.*

Forest argues that "the phrase 'available *from* the manufacturer . . . *to* any [customer]'" suggests that the price in question is the price in a "particular bilateral transaction" between the manufacturer and a customer, rather than a "hypothetical composite net revenue figure" arrived at by aggregating each discount or rebate in the chain of distribution.  ECF 112-1 at 19 (quoting 42 U.S.C. § 1396r-8) (alterations and emphasis in ECF 112-1).  According to Forest, "'[a]ny' ordinarily means a 'single member in a class if used with singular nouns.'"  ECF 112-1 at 20

(quoting *Sheldon II*, 24 F.4th at 351, in turn citing *Any*, Oxford English Dictionary (3d ed. 2021)). Therefore, Forest posits that the Rebate Statute "is read most naturally to define Best Price as the lowest price available to any one of the listed entities—not the lowest composite revenue figure resulting from combining prices to all of the listed entities for a single drug unit."  ECF 112-1 at 20 (citation omitted).[22]

According to Sheldon, "[b]oth the Supreme Court and the Fourth Circuit have held that 'any' is an expansive term."  ECF 117 at 26 (citing *SAS Inst., Inc v. Iancu*, 584 U.S. 357, 138 S. Ct. 1348, 1355 (2018); *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 218–19 (2008); *United States v. Maxwell*, 285 F.3d 336, 341 (4th Cir. 2002)).  In Sheldon's view, it follows that the terms "any entity" or "any purchaser" denote *every* "entity [or purchaser] in the distribution chain."  ECF 117 at 26.

I do not agree with Sheldon that the use of the term "any" in the Rebate Statute clearly establishes that a manufacturer must aggregate discounts to different entities in the chain of distribution, such that, on this basis, Forest possessed the requisite scienter simply by reading the Rebate Statute.

---

[22] In *Sheldon II*, Judge Wilkinson explained, 24 F.4th at 351–52:

This linguistic construction (singular nouns plus the disjunctive) strongly advises against aggregating discounts to multiple entities.  Change some nouns to see why. If, when striking a deal for baseball equipment, the thrifty Kansas City Royals asked for "the lowest price available from the manufacturer to any wholesaler, retailer, professional baseball team, minor-league organization, or collegiate program," no one would think that the equipment company needs to aggregate prices.  The Royals are just asking for the best deal that any one of the other entities received.

I recognize that the panel opinions were vacated.  But, Judge Wilkinson's explanation remains a useful illustration of Forest's interpretation of the Rebate Statute.

The word "any" is not defined in the Rebate Statute.  *See* 42 U.S.C. § 1396r-8; *id.* § 1396d (providing definitions "[f]or purposes of this subchapter").  As noted, words that are not defined in a statute are "'interpreted as taking their ordinary, contemporary, common meaning.'" *Sandifer*, 571 U.S. at 227 (citation omitted); *accord Lovo*, 107 F.4th at 207.   And, it is well established that a court may consult a dictionary to determine a term's "'plain or common meaning.'"   *In re Construction Supervision Services.*, 753 F.3d at 128 (quoting *Blakely*, 738 F.3d at 611 (internal citations omitted)); *see Davidson*, 65 F.4th at 129.

As used in the Rebate Statute, the term "any entity" could mean *every* entity in the chain of distribution or any *one* entity in the chain of distribution.  No amount of searching for the semantic essence of the word "any" can cure the Rebate Statute of its ambiguity.  The definition of the word "any" in Black's Law Dictionary (6th ed. 1990)[23] well illustrates the ambiguity of the word "any" (citations omitted):

> "'[A]ny' has a diversity of meaning and may be employed to indicate 'all' or 'every' as well as 'some' or 'one' and its meaning in a given statute depends upon the context and the subject matter of the statute.  It is often synonymous with 'either,' 'every,' or 'all.'"

In sum, even when the statutory definition of Best Price is considered in the light most favorable to Sheldon, it is no more informative than the hypothetical instruction in *Schutte* to drive at a "reasonable" speed.  *See Schutte*, 598 U.S. at 753.  As a result, simply by considering the statutory definition alone, Forest could not have acquired any of the three mental states required for liability under the FCA.

---

[23] I cite the Sixth Edition of Black's Law Dictionary, rather than the most recent Tenth edition, because the Sixth Edition is, apparently, the last to contain an entry for the word "any."

Forest's assumed familiarity with the terms of the Rebate Agreement is also an insufficient basis on which to attribute to Forest any of three culpable mental states under the FCA.  Section I(d) of the Rebate Agreement provides, in part, ECF 112-2 at 3: "'Best price' means . . . the lowest price at which the manufacturer sells the [drug] . . . to any purchaser in the United States . . . . The best price for a quarter shall be adjusted by the manufacturer if cumulative discounts, rebates or other arrangements subsequently adjust the prices actually realized." (Emphasis in original).  The phrase "sells . . . to any purchaser," *id.*, suggests that the Rebate Agreement contemplated a specific bilateral transaction between the manufacturer and a customer.  The term is not so perspicuous that Forest, simply by having read it, would have actually known, recklessly disregarded, or deliberately ignored the supposed falsity of its price reports.

Nor could the Rebate Agreement's mandate that the "best price for a quarter shall be adjusted" to reflect "subsequent[] adjust[ments] [to] the prices actually realized," by itself, have given rise to any of the culpable mental states under the FCA.  *Id.* at 3.  This mandate appears to require a manufacturer to aggregate discounts and rebates issued to the same customer at different times during the quarter.  So, for example, a manufacturer who provides a rebate to a particular customer on April 1 must adjust the "best price for a quarter" if, two weeks after the rebate of April 1, the manufacturer provides an additional rebate to the same customer.  However, this provision of the Rebate Agreement does not clearly require a manufacturer to aggregate concessions provided to different purchasers in the distribution chain.

As I see it, the "Best Price" provisions of the Rebate Statute and Rebate Agreement are equivalent in their ambiguity to the hypothetical instruction in *Schutte* to drive "reasonably." Therefore, the allegation that Forest was familiar with the terms of the Rebate Statute and Rebate

Agreement does not provide a basis on which to ascribe to Forest a culpable mental state under *Schutte*.

Nonetheless, the Relator argues that a series of regulatory pronouncements by CMS cured any ambiguity in the Rebate Statute and Rebate Agreement, just as the hypothetical police officer's instruction in *Schutte* cured the ambiguity in the requirement to drive at a "reasonable" speed.  *See* ECF 117 at 12–14.  In particular, the Relator asserts that Medicaid Drug Rebate Program Release No. 2 (ECF 112-3); Medicaid Drug Rebate Program Release No. 14 (ECF 112-4); a proposed rule issued by CMS in 2006, *see* 71 Fed. Reg. 77174 (Dec. 22, 2006); a final rule issued by CMS in 2007, *see* 72 Fed. Reg. 39142-01 (Jul. 17, 2007); and a final rule issued by CMS in 2016, *see* 81 Fed. Reg. 5170-01 (Feb. 1, 2016),  "confirm[ed] that 'Best Price' under the Rebate Statute and Rebate Agreement means the price actually realized by a drug manufacturer for a single drug unit after stacking any and all price concessions to all entities."  ECF 117 at 12.  I am not persuaded that Forest's assumed familiarity with these pronouncements is sufficient to attribute to it any one of the three culpable mental states under the FCA.  Indeed, as I shall explain, these pronouncements compounded, rather than cured, the ambiguity in the Rebate Statute and Rebate Agreement.

Medicaid Drug Rebate Program Release No. 2 (ECF 112-3) provides, in part, *id.* at 3:  "As stated in paragraphs I(a) and I(d) of the rebate agreement, you must revise AMPs and/or BPs to reflect the impact of the cumulative discounts or other arrangements on the prices actually realized in any quarter."  Notably, this language is entirely silent as to whether the "discounts or other arrangements" a manufacturer must cumulate are those extended to a *single purchaser* at different times during a quarter or, instead, those extended to *multiple purchasers* at different positions in the distribution chain, as the Relator contends.

Medicaid Drug Rebate Program Release No. 14 (ECF 112-4) is similarly unilluminating. It provides, in part, *id.* at 2: "[W]e consider any price adjustment which ultimately affects the price actually realized by the manufacturer as 'other arrangements' and, as required by the rebate agreement, included in the calculations of AMP and best price."   Again, the language of the Program Release is silent as to the critical question: whether the discounts and rebates that determine the "price actually realized" in a given quarter are those extended to a *single purchaser* of a certain drug at different times during the quarter or, instead, those extended *to multiple purchasers* of that drug in different positions in the chain of distribution.

The proposed rule issued by CMS in 2006, *see* 71 Fed. Reg. 77174-01 (Dec. 22, 2006), is also an insufficient basis for imputing scienter to Forest.   In fact, this proposed rule simply reproduces the ambiguity present in Program Releases No. 2 and 14.  The proposed rule provides, in part, *id.* at 77181:  "[I]t has been our policy that in order to reflect market transactions, the best price for a rebate period should be adjusted by the manufacturer if cumulative discounts or other arrangements subsequently adjust the price actually realized."

Further, the proposed rule states, *id.* at 77182:

 Because best price represents the lowest price available from the manufacturer to any entity with respect to a single source drug or innovator multiple source drug of a manufacturer, including an authorized generic, any price concession associated with that sale should be netted out of the price received by the manufacturer in calculating best price and best price should be adjusted by the manufacturer if other arrangements subsequently adjust the prices actually realized.  We propose to consider any price adjustment which ultimately affects those prices which are actually realized by the manufacturer as "other arrangements" and that such adjustment should be included in the calculation of best price . . . .

Elsewhere, the proposed rule provides, *id.* at 77197:

Best price shall be calculated to include all sales and associated discounts and other price concessions provided by the manufacturer to any entity unless the sale discount or other price concession is specifically excluded by statute or regulation

or is provided to an entity specifically excluded by statute or regulation from the rebate calculation.

This language leaves unanswered several important questions essential to ascertaining the meaning of "Best Price."  First, a "price concession associated with [a] sale," *id.* at 77182, could mean "any price concession directly extended by the manufacturer to a *single purchaser* of a certain drug."  Or, the phrase could mean "the sum of all price concessions extended to every customer in the chain of distribution of a particular drug unit."

Second, as in Program Releases No. 2 and No. 14, there is significant ambiguity in the term "prices actually realized."  *Id.*  In particular, it is not clear whether the "prices actually realized" are determined by reference to the discounts and rebates extended to a *single* purchaser of a drug or, instead, by reference to the discounts and rebates extended to *all* purchasers in a drug's chain of distribution.

Third, the term "price received by the manufacturer," *id.*, is ambiguous because it tells the reader nothing about *from whom* the price in question is "received."  And, fourth, there is significant ambiguity in the mandate that "Best price shall . . . include all . . . discounts and other price concessions provided by the manufacturer to any entity . . . ."  *Id.* at 77197.  As noted, "any entity" could mean "any *one* entity."  Or, it could mean "all entities in the chain of distribution with respect to a particular drug unit."

Nevertheless, the Relator insists that certain statements made by CMS in the final rule issued on July 17, 2007, 72 Fed. Reg. 39198, "confirm that manufacturers are required to aggregate price concessions provided to different entities."  ECF 117 at 13.  In particular, the Relator directs the Court's attention to the following passage, 72 Fed. Reg. at 39199:

> Comment: One commenter requested that when best price is determined, customary prompt pay discounts extended to wholesalers should not be aggregated with price concessions available to an end-customer under a contract administered through a

wholesaler chargeback arrangement, regardless of whether the manufacturer negotiated the contract directly with the end-customer or with a third party.

Response: We do not agree. As we have previously stated, there is no basis to exclude these discounts. Both the customary prompt pay discounts and other price concessions available to the end-customer are to be included in the determination of best price.

As I observed in my Memorandum Opinion of November 6, 2020 (ECF 92), "the situation described in this example is not directly analogous to Forest's situation" because "the different price concessions . . . actually function as price concessions to the single entity—the wholesaler." *Id.* at 40. "Therefore," I concluded that "CMS's instruction did not actually clarify whether there is a requirement to aggregate concessions [to] multiple entities in separate arrangements." *Id.*[24]

I remain persuaded that the chargeback arrangement described by CMS does not clearly establish that Forest was obligated to aggregate concessions separately awarded to multiple entities. A diagram included in the Amended Complaint, titled "Example of How Prompt Payment Discounts in Chargeback Situations Affect the Net Amount Realized by the Manufacturer," illustrates why, ECF 16, ¶ 38:

---

[24] Judge Wilkinson, writing for the Fourth Circuit panel majority, agreed. *See Sheldon II*, 24 F.4th at 355. He wrote that the chargeback arrangement "functions as a lagged concession to the wholesaler and is properly included in a Best Price calculation because it affects the price available to a single entity." *Id.*



**Figure 1: Example of How Prompt Payment Discounts in Chargeback Situations Affect the Net Amount Realized by a Manufacturer**

The diagram shows two price concessions.  First, the manufacturer awards the wholesaler a "2 percent prompt payment discount."  Second, the manufacturer "pays [the] wholesaler [a] $0.30 chargeback—the difference between the price ($1.00) and the price negotiated between the manufacturer and the" end customer.  The important point is that both of these concessions are awarded to a single entity: the wholesaler.  Therefore, CMS's statement in the final rule of July 17, 2007, that a manufacturer must aggregate prompt-pay and chargeback concessions does not address the aggregation of concessions extended to multiple entities along the distribution chain. It follows that CMS's statement in the final rule of July 17, 2007, does not provide a basis for attributing to Forest a culpable mental state under the FCA.

The Relator also suggests that the McKenna Letter (ECF 16, ¶ 48; ECF 112-5) establishes that Forest acted with a culpable mental state.  As noted, in the McKenna Letter, submitted by counsel for Forest to CMS on February 20, 2007, counsel wrote, *id.* at 3 (emphasis added):

> At this stage, it is difficult to determine whether rebate liability will be increased due to changes to the calculation of AMP and best price; however, *such an increase*

*is likely should the final rule alter the statutory definition of best price to require aggregation of separate discounts to distinct and unrelated entities if the discounts are 'associated with' the same unit of a product.*

Counsel for Forest also said, *id.* at 14 (emphasis added):

The statutory definition of best price has always been interpreted to mean the single lowest price to a particular customer unless the customer or transaction is exempt. However, *language in the preamble to the proposed rule suggests that CMS views best price as the net amount realized by the manufacturer on a sale rather than the lowest price to a particular customer.* It is critical that the final rule clarify that only discounts and price concessions to the same entity to which a drug is sold should be included in the computation of best price to that entity.

According to the Relator, Forest "acted with deliberate ignorance [or reckless disregard] by hiring an attorney to ask CMS to change its regulations because [Forest] knew that CMS viewed Best Price as the '*net amount realized*' whereas [Forest was] reading Best Price as the single highest rebate paid to a single entity." ECF 117 at 32 (emphasis in ECF 117). The McKenna Letter is, on its face, plainly inconsistent with the Relator's contention. In particular, the McKenna Letter states: "The statutory definition of best price has always been interpreted to mean the single lowest price to a particular customer . . . ." ECF 112-5 at 14. Therefore, to the extent that the McKenna Letter discloses Forest's subjective beliefs regarding the meaning of "Best Price," it indicates that Forest believed its practice of reporting "the single lowest price to a particular customer" was consistent with the prevailing understanding of "Best Price." *Id.*

Forest's stated concern that certain language in the preamble to the proposed rule "suggest[ed]" an inconsistent interpretation does not suffice to establish actual knowledge, deliberate ignorance, or reckless disregard. *Id.* At most, this statement confirms that Forest recognized ambiguity in the meaning of "Best Price." But, recognition of ambiguity is not equivalent to deliberate ignorance or reckless disregard.

In his dissent in *Sheldon II*, Judge Wynn wrote that even if "lack of authoritative guidance precludes '*actual* knowledge' – which it shouldn't – it certainly could not preclude a finding of

'*deliberate ignorance*.'"  *Sheldon II*, 24 F.4th at 369 (Wynn, J., dissenting) (quoting 31 U.S.C. § 3729(b))  (emphasis in *Sheldon II*).  As Judge Wynn explained, the FCA's knowledge "standard is intended to reach the 'ostrich' type situation where an individual has 'buried his head in the sand' and failed to make simple inquiries which would alert him that false claims are being submitted.'"  *Id.* at 369–70 (Wynn, J., dissenting) (cleaned up) (quoting S. Rep. 99-345 at 21).

In my view, Forest's request for clarification is precisely the kind of "simple inquir[y]" that Congress intended to encourage.  *Sheldon II*, 24 F.4th at 369 (Wynn, J., dissenting).  The FCA's scienter standard should not be interpreted to penalize regulated entities for efforts to ascertain the enforcement positions of regulating agencies.  Indeed, it would be perverse to attribute deliberate ignorance or reckless disregard to Forest on the basis of a statement it made to CMS in an effort to clarify its obligations regarding the reporting of "Best Price."

I am also unpersuaded that the Reed Smith Letter (ECF 112-6), the Covington Letter (ECF 112-7), or the PhRMA Letter (ECF 112-8) provide a basis for attributing to Forest any of the three culpable mental states under the FCA.  As I have previously observed, *see* ECF 92 at 41, none of these letters acknowledges a requirement to aggregate discounts to multiple entities.  In fact, the letters clearly affirm the manufacturers' belief that they were *not* required to aggregate concessions to multiple entities.

For example, the Reed Smith Letter, which was prepared by counsel for an "anonymous leading pharmaceutical company," ECF 16, ¶ 52 , states, ECF 112-6 at 10:

> [T]he BP [best price] is the single lowest price at which the manufacturer sells the product to a single customer.  Thus, it is inappropriate to require a manufacturer to 'stack' discounts offered at one level of the pharmaceutical delivery system (e.g., to a wholesaler) on top of discounts offered at a completely different level of that system (e.g., to a retailer or health plan).

And, the PhRMA Letter provides, in part, ECF 112-8 at 18 (emphasis in ECF 112-8):

"By statute, Best Price is the lowest price available from the manufacturer 'to any wholesaler, retailer, provider, health maintenance organization, nonprofit entity, or governmental entity' . . . . Therefore, the preamble language must be read to mean that Best Price is the lowest price realized by the manufacturer net of all price concessions to a specific Best Price-eligible customer. Best price is not calculated as a price derived by aggregating price concessions to different customers. And nothing in the statute, the Medicaid Rebate Agreement, or other guidance issued by CMS would support such an interpretation.

As indicated, Sheldon also cites a rule finalized by CMS in February of 2016. *See* ECF 117 at 13–14 (citing 81 Fed. Reg. 5710 (Feb. 1, 2016)). Because this rule was issued after the period during which Forest submitted its alleged false reports, it could not have affected Forest's scienter. In any event, the rule does not clearly require aggregation. In the excerpted passage, CMS acknowledged, but did not attempt to refute, a commenter's observation that "neither the preamble nor the regulatory text of the proposed rule specifically address stacking." 81 Fed. Reg. at 5252. And, although CMS addressed a situation in which "a manufacturer offers multiple price concessions to two entities for the same drug transaction," it did so by repeating that "all discounts related to that transaction which adjust the price *available from the manufacturer* should be considered . . . when determining the best price to be reported for the drug." *Id.* at 5253 (emphasis added).

As noted, the use of the term "available from" suggests that the price in question is the price in a bilateral transaction between the manufacturer and a customer. Such a price is determined by considering the rebates available only to that customer. Therefore, even if the 2016 rule were relevant to scienter, it would not provide a sufficient basis on which to conclude that Forest "knowingly" submitted false price reports, because it simply repeats an ambiguous definition of "Best Price." 31 U.S.C. § 3729(a)(1).

I address, finally, the significance of the alleged audit by which Forest sought to identify cases in which multiple rebates were paid to different purchasers of the same drug units. *See* ECF

16, ¶¶ 69–71.  According to the Relator, Forest "implemented [the] data audit process" because it was "[a]ware of [its] potential Best Price violation based upon double rebate claims from its customers."  *Id.* ¶ 43.  In contrast, Forest claims that it conducted the audit "for entirely legitimate business reasons," namely, "to eliminate duplicate rebate payment to [certain] customers."  ECF 112-1 at 33.

As I see it, the Relator's allegation that Forest conducted an audit intended to identify instances of double rebates is, without more, insufficient to plead scienter.  The Relator has not pleaded any specific facts that would substantiate the contention that the audit was undertaken with a culpable mental state.  And, there are any number of benign "'alternative explanation[s]'" for Forest's decision to conduct the audit.  *Iqbal*, 556 U.S. at 682 (quoting *Twombly*, 550 U.S. at 567).  Absent specific allegations concerning the purpose of the audit, the Relator's claim that Forest conducted the audit in an effort to rectify a reporting practice it knew or suspected to be wrong is a "conclusory" allegation "not entitled to be assumed true."  *See Iqbal*, 556 U.S. at 681.

In sum, the Relator's allegations, if true, establish at most that Forest received a series of instructions regarding "Best Price" that were equivalent in their ambiguity to the hypothetical instruction in *Schutte* to drive at a "reasonable" speed.  In the example from *Schutte*, an officer provided a clarifying instruction specifying that a "reasonable" speed was one under 50 miles per hour.  In contrast, CMS never told Forest that calculation of "Best Price" required the aggregation of concessions made to multiple entities in the chain of distribution for a single drug unit. If described by way of the analogy in *Schutte*, CMS is like a police officer who, in purporting to clarify the meaning of "reasonable," says, "A reasonable speed is a speed that is reasonable," and expects the driver to know what speed is too fast.

Under the circumstances attendant here, the Relator has failed to allege that Forest acted with the requisite scienter.  Therefore, the Relator's claims under the FCA are subject to dismissal. The Relator's claims under the state equivalents to the FCA are also subject to dismissal, because the states construe their FCA statutes in accordance with the federal FCA standards.

## C.

Forest devotes most of its argument in the Motion to the question of falsity.  In *Sheldon II*, the Court declined to reach the issue of falsity, instead deciding the case solely on the issue of scienter.  *Sheldon II*, 24 F.4th at 346 n.2.

"To satisfy th[e] [falsity] element of an FCA claim, the statement or conduct alleged must represent an objective falsehood."  *Wilson*, 525 F.3d at 377 (citations omitted).[25]  There is some Fourth Circuit authority addressing the circumstances under which a statement based on a disputed interpretation of the law may be "false," but that authority is less than clear.

In *Wilson*, 525 F.3d at 374, the defendant, a contractor with the Department of Defense, agreed to a contract by which it was obligated, *inter alia*, to "provide the equipment, tools, parts and personnel needed for the maintenance and repair of" certain vehicles. (Internal quotation marks omitted).  The relators alleged that the defendant defaulted on the contract by "fail[ing] to change the oil or replace fuel filters and damaged windshields" of "convoy trucks." *Id.*  According to the relators, the defendant's agreement to the contract "constitute[d] a false statement because [the defendant] agreed to the maintenance conditions in the contract even though it knew it would not, and later did not, abide by those terms." *Id.* at 377.

---

[25] The requirement that a "falsehood" be "objective" is curious, because the term "subjective falsehood" is, to my mind, an oxymoron.

56

The Fourth Circuit disagreed. It stated that "differences in interpretation growing out of a disputed legal question are . . . not false under the FCA." *Id.* (citations and internal quotation marks omitted). And, the Court determined that the relators' "assertion [of falsity] rests not on an objective falsehood, as required by the FCA, but rather on the Relators' subjective interpretation of [the defendant's] contractual duties." *Id.* The Court explained, *id.* (citation omitted):

> Relators do not claim that the maintenance provisions in the contract set forth anything resembling a specific maintenance program for the convoy trucks. Likewise, they make no contention that representations were made concerning specific acts of maintenance that [the defendant] knew it lacked the capacity to perform. Instead, [the defendant's] alleged defalcations involve several general and relatively vague maintenance provisions, such as keeping vehicles "in a safe operating condition and good appearance." These sorts of claims do not qualify as objective falsehoods and thus do not constitute false statements under the FCA.

However, in *United States ex rel. Drakeford v. Tuomey*, 792 F.3d 364 (4th Cir. 2015), the Fourth Circuit reached a seemingly contrary result. In that case, the relator alleged that the defendant hospital had submitted claims for reimbursement to Medicare that were disallowed by the Stark Law, 42 U.S.C. § 1395nn. *Id.* at 372. The Stark Law prohibits a hospital from claiming reimbursement from Medicare for health services provided pursuant to a referral from a physician with whom the hospital has a prohibited "financial relationship." *Id.* (citing 42 U.S.C. § 1395nn(a)(1)). The defendant contended that the referral arrangement it had adopted did not violate the Stark Law. *Id.* at 379.

After an adverse jury verdict, the defendant argued on appeal "that the district court erred by refusing to charge the jury that claims based upon differences of interpretation of disputed legal questions are not false under the FCA." *Id.* at 383. The Fourth Circuit acknowledged that it had "said as much" in *Wilson*, 525 F.3d at 377. *Drakeford*, 792 F.3d at 383. And, the Court did not indicate that it disagreed with the defendant's suggestion that the defendant's "claims [were] based upon differences of interpretation of disputed legal questions." *See id.*

57

Nevertheless, the Court declined to follow *Wilson*.  It explained, *id.* at 383–84:

Here, [the defendant] either complied with the Stark Law or it didn't.  This is an objective inquiry.  And the jury found that [the defendant], in fact, violated the Stark Law.  As a result, [the defendant's] certification that it complied with the Stark Law was false.

The Relator argues that under *Drakeford*, 792 F.3d at 383–84, "falsity is a legal issue" that "requires an objective evaluation by the court as to the meaning of the law."  ECF 117 at 29.[26] According to the Relator, by deciding the meaning of the law, a court determines "whether the claim [in question] is false, i.e., [whether] the defendant complied with the law or it didn't."  *Id.* Consistent with *Drakeford*, the Relator asks this Court to hold that the Rebate Statute, Rebate Agreement, and related regulations required aggregation, and conclude on that basis that Forest's reports were false.  *Id.* at 27.

In contrast, Forest urges the Court to heed the *Wilson* Court's statement that "'differences in interpretation growing out of a disputed legal question are . . . not false under the FCA.'"  ECF 112-1 at 29 (quoting *Wilson*, 525 F.3d at 377).  Nonetheless, Forest also appears to argue that there is, in fact, no "disputed legal question," *Wilson*, 525 F.3d at 377, because "the unambiguous plain text of the [Rebate Statute] makes clear that a manufacturer's obligation is to report the lowest price it offers to any one of the enumerated customer types."  ECF 112-1 at 18.

I am not persuaded that either party's preferred interpretation is clearly established by the unambiguous language of the Rebate Statute, Rebate Agreement, and related regulations.  As I have explained, there is considerable ambiguity in the definitions of "Best Price" contained in the materials that have been brought to the Court's attention.   Therefore, I cannot agree with Sheldon

---

[26] The Relator also suggests, ECF 117 at 29, that *Schutte*, 598 U.S. 739, "contradict[s]" the *Wilson* Court's statement, 525 F.3d at 377, to the effect that "differences in interpretation growing out of a disputed legal question are . . . not false under the FCA."  I see no basis for the Relator's assertion.  *Schutte* interpreted the FCA's scienter element, not its falsity element.

that the Rebate Statute, Rebate Agreement, and related materials clearly establish "that 'Best Price' . . . means the price actually realized . . . for a single drug unit after stacking any and all price concession to all entities." ECF 117 at 12.  Nor can I agree with Forest that these materials "make[] clear that a manufacturer's obligation is to report the lowest price it offers to any one of the enumerated customer types." ECF 112-1 at 18.  In short, the Rebate Statute, Rebate Agreement, and related regulations neither clearly require aggregation nor clearly disclaim the need for aggregation.

In such a circumstance, I am constrained to conclude that Forest did not act in violation of the Rebate Statute, as interpreted in related regulatory materials.  It is not Forest's burden to establish that the Rebate Statute affirmatively disclaims the need for aggregation.  Instead, Forest need only demonstrate that the Rebate Statute, as interpreted, does not affirmatively establish the requirement of aggregation.  And, given the Rebate Statute's ambiguity, I conclude that the Rebate Statute, as interpreted, does not affirmatively establish that Forest was required to aggregate price concessions to different entities in the distribution chain.  Absent an obligation to aggregate price concessions to different entities in the distribution chain, Forest's failure to aggregate could not have rendered its price reports false.

I do not agree with Sheldon that the proposed rule of May 26, 2023, *see* 88 Fed. Reg. 34238 (May 26, 2023), establishes the falsity of Forest's reports.  This proposed rule provides, in part, *id.* at 34260:  "CMS has concluded that 'best price' must include (or 'stack') all the discounts and rebates associated with the final price, even if the entity did not buy the drug directly from the manufacturer."

Sheldon's reference to the proposed rule of May 26, 2023, is unavailing for two reasons. First, CMS has recently disclosed that it will *not* finalize the "stacking" provision to cure any

ambiguity in the statute, in that proposed rule.  *See* ECF 121-1 at 2–3.  Instead, CMS will "pursue the collection of additional information from manufacturers related to best price stacking methodologies to better understand and inform future rulemaking."  *Id.* at 3.  If anything, then, the proposed rule suggests that CMS has considered, but declined to adopt, a provision requiring the "stacking" of discounts.

Second, even assuming that CMS had finalized the "stacking" provision and unambiguously required the aggregation of discounts, the Court would not be bound to accept as authoritative CMS's construction of the Rebate Statute and Rebate Agreement.  *See Loper*, 144 S.Ct. at 2273 ("Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority.").[27]

In sum, I conclude that no duty to aggregate arose from the Rebate Statute, Rebate Agreement, and related regulations.  Absent such a duty, Forest's failure to aggregate price concessions to different entities in the chain of distribution did not render false its price reports to the government.

### D.

In the Opposition, Sheldon asserted that, under *Chevron, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), a court must "defer to an agency's 'reasonable interpretation'

---

[27] Sheldon argued that, under *Chevron,* 467 U.S. 837, a court must "defer to an agency's 'reasonable interpretation' of an ambiguous statute."  ECF 117 at 27 (citing *Chevron*, 467 U.S. at 844).  Consistent with *Chevron*, Sheldon asserted:  "If the Court determines that the Rebate Statute and Rebate Agreement are ambiguous . . . the Court should defer to CMS' interpretation of the Rebate Statute and Rebate Agreement, including CMS' recent rulemaking efforts earlier this year."  ECF 117 at 27.  The "recent rulemaking effort[]," *id.*, to which Sheldon referred, is the proposed rule announced by CMS on May 26, 2023.  *See* 88 Fed. Reg. 34238 (May 26, 2023).

But, as indicated, CMS has indicated that it will not finalize the "stacking" provision.  And, in any event, the Supreme Court's recent decision in *Loper* abrogated the rule of *Chevron* deference.

of an ambiguous statute."  ECF 117 at 27 (citing *Chevron*, 467 U.S. at 844).  And, consistent with *Chevron*, Sheldon argued that, if "the Court determines that the Rebate Statute and Rebate Agreement are ambiguous . . . the Court should defer to CMS' interpretation of the Rebate Statute and Rebate Agreement, including CMS' recent rulemaking efforts earlier this year."  ECF 117 at 27.[28]  In contrast, Forest insisted that, under *Chevron*, "the Court should not consider these [regulatory] sources because the meaning of the Medicaid Rebate Statute is clear on its face."  ECF 112-1 at 23.

As noted, the Supreme Court's recent decision in *Loper*, 144 S.Ct. 2244, abrogated the rule of *Chevron* deference.  Therefore, I invited the parties to comment on the significance of *Loper*, if any, to their respective arguments.

In its supplemental submission, Forest asserts that *Loper*'s abrogation of *Chevron* is immaterial to the Court's assessment of the Motion "because the meaning of the Medicaid Rebate Statute is clear," and "there never was a need . . . to resort to *Chevron* deference."  ECF 126 at 1.  Sheldon likewise argues that, given the supposedly unambiguous statutory text, the "Court should conclude that the Rebate Statute and Rebate Agreement require stacking of rebates—and nothing in *Loper* impacts this analysis."  ECF 127 at 5.  Sheldon also argues that, if the Court concludes that the statutory definition of "Best Price" is ambiguous, it must, notwithstanding *Loper*, defer to CMS's reasonable interpretation of that term.  *Id.*

The Court's conclusions that Forest did not act with the requisite scienter, or submit reports that were "false" within the meaning of the FCA, in no way depend on or involve the exercise of deference to CMS's interpretation of the Rebate Statute.  Indeed, in the Court's ruling

---

[28]  The recent rulemaking effort *id.* which Sheldon referred is the proposed rule announced by CMS on May 26, 2023.  *See* 88 Fed. Reg. 34238 (May 26, 2023).

regarding falsity, the Court has interpreted the Rebate Statute for itself.  And, in the Court's ruling on scienter, the Court has attended to regulatory interpretations of "Best Price" only insofar as these may have, as Sheldon argues, given rise to a culpable mental state under the FCA.

## E.

As an alternative ground for dismissal, Forest argues that the Relator has failed to plead fraud with particularity, as required by Fed. R. Civ. P. 9(b).  ECF 112-1 at 35–38.  However, because I have concluded that the Relator failed to plead the existence of scienter or falsity, I need not address Forest's alternative argument for dismissal under Rule 9(b).  *See Rostholder*, 745 F.3d at 703 n.8 (noting that the court did not need to address defendant's argument that relator did not allege a claim under Rule 9(b) because court concluded relator failed to plead the existence of a false statement and the scienter requirement required for an FCA claim).

## F.

In his dissenting opinion in *Sheldon II*, Judge Wynn expressed concern that granting Forest's motion to dismiss would, in effect, license Forest's alleged abuse of the public fisc and contribute to the "swelling sea of fraud" against the government.  *Sheldon II*, 24 F.4th at 377 (Wynn, J., dissenting).

Congress and CMS have had years to inform manufacturers, in clear and unambiguous terms, of what was expected of them.  But, for one reason or another, neither Congress nor CMS has done so.  To the extent that Forest engaged in conduct that Congress or CMS should have proscribed, it is not this Court's role to rectify the error.

## V.       Conclusion

For the reasons discussed, I shall grant the Motion (ECF 112).  An Order follows, consistent with this Memorandum Opinion.

Date:  July 23, 2024

_____/s/_____
Ellen Lipton Hollander
United States District Judge
